# EXHIBIT 1

**Memorandum of Agreement**

**Party 1: Yao Lin (Male)**
ID Number:321026197211050034
Address: Lijing Huayuan 7-3-3, Shunyi District, Beijing

**Party 2: Jia Chen (Female)**
ID Number: 450305197602041023
Address: Lijing Huayuan 7-3-3, Shunyin District Beijing

Because Party 1 (Yao Lin) has a third party, resulting in the breakup of the family, we now agree as follows.

1. The two sides are separated from now on and calm down for six months. If Party 2 (Jia Chen) insists on divorce after six months, the man should cooperate. After the divorce, Party 2 (Jia Chen) with the weight does not change the child's surname, continue to follow the father's surname Lin, do not inform the children and both parents for the time being, so as not to hurt the children, stimulate the elderly; in both sides that the appropriate time before the public.

2. The custody of the two children goes to Party 2 (Jia Chen). After obtaining the consent of Party 2, Party 1 (Yao Lin) can visit the child at the same time and place as agreed. The number of visits is not less than four times a month, and each visit is not less than four hours.

3. The agreement is effective from the date of signature. From the date of signing, the real estate, vehicles, bank accounts and financial accounts in the name of Party 2 (Jia Chen) belong to Party 2. The vehicles, bank accounts and financial accounts in the name of Party 1 (Yao Lin) belong to Party 2 (Jia Chen). The joint account in the U.S. in the name of both parties shall belong to Party 2 (Jia Chen), and the cash and financial resources therein shall belong to Party 2 (Jia Chen) until the account is closed, and both parties agree to keep the joint account temporarily until each of them reopens a separate account.

4. The company under the name or actual control of the male party shall be owned by Party 1 (Yao Lin). Party 1 (Yao Lin) promises to pay five million dollars a year for living expenses to Party 2 (Jia Chen) and the children from the date of signing, including after the formal divorce.

5. The debts and credits in each person's name shall be enjoyed or assumed by each of them.

6. Other outstanding matters shall be agreed by both parties after separate negotiation

Party 1: Yao Lin
03/17/2014

Party 2: Jia Chen
03/17/2014

# EXHIBIT 2

Docusign Envelope ID: CA1C508D-7368-4208-95F1-B8F54246G294

Case 1:23-ap-01036-MB    Doc 28-2    Filed 05/15/25    Entered 05/15/25 22:53:40    Desc
Exhibit Declaration of Yao Lin Declaration of Jia Chen Exhibits 1 through 31    Page 4 of 251

1    **LO & LO LLP**
     JONATHAN J. LO (SBN 305306)
2    jonathan@lolollp.com
     KELVIN J. LO (SBN 314611)
3    kelvin@lolollp.com
     BRENDAN T. MOLLOY (346921)
4    brendan@lolollp.com
     506 North Garfield Avenue, Suite 280
5    Alhambra, California 91801
     Telephone: 626.289.8838
6    Facsimile: 626.380.3333

7
     Attorneys for Defendant
8    YAO LIN

9                      UNITED STATES BANKRUPTCY COURT

10                      CENTRAL DISTRICT OF CALIFORNIA

11                      SAN FERNANDO VALLEY DIVISION

12

13   In re                                    Case No. 1:23−bk−10733−MB

14   YAO LIN,                                  Adv. No. 1:23-ap-01036-MB

15                                             Chapter 7
                    Debtor.
16                                             Hon. Martin R. Barash

17   _____

     BEIJING SOUFUN SCIENCE AND              **DECLARATION OF YAO LIN IN**
18   TECHNOLOGY DEVELOPMENT CO.,             **SUPPORT OF DEFENDANT YAO LIN'S**
     LTD.,                                   **MOTION FOR SUMMARY JUDGMENT**
19                                           **OR, ALTERNATIVELY, SUMMARY**
                                             **ADJUDICATION**
20                  Plaintiff,
          v.                                 Date:
21                                           Time:
     YAO LIN,                                Place:  21041 Burbank Blvd., Crtrm 303
22                                                   Woodland Hills, CA 91367
                    Defendant.               Judge:  Hon. Martin R. Barash
23

24

25

26

27

28



Docusign Envelope ID: CA1C508D-7368-4208-9BF1-BEF5424C6294

Case 1:23-ap-01036-MB    Doc 28-2    Filed 05/15/25    Entered 05/15/25 22:53:40    Desc
Exhibit Declaration of Yao Lin Declaration of Jia Chen Exhibits 1 through 31    Page 5 of 251

# **DECLARATION OF YAO LIN**

I, YAO LIN, hereby declare:

1.      I am over 18 years of age.  I have personal knowledge of the facts set forth herein, unless stated on information and belief, and if called as a witness, I could and would competently testify thereto.

2.      On or about March 17, 2014, Jia Chen, my marital partner at the time, found out that I was having an affair.

3.      Subsequently, Jia Chen and I signed a separation agreement.  Under that agreement, our joint bank accounts in the United States were assigned to Jia Chen.  Additionally, I agreed to pay 5 million Chinese RMB to Jia Chen in alimony/child support.  In return, I maintained sole ownership of my companies which were worth approximately $120 million USD at that time. Additionally I retained ownership of my real property in Zhenjiang, China while Jia Chen retained ownership of her real property in Beijing China.  Finally, as part of that agreement, I was responsible for my own debts, and Jia Chen was responsible for her own debts.

4.      In or about August 2014, Jia Chen and I reunited, with Jia Chen agreeing to give me another chance provided that I end my affair and keep our separation agreement in place.

5.      On July 13, 2015, Jia Chen and I purchased 27487 Latigo Bay View Drive in Malibu, CA (the "Latigo Property") for $4.75 Million USD.

6.      In September 16 2015, plaintiff Beijing Soufun Science and Technology Development Co., Ltd. ("BSF" or "Plaintiff") entered into an Agreement on Settlement of Outstanding Amount and the Termination of Nominee Holding the Final Award (the "Termination Agreement") with Allscore Payment Services Co., Ltd. ("Allscore"); Beijing Zhonghan Hailian Assets Management Co., Ltd. ("Hailian"); and Nanning Xuyin Business Co., Ltd. ("Xuyin").

7.      Additionally, on September 16, 2015, Plaintiff entered into a Guarantee Contract (the "Guarantee Contract") with Beijing Longhe Trading Co. Ltd. ("Longhe"), Xuyin, and me. Under the Guarantee Contract, Xuyin, Lin and Longhe are jointly and severally liable for all obligations borne by Allscore and Hailian under the Termination Agreement.



Docusign Envelope ID: CA1C508D-7368-4209-85F1-B9E5424C6294

Case 1:23-ap-01036-MB    Doc 28-2    Filed 05/15/25    Entered 05/15/25 22:53:40    Desc
Exhibit Declaration of Yao Lin Declaration of Jia Chen Exhibits 1 through 31    Page 6 of 251

1  8.  However, in entering into the Guarantee Contract, I and the other guarantors did

2 not make any representations which we knew or believed to be false, and I had no intent to deceive

3 Plaintiff.

4  9.  I believed at that time that I, Longhe, and Xuyin were sufficiently capitalized to

5 guarantee the Termination Agreement.

6  10.  On September 29, 2017, Jia Chen and I purchased 31663 Broad Beach Road in

7 Malibu, CA (the "Broad Beach Property") with $2.82 Million USD, which included a $1.5 million

8 USD loan from East West Bank under both my name and Jia Chen's name.

9  11.  In January of 2018, Jia Chen discovered that I had regrettably continued my affair

10 after seeing messages on my phone corresponding with my mistress.

11  12.  After discovering my continued affair, Jia Chen immediately had a new divorce

12 agreement drafted and we signed the agreement. The new divorce agreement provided that Jia

13 Chen would have the rights to the properties located in America, the Latigo Property, the Broad

14 Beach Property, and our American-based joint bank accounts and finance management accounts.

15 In exchange, Jia Chen agreed to be solely responsible for the loans on the Latigo Property and

16 Broad Beach Property and, although not concurrent with the divorce, Jia Chen paid me

17 approximately $2.74 million (consisting of a $2.34 million wire to help me keep my companies

18 afloat and approximately $400,000 in payments for my legal fees).  In addition, I kept my Chinese

19 businesses, and Jia Chen gave up any community property interest in those companies. Finally, I

20 agreed to pay $100,000 per month to Jia Chen and my children, who would remain in the U.S.

21 with their mother.

22  13.  At the time that I entered the new divorce agreement, I felt that I had received a fair

23 deal from Jia Chen, and I believed that my net worth actually increased when I removed the home

24 loan liabilities.

25  14.  At the time that the new divorce agreement was signed, the Latigo Property was

26 valued at about $2.35 million USD (value of $4.75 million minus $2.4 million loan), and the Broad

27 Beach Property was valued at about $1.32 million USD (value of $2.82 million minus $1.5 million

28 loan).  The total value of the properties transferred was $3.67 million USD.



DEFENDANT YAO LIN'S DECLARATION

Docusign Envelope ID: CA1C508D-7368-4208-B5F1-BFF5424C6294

15.     On January 7, 2019, I went to the U.S. embassy in Beijing, China to notarize the transfer of Latigo Property and the Broad Beach Property to Jia Chen.

16.     In May of 2019, a Memorandum of Understanding with Wirecard confirmed that my company, Allscore, was worth 800 million Chinese RMB as of May of 2019.

17.     On September 12, 2019, Jia Chen and I registered our divorce in China.    The divorce registration merely confirmed the terms of our earlier separation agreement.

18.     On November 5, 2019, Wirecard signed an agreement to buy Joydragon and Aiwu for a total of €78,695,023.

19.     At that time, I owned 100% of Joydragon, which owns 69% of Apple Consulting. Apple Consulting was the holding company of Allscore and owned 98.24% shares.

20.     The agreement recognized that the total value of Allscore was EUR 78,695,023 which was approximately $120 million USD at that time.

21.     On December 24, 2019, Jia Chen agreed to give me another chance. However, given our past history Jia Chen demanded a prenuptial agreement keeping our asset arrangements from the previous agreements and maintaining our financial lives as seperate. As part of the prenuptial agreement, I agreed to continue paying $150,000.000 each month to Jia Chen and my children.

22.     On December 30, 2019, deciding to give our marriage another chance for the sake of our children, Jia Chen and I remarried.

23.     In January of 2020, I moved to the United States and became a United States permanent resident in order to reunite with my family and be closer to them.

24.      In June of 2020, Wirecard was embroiled in a scandal and went bankrupt never fulfilling its contractual agreements with Allscore. As a result, Allscore's business was suspended by the People's Bank of China and Allscore lost its income.

25.     In March of 2021, the $1.5 million mortgage on the Broad Beach Property, which was still under both my name and Jia chen's name, was paid off by Jia Chen, who borrowed a new loan from East West Bank under only her own name.



Adv. No. 1:23-ap-01036-MB

DEFENDANT YAO LIN'S DECLARATION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

26.     I never transferred $800,000.00 from any East West Bank Account prior to filing my bankruptcy actions and any cash transfer that may have occurred were pursuant to my divorce agreement with Jia Chen.

I declare under penalty of perjury under the laws of the United States that the forgoing is true and correct. Executed this 15th day of May, 2025.



DocuSigned by:

YAO LIN

1F647CB57BF5466...

YAO LIN



5

Adv. No. 1:23-ap-01036-MB

DEFENDANT YAO LIN'S DECLARATION

# EXHIBIT 3

1   **LO & LO LLP**
    JONATHAN J. LO (SBN 305306)
2   jonathan@lolollp.com
    KELVIN J. LO (SBN 314611)
3   kelvin@lolollp.com
    BRENDAN T. MOLLOY (346921)
4   brendan@lolollp.com
    506 North Garfield Avenue, Suite 280
5   Alhambra, California 91801
    Telephone: 626.289.8838
6   Facsimile: 626.380.3333

7
    Attorneys for Defendant
8   YAO LIN

9                    UNITED STATES BANKRUPTCY COURT

10                    CENTRAL DISTRICT OF CALIFORNIA

11                    SAN FERNANDO VALLEY DIVISION

12

13   In re                                  Case No. 1:23−bk−10733−MB

14   YAO LIN,                               Adv. No. 1:23-ap-01036-MB

15                                          Chapter 7
              Debtor.
16                                          Hon. Martin R. Barash

17   BEIJING SOUFUN SCIENCE AND             **JIA CHEN'S DECLARATION IN**
18   TECHNOLOGY DEVELOPMENT CO.,            **SUPPORT OF DEFENDANT YAO LIN'S**
     LTD.,                                  **SEPARATE STATEMENT IN SUPPORT**
19                                          **OF MOTION FOR SUMMARY**
                                            **JUDGMENT OR, ALTERNATIVELY,**
20            Plaintiff,                    **SUMMARY ADJUDICATION**
        v.
21                                          Date:
     YAO LIN,                               Time:
22                                          Place:  21041 Burbank Blvd., Crtrm 303
              Defendant.                            Woodland Hills, CA 91367
23                                          Judge:  Hon. Martin R. Barash

24

25

26

27

28



Docusign Envelope ID: CA16508D-7368-4209-BEF1-BF55424C6294

Case 1:23-ap-01036-MB    Doc 28-2    Filed 05/15/25    Entered 05/15/25 22:53:40    Desc
Exhibit Declaration of Yao Lin Declaration of Jia Chen Exhibits 1 through 31    Page 11 of 251

1      **<u>DECLARATION OF JIA CHEN</u>**

2      I, JIA CHEN, hereby declare:

3      1.      I am over 18 years of age.  I have personal knowledge of the facts set forth herein,

4      unless stated on information and belief, and if called as a witness, I could and would competently

5      testify thereto.

6      2.      On or about March 17, 2014, I, Yao Lin's partner, found out Yao Lin was having

7      an affair.

8      3.      Subsequently, Yao Lin and I signed a separation agreement.  Under that agreement,

9      our joint bank accounts in the United States were assigned to me. Additionally, Yao Lin agreed to

10     pay 5 million Chinese RMB to me in alimony/child support.  In return Yao Lin maintained sole

11     ownership of his companies which were worth approximately 120 million dollars at that time.

12     Additionally LIN retained ownership of his real property in Zhenjiang, China while I retained

13     ownership of my real property in Beijing, China.  Finally, each party was responsible for their own

14     debts.

15     4.      In or around August of 2014, I reunited with Yao Lin, I agreed to give him another

16     chance provided that he ended his affair and kept our separation agreement in place.

17     5.      On July 13, 2015, Yao Lin and I purchased 27487 Latigo Bay View Drive in

18     Malibu, CA (the "Latigo Property") for $4.75 million USD.

19     6.      On September 29, 2017, Yao Lin and I purchased 31663 Broad Beach Road in

20     Malibu, CA (the "Broad Beach Property") for $2.82 million USD, which included a $1.5 million

21     USD loan from East West Bank under both of our names.

22     7.      In January of 2018, I discovered that Yao Lin had continued his affair after seeing

23     messages on his phone corresponding with his mistress.

24     8.      After discovering his continued affair, I immediately had a new divorce agreement

25     drafted, and we signed the agreement.  The new divorce agreement provided that I would have the

26     rights to the properties located in the United States, the Latigo Property, the Broad Beach Property,

27     and our American-based joint bank accounts and finance management accounts. In exchange, I

28     agreed to be solely responsible for the loans on the Latigo Property and the Broad Beach Property,



2

Adv. No. 1:23-ap-01036-MB

JIA CHEN'S DECLARATION

Docusign Envelope ID: CA1C508D-7368-4203-8EF1-BEF5424CC294

Case 1:23-ap-01036-MB    Doc 28-2    Filed 05/15/25    Entered 05/15/25 22:53:40    Desc
Exhibit Declaration of Yao Lin Declaration of Jia Chen Exhibits 1 through 31    Page 12 of 251

and I paid Yao Lin approximately $2.74 million (consisting of a $2.34 million wire to help him keep his companies afloat and approximately $400,000 in payments for his legal fees). In addition, Yao Lin kept his Chinese businesses, and I gave up any community property interest in those companies. Finally, Yao Lin agreed to pay $100,000 per month to me and my children, who would remain in the United States with me.

9.     At the time that I entered the new divorce agreement I felt that I had received a fair deal from Yao Lin.

10.     At the time that the new divorce agreement was signed, the Latigo Property was valued at about $2.35 million (value of $4.75 million minus $2.4 million loan), and the Broad Beach Property was about $1.32 million (value of $2.82 million minus $1.5 million loan).  The total value of the properties transferred was $3.67 million USD.

11.     In November 2018, the Latigo Property was destroyed in the Woolsey Fire.  At the time, the Latigo Property had no insurance coverage.

12.     In November and December 2018, I wrote applications for disaster relief funds to FEMA and the Malibu Emergency Relief Fund.  In both application letters, I wrote that Yao Lin and I were separated and in divorce proceedings.

13.     On January 7, 2019, Yao Lin went to the U.S. embassy in Beijing, China to notarize the transfer of the Latigo Property and the Broad Beach Property to me.

14.     At the time that Yao Lin notarized the transfers to me, the Latigo Property was only a burnt and empty plot of land, and it still had a $2.2 million USD loan on it.  Thus, at that time the net value of the Latigo Property was about $0 dollars.

15.     I have paid the loans on the Latigo Property and the Broad Beach Property by myself since January 2018.

16.     On March 18, 2019, grant deeds for the Latigo Property and the Broad Beach Property were recorded reflecting a change in title to me as my sole and separate properties.

17.     In September 2019, after a year of separation, I found out Yao Lin had wired money to his mistress, so I contacted a lawyer to finalize the divorce.



3

Docusign Envelope ID: CA1C508D-7368-4208-BEF1-B8F5424C6294

18.    On September 12, 2019, Yao Lin and I registered our divorce in China.  The divorce registration merely confirmed the terms of our earlier separation agreement.

19.    On December 24, 2019, I agreed to give Yao Lin another chance. However, given our past history I demanded a prenuptial agreement keeping our asset arrangements from the previous agreements and maintaining our financial lives as sperate. As part of the prenuptial agreement, Yao Lin agreed to continue paying $150,000.000 a month to me and my children.

20.    On December 30, 2019, deciding to give our marriage another chance for the sake of our children, Yao Lin and I remarried.

21.    In March 2021, the $1.5-million mortgage on the Broad Beach Property, which was still under both Yao Lin's name and my name, was paid off by me, as I borrowed a new loan from East West bank under only my own name.

I declare under penalty of perjury under the laws of the United States and California that the foregoing is true and correct. Executed this 15th day of May, 2025.



Signed by:

Jia Chen

236B4FBDA8D8448...

JIA CHEN



Adv. No. 1:23-ap-01036-MB

JIA CHEN'S DECLARATION

# EXHIBIT 4

## Re: Personal life

From: Amy Lee (amychanglee@yahoo.com)

To:    jiachenly@yahoo.com

Date:  Tuesday, March 18, 2014 at 08:13 PM PDT

Dear Jia,
I am so shocked and sad to hear your news!  What happened?  I just saw you two in
December and things seemed to be fine.  Have you guys tried marriage counseling?  Terry
and I used counseling at two different times after we were married and they were really helpful
for keeping us together.  Would Yao be willing to try it now?  If he has wronged you, would
you be willing to forgive him?  You have gone through so much together.  Whatever happens,
know that I support you as a friend.  Call if you want to talk; we can even Skype.  You are in
my prayers.
love, Amy

On Tuesday, March 18, 2014 10:53 PM, "jiachenly@yahoo.com" <jiachenly@yahoo.com> wrote:
Dear Amy,

Tell you a personal news, bad one -- Yao and I has separated and plan to finalize divorce in
6 months.

I am so sad and heartbroken. But it is life.  Finally I survive after long term sadness.

I am taking care two babies, whom are with me, but will try  not to infect my work. so you
do not need to worry about.

As a friend, you also do not need worry about me. The worst time already past and now I
am peaceful.  I still believe in love and have confidence I definitely may find someone who
loves me and my adorable two babies.

Cheers,

Jia

发自我的 iPhone

# EXHIBIT 5

**RECORDING REQUESTED BY:**
Stewart Title Company

**AND WHEN RECORDED MAIL TO:**

Mr. Yao Lin and Mrs. Jia Chen
5579 Angelus Ave
San Gabriel, CA. 91776



07/13/2015

*20150836276*

THIS SPACE FOR RECORDER'S USE ONLY:

## GRANT DEED

**Title Order No.: 01180-145974**          **Escrow No.: 003427**          AP#: 4460-035-010

THE UNDERSIGNED GRANTOR(S) DECLARE(S)

**DOCUMENTARY TRANSFER TAX is $5,225.00**

[X] computed on full value of property conveyed, or
[ ] computed on full value less value of liens or encumbrances remaining at time of sale.
[ ] Unincorporated area   [X] City of Malibu **AND**

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,
**Mark A. Newman and Janet L. Newman, Husband and Wife as Joint Tenants**

hereby GRANT(s) to:
**Yao Lin and Jia Chen, Husband and Wife as Community Property with Right of Survivorship**

the real property in the City of Malibu, County of Los Angeles, State of California, described as:

COMPLETE LEGAL DESCRIPTION IS ATTACHED HERETO AS EXHIBIT "A" AND MADE A PART HEREOF

Also Known as: 27487 Latigo Bay View Drive, Malibu, CA 90265

Dated May 15, 2015

Mark A. Newman

Janet L. Newman

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF Los Angeles
On 5/15/15 before me, Kimberly D. Mallas          A Notary Public personally
appeared Mark A. Newman and Janet L. Newman          who proved to me on the basis
of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Signature _____

KIMBERLY D. MALLAS
Commission # 1992091
Notary Public - California
Ventura County
My Comm. Expires Sep 23, 2016

(Seal)

MAIL TAX STATEMENTS TO PARTY SHOWN BELOW; IF NO PARTY SHOWN, MAIL AS SHOWN ABOVE:

16

## LEGAL DESCRIPTION
## EXHIBIT "A"



**The land referred to herein is situated in the State of California, County of Los Angeles, City of Malibu and described as follows:**

Parcel 1:
Lot 10, of Tract No. 46851, in the City of Malibu, County of Los Angeles, State of California, as per map recorded in Book 1171 Pages 62 to 73, inclusive of Maps, in the Office of the County Recorder of said County.

Excepting therefrom all minerals, oil, petroleum, asphaltum, gas, coal and other thereof, but without surface right of entry, as reserved by Marblehead Land Company, in deed recorded March 4, 1947 as Instrument No. 1036 in Book 24232, Page 380, of Official Records.

Parcel 2:
An easement for road purposes and ingress and egress over those certain strips of land designated as "Private Driveway and Fire Lane" and "Private Streets", as designated and delineated on the map of said Tract No. 46851.

APN: 4460-035-010



**This page is part of your document - DO NOT DISCARD**



# 20150836276



**Pages:**
**0003**

**Recorded/Filed in Official Records**
**Recorder's Office, Los Angeles County,**
**California**

**07/13/15 AT 08:00AM**

| | |
|---|---|
| FEES: | 25.00 |
| TAXES: | 5,225.00 |
| OTHER: | 0.00 |
| PAID: | 5,250.00 |



**L E A D S H E E T**



201507130170002

00010850904

006955034

**SEQ:**
**16**

DAR - Title Company (Hard Copy)



**THIS FORM IS NOT TO BE DUPLICATED**

T19

EXHIBIT 6

Re: update of my personal life                                      #3

From: Amy Lee (amychanglee@yahoo.com)

To:    jiachenly@yahoo.com

Date:  Tuesday, August 5, 2014 at 08:27 PM PDT


Dear Jia,

I am so happy to hear that Lin Yao came back! It is not surprising that the babies love him.
They are old enough to know the difference between girls and boys and they know that their
father is male like them. It's good for them to have Lin Yao back, as long as you are at peace
about it. It is also natural that you feel differently about him than before. He has hurt you
deeply and you had to prepare your mind and heart for living without him. However, I do
believe that true forgiveness is possible; and that you can learn to love him again. It will not
be same love of your CUPL days that you had kept for decades. It might be a more quiet kind
of feeling, maybe based initially just on appreciation of his love for your sons, but grows as he
earns your trust again. This different kind of love can be enough of a basis for sustaining your
marriage, if you allow it. The first step, however, is forgiveness; as you will never love him if
you do not forgive him. For me, I am able to forgive someone who has hurt me only when I
focus on how God has forgiven me. I am not a forgiving person when I rely on my own
feelings. I can love others because Jesus loves me. I will continue to pray for you and for
your marriage, Jia.

I am extremely grateful for your help for Steve. You gave him such a fantastic start and put
him on a good footing for his RLA term. It was also a joy to me personally to have you back
on the team. Although I myself would much rather keep you than have Dong Yue
return, we cannot force that to happen. I hope you will be open to the possibility of working
for the Embassy again in the future. Steve has told me that Dong Yue plans to leave Beijing in
a few years (please do not let anyone know this, and do not tell Steve that I shared this
information with you). Maybe the timing will work out with your return to full time work. It
would be terrific to have you back.

Yes, Terry finally finished his PhD! He successfully defended his thesis in early June. He is
still working at the same place, on a Post-doctoral fellowship and will do so for a year while
he looks for another job. The girls are fine, growing into young ladies. Hannah is starting high
school in three weeks; she is too shy to have a boyfriend yet. Lydia I will have to worry about.

My best to you, also,
love,
Amy


On Tuesday, August 5, 2014 11:02 AM, "CHEN, Jia" <jiachenly@yahoo.com> wrote:

Dear Amy,

Just some update of my life.

Lin Yao went back home. He feels sorry and regret, saying he never think of leaving me and the seperation with me & children makes him in a terrible life. I allowed him back mainly because my babies love him so much. Every weekend, when he came home to visit kids, they laugh and huged him tightly with big smile. Actually I do not understand why they like him so much.  But to be honest, I have no such feeling on him as same as before. He was my whole world in the past, however, I did not feel that way. I did not know if it is right to have him back, and I am also not sure if our marrige may continue because of the lack of love between us.  I do not know, I do not know.  Luckily, kids and I would have enough property to live on, and we do not need to worry about money even if our marriage finally is not able to work out.

Aug 29 is my last date in the Embassy, and I really  appreciate you and Steve to give this opportunity to me.  I have a very happy time in the office in the past four months.  After it, I probably will seek a part time job in an international NGO or a charity in Beijing. Part time job would makes me have more time to take care my beloved babies, who are more and more funny; however, a good part time job is not easy to find in China, and most likely I will stay at home until they go to pre-school next summer. They are so adorable, and I never knew child is such a wonderful little thing :).  I cannot stop smile every time when I think about them, for example, NOW.

How are you?  Did Terry finish his study?  May I call you Mrs. Dr. Lee?  How are girls?  Pls do not tell me that Hannah already has BF.  In my memorry, they are still small girls eating in my dinning room.

Best wishes to you, my dear friend.

Jia

# EXHIBIT 7

1    PILLSBURY WINTHROP SHAW PITTMAN LLP
     RONALD L. CHENG (CA Bar Number 138892)
2    ronald.cheng@pillsburylaw.com
     725 South Figueroa Street, 36th Floor
3    Los Angeles, CA 90017-5524
     Telephone:  213-488-3631
4    Facsimile:  225-754-4143

5
     MICHELLE K. NG (admitted *pro hac vice*)
6    michelle.ng@pillsburylaw.com
     31 W. 52nd Street
7    New York, New York 10019-6131
     Telephone: 212-858-1195
8

9    *Attorneys for Respondent Yao Lin*

10

11                     **UNITED STATES DISTRICT COURT**

12                    **CENTRAL DISTRICT OF CALIFORNIA**

13                          **WESTERN DIVISION**

14

15   Beijing SouFun Science and Technology        **RESPONDENT YAO LIN'S**
     Development Co., Ltd., a People's Republic of  **MEMORANDUM OF POINTS AND**
16   China corporation,                            **AUTHORITIES IN SUPPORT OF**
                                                    **OPPOSITION TO PETITION FOR**
17                      Petitioner,                 **CONFIRMATION, RECOGNITION, AND**
                                                    **ENFORCEMENT OF FOREIGN**
18               v.                                 **ARBITRATION AWARD**

19
     Yao Lin, an individual,                        **Judge: Hon. André Birotte Jr., United**
20                                                  **States District Judge**
                        Respondent.                 **Courtroom: 7B**
21

22

23

24

25

26

27

28
                                    1

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................................5

II. FACTUAL BACKGROUND ..............................................................................................6

    A.     THE CONTRACTUAL AGREEMENTS ....................................................................6

    B.     THE 2017 ARBITRAL AWARD..............................................................................7

    C.     THE 2019 ARBITRAL AWARD..............................................................................8

          (1)    The Xiamen Bank Loan ..............................................................................8

          (2)    Petitioner's Claim for Penalty Interest...........................................................10

          (3)    The 2019 Award ........................................................................................10

                 a.     The Tribunal's Attempt to Reconcile the 12-28-2015 Loan with the Settlement Agreement.....................................................11

                 b.     The Tribunal's Imposition of Penalty Interest .....................................12

III. THE TRIBUNAL ACTED OUTSIDE ITS AUTHORITY WHEN IT IMPOSED OBLIGATIONS BEYOND THE RELEVANT AGREEMENTS ..........................................14

    A.     Overview of Standard for Confirming the Arbitral Award .........................................14

    B.     The 2019 Award Should Not Be Confirmed Because It Is Premised On the 12-28-2015 Loan that Was Outside the Scope of the Arbitration Agreement .................16

    C.     The Award Should Not be Confirmed Because the Award of RMB 66,784,745.30 Penalty Interest Component Is Not Within the Scope of the Termination Agreement .............................................................................................20

    D.     Recognition of the 2019 Award Is Moot as There Are No Damages Due Petitioner Once Those Parts of the Award Corresponding to the 12-28-2015 Loan and Penalty Interest Are Eliminated ..................................................................22

IV. CONCLUSION..................................................................................................................23

4873-2262-2267

**TABLE OF AUTHORITIES**

**Page(s)**

<u>Cases</u>

*Advanced Micro Devices, Inc. v. Intel Corp.*,
9 Cal. 4th 362 (1994) ............................................................................................15, 20

*Al-Qarqani v. Chevron Corp.*,
8 F.4th 1018 (9th Cir. 2021) .......................................................................................18

*Aspic Eng'g & Constr. Co. v. ECC Centcom Contrs., LLC*,
268 F. Supp. 3d 1053 (N.D. Cal. 2017) .....................................................................15

*Aspic Eng'g and Constr. Co. v. ECC Centcom Constrs. LLC*,
913 F.3d 1162 (9th Cir. 2019) ..............................................................................15, 19

*AT&T Techs., Inc. v. Communications Workers of America*,
475 U.S. 643 (1986)................................................................................................15, 19

*Dastime Group Ltd. v. Moonvale Invs. Ltd.*,
No. 17-cv-01859-JSW, 2017 WL 4712179 (N.D. Cal. Oct. 11, 2017) ......................15

*Hall Street Assocs. v. Mattel, Inc.*,
552 U.S. 576 (2008)......................................................................................................22

*Keebler Co. v. Milk Drivers and Dairy Emps. Union, Local No. 471*,
80 F.3d 284 (8th Cir. 1996) ..............................................................................19, 20, 21

*Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*,
341 F.3d 987 (9th Cir. 2003) (*en banc*) .....................................................................15

*Management & Tech. Consultants S.A. v. Parsons-Jurden Int'l Corp.*,
820 F.2d 1531 (9th Cir. 1987) ....................................................................................15

*Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie du Papier (RAKTA)*,
508 F.2d 969 (2d Cir.1974)..............................................................................14, 15, 20

*Polimaster Ltd. v. RAE Sys., Inc.*,
623 F.3d 832 (9th Cir. 2010) ......................................................................................14

*Schoenduve Corp v. Lucent Techs., Inc.*,
442 F.3d 727 (9th Cir. 2006) ......................................................................................16

*Steelworkers v. Enterprise Corp.*,
363 U.S. 593 (1960)......................................................................................................15

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l, Corp.*,
559 U.S. 662 (2010)..........................................................................................17, 18, 20

3

1

*Sunshine Mining Co. v. United Steelworkers of Am.*,
    823 F.2d 1289 (9th Cir. 1987) ................................................................................15

2

### Statutes and Codes

3

4

United States Code
    Title 9, section 9....................................................................................................22
    Title 9, section 10...........................................................................................14, 16
    Title 9, sections 201-208.......................................................................................14
    Title 9, section 207........................................................................................14, 22

5

6

7

### Other Authorities

8

New York Convention, June 10, 1985, 21 U.S.T. 2517, 330 U.N.T.S. 38, art. V(1)(c)...............5, 14

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I. <u>INTRODUCTION</u>

Respondent Yao Lin ("Respondent Lin") respectfully submits this opposition to the petition to confirm arbitral award (the "Petition") filed by petitioner Beijing SouFun Science and Technology Development Co., Ltd. ("Petitioner").  The Petition seeks to confirm a three-year-old arbitral award issued in Beijing, in the People's Republic of China, by a tribunal (the "Tribunal") of the China International Economic and Trade Arbitration Commission ("CIETAC").

The award should not be confirmed, because the Tribunal exceeded its authority in two ways. First, the Tribunal exceeded the scope of the two agreements that Petitioner placed in issue when the Tribunal included sums purportedly based on a loan repayment obligation that was described in neither of those agreements.  Instead, that obligation was in a third and separate agreement that Petitioner did not present to the Tribunal in its demand or to this Court to seek confirmation. Moreover, even if the Tribunal could consider that separate agreement, the loan obligation at issue was outside the agreement's scope.  Second, the Tribunal also imposed penalty interest outside the scope of the agreement -- the interest was not based on the amounts described in the relevant agreement and, indeed, the Tribunal failed to specify the basis for that aspect of its award.

These defects in the award trigger Article V of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention" or "Convention"), which governs the recognition of the award and provides that the Court should not recognize an arbitral award if "[t]he award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration."  New York Convention, June 10, 1985, 21 U.S.T. 2517, 330 U.N.T.S. 38, art. V(1)(c). Without these components, the remaining bases of the award must also fail, either because they are based in part on these flawed components or are insufficient to overcome offsets in the award.  For the reasons herein, Respondent Lin respectfully requests this Court to deny the Petition.

///

///

///

5

## II. FACTUAL BACKGROUND

### A. THE CONTRACTUAL AGREEMENTS

Petitioner commenced this action to enforce an arbitral award (the "2019 Award") that CIETAC issued almost three years before. (Docket Control No. ("Dkt.") 1-3). Petitioner brought the underlying arbitration (the "2019 Arbitration") against Allscore Payment Services Co., Ltd. ("Allscore"), Beijing Zhonghan Hailian Assets Management Co., Ltd. ("Hailian"), Respondent Lin, and Beijing Longhe Trading Co., Ltd. ("Longhe"; collectively, "Respondents"). (*Id.*, p. 30).[1] Petitioner's arbitration demand concerned concerns two agreements. (*Id.*, p. 36).

The agreements consisted of (1) an omnibus resolution of prior obligations known as the "Termination Agreement"[2] and (2) a guarantee (the "Guarantee"). The Termination Agreement was entered into among Petitioner, Nanning Xuyin Business Co., Ltd. ("Xuyin"), Allscore, and Hailian. (Dkt. 1-4). This agreement resolved obligations that were specified in three prior "Collection Agreements" between Allscore and Petitioner.[3] The Termination Agreement provided in a "Whereas" recital that the amount due under the Collection Agreements consisted of (i) the principal amount of RMB 199,944,869; (ii) liquidated damages to be calculated as provided under one of the Collection Agreements ((i) and (ii) were referred to as the "Outstanding Amount"); and (iii) a so-called "To-Be-Settled Amount" of RMB 8,950,306.72. (*Id.*, p. 87, "Whereas" ¶ 3). The Termination Agreement stated that Hailian and Allscore would be jointly liable for the Outstanding Amount and the To-Be-Settled Amount. (*Id.*, p. 88, Art. 1(1)).

The Termination Agreement stated that Xuyin had been entrusted to hold two sets of shares of Guilin Bank under Share Certificate No. 1666 ("No. 1666 Shares") and Share Certificate No. 1667 ("No. 1667 Shares"; collectively the "Shares"). (*Id.*, p. 87, "Whereas" ¶ 1). The Termination Agreement specified that the Shares' value of RMB 173,825,091.50 would be used, effectively as a

---

[1] Unless otherwise noted, page citations refer to the certified English translation of the document.
[2] The agreement was formally entitled, "the Agreement on Settlement of the Outstanding Amount and the Termination of Nominee Holding."
[3] The Collection Agreements consisted of: (i) the "POS Collection Service Agreement," (ii) a memorandum between Allscore and Soufun for Allscore's obligations under the POS Collection Service Agreement, and (iii) a "Letter of Commitment" from Allscore to Petitioner for obligations under the POS Collection Service Agreement. (*Id.*, p. 87).

6

1   credit, to repay the amounts described above. (*Id.*, p. 88, Art. 2). The Termination Agreement noted

2   in a recital that the No. 1667 Shares were pledged to Xiamen International Bank ("Xiamen Bank") to

3   guarantee an RMB 85.52 million loan to Allscore from that bank, but did not otherwise address that

4   obligation. (*Id.*, "Whereas" ¶ 4).

5        The Guarantee was entered into among Petitioner and Xuyin as "beneficiaries" on the one

6   hand, and Respondent Lin and Longhe as "guarantors," on the other. (Dkt. 1-5). The Guarantee

7   referenced and was limited to the Termination Agreement and another agreement known as the

8   Settlement Agreement. (*Id.*, p. 99).

9        The Termination Agreement and the Guarantee each included an arbitration clause, providing

10  for arbitration of disputes arising from or in connection with the relevant agreement. (Dkt. 1-4, p. 90;

11  Dkt. 1-5, p. 101).

12  **B.   THE 2017 ARBITRAL AWARD**

13       The Petition does not mention that the 2019 Award was in fact subject to the findings and

14  decisions of a prior CIETAC arbitration commenced on June 20, 2016 (the "2017 Arbitration"). On

15  August 17, 2017, a CIETAC tribunal, on Petitioner's application, issued an award (the "2017

16  Award") with respect to the Termination Agreement and the Guarantee. (*See* Declaration of Yao Lin

17  ("Lin Decl."), Ex. J). As relevant here, the 2017 Award made the following findings as to amounts

18  due under the Termination Agreement:

| AWARD | AMOUNT |
|---|---|
| Amount owed pursuant to Termination Agreement | RMB 199,944,869.00 |
| Offset value of Shares | (RMB 173,825,091.50) |
| Difference / amount owing | RMB 26,119,777.50 |
| Amounts repaid by Allscore | (RMB 13,403,229) |
| **Total Principal under Termination Agreement** | **RMB 12,716,548.50** |

(*Id.*, pp. 163-67). Together with attorney's fees and arbitration fees, Petitioner was entitled to RMB

12,992,105.50. (*Id.*).

///

///

///

7

## C.    THE 2019 ARBITRAL AWARD

Petitioner then commenced the 2019 Arbitration, again based solely on the Termination Agreement and the Guarantee.  (Dkt. 1-3, p. 31).  Petitioner sought the following amounts:

| CATEGORY | AMOUNT |
| --- | --- |
| Amount due for the Shares | RMB 173,825,091.50 |
| "To-Be-Settled Amount" due under the Termination Agreement | RMB 8,950,306.72 |
| "Amount repaid to Xiamen International Bank" | RMB 82,567,667.30 |
| Proceeds realized from the Shares | (RMB 202,666,968) |

(*Id.*, p. 38).  Although the sum of these amounts was RMB 62,676,097.10, Petitioner sought RMB 59,243,660.97.

### (1)    *The Xiamen Bank Loan*

Petitioner also sought recovery for the first time for the so-called "amounts repaid to Xiamen International Bank."  The Termination Agreement did not describe any sort of repayment obligation and simply referred to the stock pledge for a RMB 85.52 million Xiamen Bank loan.

In fact, this loan obligation to Xiamen Bank was discussed in a separate "Settlement Agreement" entered into on the same date as the Termination Agreement among Petitioner, Allscore, Hailian, and Xuyin.  (Lin Decl., Ex. I).  The Settlement Agreement initially referred to the No. 1667 Shares that were pledged for a then-existing RMB 85.52 million loan that Allscore and Hailian were to repay to Xiamen Bank.  (*Id.*, pp. 102-03, "Whereas" ¶ 2).  This loan was pursuant to a loan agreement no. XRB14157 (the "XRB14157 Loan").  (Lin Decl., Ex. C).  After describing the stock pledge for the RMB 85.52 million loan, the Settlement Agreement provided that, if Hailian and Allscore failed to repay debts to Xiamen Bank before December 23, 2015, thereby causing Xiamen Bank to exercise the pledge on these shares, Allscore would owe Petitioner RMB 88.52 million.  (Lin Decl., Ex. I, p. 103, Art. 1(1) and (2)).[4]  Petitioner did not base its arbitration demand on the Settlement Agreement (referred to in the Arbitral Award as the "Agreement").[5]

---

[4] The Settlement Agreement does not explain the calculation of this amount, which is greater than the amount of the loan.

[5] The originals of the 2019 Award (Dkt. 1-3, p. 15, § 2(1), ¶ 2) and the Settlement Agreement (Lin Decl., Ex. I, p. 98 (title)) use the same Chinese characters (协议书).

8

1    This RMB 85.52 million Xiamen Bank loan obligation that was discussed in the Settlement

2    Agreement was the second in a series of three loans from Xiamen Bank.  The first loan arose from a

3    December 9, 2014, "Comprehensive Credit Line Contract" between Allscore and Xiamen Bank.  (Lin

4    Decl., Ex. A).  Under the Comprehensive Credit Contract, Xiamen Bank offered Allscore a line of

5    credit of up to RMB 90.123 million.  (*Id.*, p. 23).  The No. 1667 Shares that Xuyin held were also

6    pledged for repayment.  (*Id.*, p. 26).

7    On December 25, 2014, the first loan occurred, when Allscore drew RMB 90.123 million.

8    (Lin Decl., ¶ 3; Ex. B).

9    On December 26, 2014, Allscore and Xiamen Bank entered into the second loan -- the RMB

10    85.52 million loan (the XRB14157 Loan) described in the Settlement Agreement.  (Lin Decl., Ex. C).

11    Under this agreement, Xiamen Bank extended a RMB 85.52 million loan to Allscore on or about

12    December 30, 2014.  (*Id.*).  As a condition of the loan, Hailian was to pledge an RMB deposit to

13    guarantee the repayment of the loan.  (*Id.*, p. 60, Art. 7).  On the same day, Hailian deposited RMB

14    90 million at Xiamen Bank in a Certificate of Deposit (the "Certificate of Deposit"), which was

15    pledged to secure the RMB 85.52 million loan, maturing on December 26, 2015.  (Lin Decl., ¶ 5; Ex.

16    D).  On December 30, 2014, Xiamen Bank funded the XRB14157 Loan.  (Lin Decl., ¶ 6; Ex. E).

17    On or about December 25, 2015, Allscore repaid the first loan for RMB 90.123 million, which

18    corresponded to the December 25, 2014, draw.  (Lin Decl., ¶ 7).

19    On or about December 28, 2015, after the Certificate of Deposit matured, Hailian transferred

20    RMB 85,614,356.73 to repay the balance of the second loan (the XRB14157 Loan).  (Lin Decl., ¶ 8;

21    Exs. F and G).  Thus, as of December 28, 2015, the XRB14157 Loan described in the Settlement

22    Agreement was fully repaid.

23    On December 28, 2015, after the repayment date in the Settlement Agreement, Allscore

24    borrowed the third loan, for RMB 90.123 million under the Comprehensive Credit Contract (the "12-

25    28-2015 Loan").  (Lin Decl., ¶ 9).[6]

26

27    [6] In the 2019 Award, the Tribunal described the 12-28-2015 Loan as issued on December 18, 2015
28    (Dkt. 1-3, p. 60).  That appears to be a typographical error, because, on the following page, the Tribunal
     correctly states that the 12-28-2015 Loan was provided to Allscore on December 28, 2015 (*id.*, p. 61).

9

1    Nearly two years later, on September 5, 2017, Xuyin entered into an "Agreement for

2 Repayment by Guarantor" (the "Xuyin Repayment Agreement") with Xiamen Bank.  (Lin Decl., Ex.

3 H).  Xuyin agreed to "perform its guarantee liability and pay off all debts owed by [Allscore] to

4 [Xiamen Bank] under the [Comprehensive Credit Contract]," totaling RMB 82,567,667.30.  (*Id.*, pp.

5 92-93; Dkt. 1-3, p. 55).  These amounts were not included in the Termination Agreement or the

6 Settlement Agreement.

7    Respondents pointed out in the 2019 Arbitration that the Settlement Agreement applied only

8 to amounts due after execution on the pledged shares, but not to debt claims made by Petitioner after

9 repayment of the loan.  (Dkt. 1-3, pp. 46-47).

10    **(2)    *Petitioner's Claim for Penalty Interest***

11    Petitioner also sought penalty interest of RMB 66,784,745.30, based on a 0.05% per diem rate

12 from May 19, 2015, to November 30, 2017.  (Dkt. 1-3, p. 38).  In response, Respondents argued there

13 was no contractual or legal basis for this request and that the outstanding principal used to calculate

14 penalty interest was erroneous.  (*Id.*, pp. 41, 48).  Respondents further contended that Petitioner "did

15 not list the calculation process of 'penalty interest,' including calculation base, calculation period,

16 etc."  (*Id.*, p. 49).

17    **(3)    *The 2019 Award***

18    The 2019 Award initially acknowledged that the 2017 Award determined that Allscore owed

19 RMB 12,716,548.50 under the Termination Agreement.  (Dkt. 1-3, p. 56) (referring to the 2017

20 Arbitration as the "Previous Case" and the 2017 Award as the "Award of Previous Case").  In

21 addition, the RMB 173,825,091.50 value of the Shares that had been deducted in the 2017 Award was

22 due.  (*Id.*, p. 63).

23    In addressing Petitioner's claimed loan obligation to Xiamen Bank, the Tribunal reviewed the

24 Settlement Agreement.  (Dkt. 1-3, p. 52).  As noted above, Petitioner had never submitted the

25 Settlement Agreement as a subject of arbitration.  In any case, pursuant to the Settlement Agreement,

26 Allscore and Hailian agreed to repay the RMB 85.52 million owed to Xiamen Bank (the XRB14157

27 Loan) on or before December 23, 2015.  (Lin Decl., Ex. I).  The Tribunal did not address the

28

10

4873-2262-2267

1   XRB14157 Loan and instead found that Xiamen Bank extended the 12-28-2015 Loan on December

2   28, 2015, that is, five days after the December 23, 2015, repayment date stated in the Settlement

3   Agreement. (Dkt. 1-3, p. 53).

4           The Tribunal held that Respondents were liable for the amounts that Xuyin repaid in 2017 under

5   the Xuyin Repayment Agreement.   (*Id.*, pp. 55, 62; Lin Decl., Ex. H).   The Xuyin Repayment

6   Agreement specified that the 12-28-2015 Loan was the loan to be repaid by Xuyin.  (Lin Decl., Ex. H,

7   p. 92, "Whereas" ¶ 3 and Art. 1).  Neither the 12-28-2015 Loan nor Xuyin's repayments were included

8   in the Termination Agreement or the Settlement Agreement, nor could they have been, as the Settlement

9   Agreement referred to an earlier repayment date of December 23, 2015.  The Tribunal noted that while

10  "Xiamen International Bank did not exercise its pledge," Allscore failed to repay the 12-28-2015 Loan

11  on or before December 22, 2016, and therefore RMB 82,567,667.30 was to be added to the damages.

12  (Dkt. 1-3, p. 62).

13          In sum, the 2019 Award included a principal amount of RMB 55,427,195.39, consisting of the

14  following amounts (*see* Dkt. 1-3, p. 76):

| CATEGORY | AMOUNT |
|---|---|
| Amount due for the Shares | RMB 173,825,091.50 |
| "To-Be-Settled Amount" due under the Termination Agreement | RMB 8,950,306.72 |
| Repayment of the 12-28-2015 Loan by Xuyin | RMB 82,567,667.30 |
| Proceeds realized from the transfer of the Shares | (RMB 202,666,968.00) |
| Dividends received from the Shares | (RMB 7,248,901.13) |
| **Principal amount due under the Termination Agreement and the Settlement Agreement** | **RMB 55,427,195.39** |

                a.      **The Tribunal's Attempt to Reconcile the 12-28-2015 Loan with the
                        Settlement Agreement**

22          Recognizing that the 12-28-2015 Loan was not the same loan in the Settlement Agreement

23  and conceding that it did not have the relevant loan agreements (*Id.*, p. 60), the Tribunal stated that

24  "although the amounts" of the 12-28-2015 Loan and the loan specified in the Termination Agreement

25  and Settlement Agreement "were not completely consistent," the debts described in these two

26  agreements, which consisted of:

27          the loan principal of RMB 88.52 million, interest and penalty interest – just referred to
            the debt of the maximum amount of RMB 90.132 million [Allscore] owed to [Xiamen

                                              11

Bank] under Comprehensive Line of Credit Contract because pledgor, pledgee and the collateral were identical; because the term of the line of credit agreed in [the Comprehensive Credit Contract] expired on December 22, 2016, there was theoretical uncertainty on [Allscore and Hailian's] paying off all debts to [Xiamen Bank] before December 13, 2015; and, [Xiamen Bank] actually provided a loan of RMB 90.132 million to [Allscore] on December 28, 2015, thus, it was actually impossible for [Allscore] to repay all debts of Xiamen International Bank before December 13, 2015.[7]

(Dkt. 1-3, p. 61).  Despite this impossibility, the Tribunal determined that the Termination Agreement and the Settlement Agreement "acknowledged" the 12-28-2015 Loan as "debts owed to [Petitioner] by [Allscore]."  (*Id.*).  The Tribunal did not identify language in any agreement that supported this rationale or demonstrated that the Settlement Agreement was intended to extend to apply to subsequent loans such as the 12-28-2015 Loan.

Nevertheless, the Tribunal determined that because the earlier deadline "was in fact impossible, the arbitral tribunal believed that the maturity date of December 22, 2016 should be used in considering repayment."  (*Id.*).  Furthermore, the Tribunal noted that although Xiamen Bank "did not exercise its pledge" against the No. 1667 Shares – a prerequisite under the Settlement Agreement – it was reasonable to award the additional amount of RMB 82,567,667.30 for Xuyin's repayment of the 12-28-2015 Loan because "it directly led to the decrease in cash assets rather than equity assets of [Xuyin], which damaged [Xuyin's] economic interests."  (*Id.*, p. 62).  This condition was not stated in any agreement.  Indeed, at the time of the Settlement Agreement, Xuyin had not even undertaken to repay the loan, so that Allscore could not have had any derivative obligation to Xuyin.

b.  **The Tribunal's Imposition of Penalty Interest**

In addition to the foregoing amounts, the Tribunal also imposed penalty interest[8] of RMB 66,784,745.30.  Petitioner did not explain during the 2019 Arbitration how the penalty interest was calculated, except that it was based on the "outstanding amount of RMB 59,243,660.07" and at "interest rate of 0.05% per day, temporarily calculated from May 19, 2015 to November 30, 2017."

---

[7] The two references in this excerpt to "December 13, 2015," appear to be erroneous references to December 23, 2015, as stated in the Settlement Agreement.  In any case, even if December 13 applies, the Settlement Agreement could not apply to the 12-28-15 Loan for the reasons stated in the text.
[8] The original Chinese version of the 2019 Award refers to "penalty interest" (or 罚息 ("fáxī") in the original Chinese language), but the English translation refers to the same word as "penalty interest" and "liquidated damages."  The term used here is "penalty interest."

12

1    (Dkt. 1-3, p. 37).  That rate (equivalent to 18% per annum) appeared in the Letter of Commitment,

2    which was one of the Collection Agreements resolved in the Termination Agreement.  (Dkt. 1-4,

3    "Whereas" ¶¶ 3-4; Lin Decl., Ex. K).  Respondents objected to penalty interest because the basis for

4    its calculation was not explained:

5            Claimant did not list the calculation process of "penalty interest", including
        calculation base, calculation period, etc. In view of the fact that Claimant
6        refused to provide or was unable to provide the calculation process of this
        arbitration claim at all, it could be determined that it could not prove the
7        legality and rationality of this arbitration claim at all, so Claimant should bear
        the corresponding adverse consequences.

8    (*Id.*, p. 49).

9            The Tribunal agreed that Petitioner "did not provide the specific calculation method." (*Id.*.,

10   p. 77).  Nevertheless, it found penalty interest due, stating

11           The arbitral tribunal noted that [Petitioner] did not provide the specific
        calculation method of liquidated damages, but only based on the amount
12       shown in the statistical table generated from the system, and for the calculation
        based, RMB 202,666,968 of the target share price and the cash repayment
13       amount of the Respondents during the period had been deducted.  Therefore
        the arbitral tribunal believed that the amount claimed by [Petitioner] was
14       accurate.

15

16   (*Id.*).

17           As discussed above, the sums due under the Collection Agreements (including the Letter of

18   Commitment) were resolved in the Termination Agreement, which determined that principal amount

19   due under the Collection Agreements was RMB 199,944,869.  The Termination Agreement also

20   stated that "liquidated damages shall be calculated based on Letter of Commitment issued by

21   [Allscore] on May 20, 2015." (Dkt. 1-4, "Whereas" ¶ 3).  In turn, the Letter of Commitment

22   addressed amounts due that were resolved in the Termination Agreement but provided for the 0.05%

23   daily rate.  (Lin Decl., Ex. K).

24           The Tribunal determined the penalty interest was RMB 66,784,745.30.  To the Tribunal, that

25   amount represented the "outstanding amount (temporarily calculated from May 19, 2015 to

26   November 30, 2017)" based on the Letter of Commitment and that, quoting from that letter, "if

27   Allscore cannot pay [Petitioner]…all outstanding amounts as of May 29, 2015, Allscore shall pay

28

13

[Petitioner] liquidated damages based on 0.05% per day for the unpaid portion." (Dkt. 1-3, pp. 37, 77). Other than a reference to "the amount shown in the statistical table generated from the system," the Tribunal did not otherwise explain the basis for the penalty interest.

## III. **THE TRIBUNAL ACTED OUTSIDE ITS AUTHORITY WHEN IT IMPOSED OBLIGATIONS BEYOND THE RELEVANT AGREEMENTS**

### A. **Overview of Standard for Confirming the Arbitral Award**

Chapter 2 of the Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 201-208, governs awards under the New York Convention. The FAA provides:

> Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration. The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.

9 U.S.C. § 207.

The New York Convention provides that the Court may refuse to recognize an arbitral award if the award exceeds the scope of the arbitration agreement or arbitration demand:

> The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced.

New York Convention, Article V(1)(c). "When interpreting the defenses to confirmation of an arbitration award under the New York Convention, [the Court] may look to authority under" the FAA, 9 U.S.C. § 10. *Polimaster Ltd. v. RAE Sys., Inc.*, 623 F.3d 832, 836 (9th Cir. 2010); *see also Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie du Papier (RAKTA)*, 508 F.2d 969, 976 (2d Cir.1974) (cited in *Polimaster*; applying FAA caselaw to analyze Convention excess of jurisdiction claim). That source of authority is particularly relevant for the Convention ground that the tribunal acted beyond the scope of its authority:

> [New York Convention Article V(1)(c)] tracks in more detailed form 10(d) of the Federal Arbitration Act, 9 U.S.C. 10(d), which authorizes vacating an award 'where the arbitrators exceeded their powers.' Both provisions basically allow a party to attack an award predicated upon arbitration of a subject matter not within the agreement to submit to arbitration.

14

1    *Parsons & Whittemore*, 508 F.2d at 976; *see also Management & Tech. Consultants S.A. v. Parsons-*

2    *Jurden Int'l Corp.*, 820 F.2d 1531, 1534 (9th Cir. 1987) (Convention "tracks" the FAA, including the

3    ground that the award decides matters "beyond the scope of the submission to arbitration" under

4    Article V, Section 1(c)); *Dastime Group Ltd. v. Moonvale Invs. Ltd.*, No. 17-cv-01859-JSW, 2017

5    WL 4712179, at *3 (N.D. Cal. Oct. 11, 2017) (defenses under Convention Article V(1)(c) for award

6    dealing with matter outside scope of arbitral agreement and FAA Section 10 permitting vacation of

7    award when arbitrators exceeded powers "are similar in scope").  Thus, because both provisions

8    address the same ground, it is appropriate to consult relevant FAA authority.

9          "[A]rbitrators 'exceed their powers' when the award is 'completely irrational' or exhibits a

10   'manifest disregard of the law.'"  *Aspic Eng'g and Constr. Co. v. ECC Centcom Constrs. LLC*, 913

11   F.3d 1162, 1166 (9th Cir. 2019) (quoting *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341

12   F.3d 987, 997 (9th Cir. 2003) (*en banc*) (internal citations omitted)).[9]  An award not grounded in the

13   agreement fails this standard:

14          the Arbitrator exceeded his authority and failed to draw the essence of the Award from
        the Subcontracts. The Award disregarded specific provisions of the plain text in an
15      effort to prevent what the Arbitrator deemed an unfair result. Such an award is
        "irrational."

16   *Aspic*, 913 F.3d at 1168.  Thus, an arbitrator may not "impose obligations outside the contract."

17   *AT&T Techs., Inc. v. Communications Workers of America*, 475 U.S. 643, 651 (1986); *see also*

18   *Advanced Micro Devices, Inc. v. Intel Corp.*, 9 Cal. 4th 362, 378 (1994) (federal courts have applied

19   to commercial arbitration awards the rule in *Steelworkers v. Enterprise Corp.,* 363 U.S. 593, 597

20   (1960), that the arbitrator's "award is legitimate only so long as it draws its essence from the

21   collective bargaining agreement.  When the arbitrator's words manifest an infidelity to this

22   obligation, courts have no choice but to refuse enforcement of the award").  Moreover, "[t]he scope

23   of the arbitrator's authority is limited to the issue submitted to him by the parties." *Sunshine Mining*

24   *Co. v. United Steelworkers of Am.*, 823 F.2d 1289, 1294 (9th Cir. 1987).

25

26

27   _____

     [9]     Although not discussed by the Ninth Circuit, the district court in *Aspic* clarified that its analysis
     was under both the New York Convention and the FAA.  *Aspic Eng'g & Constr. Co. v. ECC Centcom*
28   *Contrs., LLC*, 268 F. Supp. 3d 1053, 1057, 1058-59 (N.D. Cal. 2017).

**B.**     **The 2019 Award Should Not Be Confirmed Because It Is Premised On the 12-28-2015 Loan that Was Outside the Scope of the Arbitration Agreement**

A substantial part of the 2019 Award consisted of RMB 82,567,667.30, which was derived from the balance that Xuyin repaid on the 12-28-2015 Loan under the Xuyin Repayment Agreeement. (Lin Decl., Ex. H).  This aspect of the 2019 Award is defective for two reasons.  First, the Tribunal adjudicated an obligation that at most arose under the Settlement Agreement, which the Petitioner never submitted to the Tribunal as a basis for its demand.  Second, even if the Settlement Agreement could be considered, the Tribunal imposed a repayment obligation that arose after the repayment date specified in the Settlement Agreement and thus could not have been agreed to under the Termination Agreement, the Settlement Agreement, or the Guarantee.

First, the 2019 Award was defective because it was based on the Settlement Agreement, which Petitioner never submitted to the Tribunal (the award could not have arisen under the Xuyin Repayment Agreement, which was between only Xuyin and Xiamen Bank and which in any case did not contain an arbitration clause).  The Termination Agreement never discussed how Allscore and Hailian would become liable on a Xiamen Bank loan, including any repayment deadline or whether the pledge had to be executed for the repayment obligation to arise.  It was only the Settlement Agreement that referenced an RMB 85.52 million loan (the XRB14157 Loan), detailed a repayment deadline of December 23, 2015, and the requirement that Xiamen Bank exercise the pledge before an additional RMB 88.52 million – an amount different from the RMB 82,567,667.30 stated in the Xuyin Repayment Agreement and used in the 2019 Award – would be added to Allscore's obligation. (Lin Decl., Ex. I).

Although the Tribunal considered the Settlement Agreement, Petitioner never relied upon it for its claim regarding the Xiamen Bank loan (and indeed could not have, because as discussed below, it did not cover the loan at issue), or any other claim.  As Petitioner states in its memorandum, "Petitioner brought its claim pursuant to the arbitration provisions of the Termination Agreement and Guarantee Contract . . . .").  (Dkt. 1-1, p. 3:11-12).  "The scope of the arbitrator's authority is determined by the contract requiring arbitration as well as by the parties' definition of the issues to be

16

1    submitted in the submission agreement," or, in this case, Petitioner's arbitration demand.  *Schoenduve*

2    *Corp v. Lucent Techs., Inc.*, 442 F.3d 727, 732 (9th Cir. 2006).  Even though Petitioner did not rely

3    upon the Settlement Agreement, the Tribunal nevertheless equated the XRB14157 Loan for RMB

4    85.52 million (and the Settlement Agreement's related increased amount of RMB 88.52 million on

5    default) and the 12-28-15 Loan for RMB 90.132 million (and the related Xuyin Repayment

6    Agreement amount of RMB 82,567,667.30).  (Dkt. 1-3, p. 61).  Petitioner's reliance on only the

7    Termination Agreement and Guarantee – and not the Settlement Agreement – is reinforced by its

8    failure to reference the Settlement Agreement in its Petition here or even provide it to this Court.

9    Because Petitioner never made the Settlement Agreement part of its demand, the Tribunal acted

10   beyond its authority.

11           Second, even if the Tribunal could appropriately consider the Settlement Agreement, that

12   agreement provides no support for the award.  That agreement states that respondents had to repay the

13   debts then outstanding on or before December 23, 2015.  Both the original RMB 90.123 million loan

14   and the XRB14157 RMB 85.52 million loan were in fact repaid.[10]  Nevertheless, the Tribunal

15   conflated the RMB 85.52 million loan (which had been repaid) with a different loan, the 12-28-2015

16   Loan.  The Tribunal determined there was an obligation on the latter loan only because Xuyin

17   separately repaid the balance of that 12-28-2015 Loan under the Xuyin Repayment Agreement, which

18   was not referenced in the Settlement Agreement (Dkt. 1-3, pp. 62-63).  To support its rationale, the

19   Tribunal found, without basis, that the Termination Agreement and Settlement Agreement

20   "acknowledged" the 12-28-2015 Loan and that the December 23, 2015, repayment date in the

21   Settlement Agreement must have meant December 22, 2016, instead.  (*See supra* § II(C)(3)(a)).

22           The Tribunal not only failed to enforce the arbitration agreements as agreed to by the parties,

23   but read into those agreements new and additional conditions not provided for in the Agreements.

24   *See Stolt-Nielsen S.A. v. AnimalFeeds Int'l, Corp.*, 559 U.S. 662, 672, 682 (2010) ("an arbitration

25

26   ---
     [10] Both loans were paid within days of the December 23, 2015, date specified in the Settlement
     Agreement.  The Tribunal never relied on this ground in finding for Petitioner and, in any case, given

27   that Xuyin assumed the guarantee and paid the balance on the 12-28-2015 Loan, the Tribunal
     necessarily found that Xiamen Bank did not exercise its pledge, as required by the Settlement

28   Agreement.  (Dkt. 1-3, p. 62).

                                                        17

decision may be vacated under FAA § 10(a)(4) of the FAA on the ground that the arbitrator exceeded [his] powers . . . when [an] arbitrator strays from interpretation and application of the agreement and effectively dispense[s] his own brand of industrial justice" (internal citation omitted)); *see also Al-Qarqani v. Chevron Corp.*, 8 F.4th 1018, 1024 (9th Cir. 2021) ("In the United States, arbitration is strictly a matter of consent and requires an agreement to arbitrate.") (quotation omitted and alteration adopted).  Thus, an award is defective where the tribunal fails to "give effect to the contractual rights and expectations of the parties."  *Stolt-Nielsen*, 559 U.S. at 682 (quotation omitted).

The Tribunal replaced the conditions in the Settlement Agreement with the following new conditions in order to justify the 2019 Award:

| Condition Under the Settlement Agreement (Lin Decl., Ex. I, Art. 1(2)) | Tribunal's New Condition |
|---|---|
| <u>Loan</u>.  Allscore/Hailian to repay the principal of the then-existing loan of RMB 85.52 million (the XRB14157 Loan) | <u>Different Loan</u>.  Allscore/Hailian to repay the principal of the 12-28-2015 Loan of RMB 90.123 million (Dkt. 1-3, p. 61) |
| <u>Repayment Date</u>.  Allscore/Hailian to repay the debt to Xiamen Bank prior to December 23, 2015 | <u>Different Repayment Date</u>.  The loan repayment due date was actually December 22, 2016, since the 12-28-2015 Loan could not have been repaid on or before December 23, 2015 as provided under the Termination Agreement and the Settlement Agreement (Dkt. 1-3, p. 61) |
| <u>Exercise Condition</u>.  Xiamen Bank to exercise the pledge on the pledged shares | <u>No Exercise Condition</u>.  Even though Xiamen Bank did not exercise its pledge on the pledged shares, Xuyin's repayment of the 12-28-2015 Loan pursuant to the September 5, 2017 Xuyin Repayment Agreement "directly led to the decrease in cash assets rather than equity assets of [Xuyin], which damaged [Xuyin's] economic interests" (Dkt. 1-3, p. 62) |

The 12-28-2015 Loan was not within the scope of the arbitration agreement in the Settlement Agreement, the Termination Agreement, or the Guarantee.  The Settlement Agreement not only refers to an existing RMB 85.52 million "loan" (Lin Decl., Ex. I, pp. 102-03, "Whereas" ¶ 2), but Article 1(1) requires the loan(s) to be paid before December 23, 2015.  Therefore, the Settlement Agreement did not encompass the 12-28-2015 Loan, because that Loan was issued after the due date for repayment.  That is, it would have been illogical for the Settlement Agreement to cover a loan made

18

after the repayment date set forth in that same agreement.  Given that the RMB 85.52 million was in fact repaid, no amount attributable to the 12-28-15 Loan may be awarded under the Settlement Agreement.

The Tribunal's flawed attempt to ground its ruling on the loan in the agreements only demonstrates that the loan at issue was outside the scope of the Settlement Agreement.  Despite admitting the "impossibility" that the 12-28-2015 Loan could be repaid on or before December 23, 2015, as required under the Settlement Agreement, the Tribunal unilaterally inserted a payment due date of December 22, 2016, for a different obligation and dispensed with the pledge execution condition.  *See Aspic Eng'g*, 913 F.3d at 1168 (arbitrator "rationaliz[ed]" to avoid outcome he thought "unjust").

The Tribunal noted that even though the Xiamen Bank did not exercise the pledge on the shares—a condition precedent to imposing the additional amount to the 2019 Award pursuant to the Settlement Agreement—it had the authority to add into the award the amount repaid on the 12-28-2015 Loan.  The Tribunal determined that it was "because of the repayment by [Xuyin] that [Xiamen Bank] ultimately needed not to exercise its pledge," even though this "actual situation was not consistent with the increase in the debts of [Allscore] to [Petitioner] stipulated in the [Settlement] Agreement."  (Dkt. 1-3, p. 62).  In discarding the agreement's requirement of an exercise against the pledge, the Tribunal erred when it sought to "impose obligations outside the contract."  *AT&T Techs.*, 475 U.S. at 651.

The three interpolations above flatly contradict the three contrary stipulations in the Settlement Agreement.  Thus, the 2019 Award "fails to draw its essence from the agreement."  *See, e.g., Aspic*, 913 F.3d at 1166; *Keebler Co. v. Milk Drivers and Dairy Emps. Union, Local No. 471,* 80 F.3d 284, 288 (8th Cir. 1996) ("arbitrator erred in imposing a new obligation upon [a party] that was not . . . in existence").  *Keebler* held similar conduct by the arbitrator also exceeded the scope of the arbitration agreement. There, the arbitrator "amended the terms of the side agreement" between Keebler and a labor union governing how Keebler handled certain accounts by "imposing a new obligation on Keebler to obtain Union agreement prior to transferring certain accounts."  *Keebler*, 80

19

1   F.3d at 289.  Here, the Tribunal read into the Settlement Agreement the post-repayment date 12-28-

2   2015 Loan, read in a different repayment date, and nullified the execution condition.  The Tribunal

3   committed the same error as the arbitrator in *Keebler*.  Thus, the 2019 Award was defective by

4   including the RMB 82,567,667.30 amount, as well as RMB 1,806,557.63 interest calculated on that

5   amount (Dkt. 1-3, pp. 77-78).

6   **C.**   **The Award Should Not be Confirmed Because the Award of RMB 66,784,745.30 Penalty Interest Component Is Not Within the Scope of the Termination Agreement**

7

8           As stated above, when an arbitral tribunal exceeds the intent of the parties, its award is subject

9   to challenge under the New York Convention as being outside the scope of the parties' agreement.

10  *See Stolt-Nielsen*, 559 U.S. at 682; *Parsons & Whittemore*, 508 F.2d at 976.  Here, the Tribunal based

11  the penalty interest calculation on the Letter of Commitment (one of the Collection Agreements

12  resolved in the Termination Agreement).  (Dkt. 1-3, p. 77).  The Termination Agreement specified

13  that penalty interest is to be calculated based on the Letter of Commitment.  (Dkt. 1-4, pp. 87-88,

14  "Whereas" ¶ 3).  In contrast, the 2019 Award refers only to "the amount shown in the statistical table

15  generated from the system" to calculate penalty interest.  (Dkt. 1-3, p. 77).  That calculation is not

16  based on the Termination Agreement or the Letter of Commitment.  This language from the award

17  compels this Court "to infer the award was based on an extrinsic source," so that the award has no

18  rational relationship to the contract, an interpretation of the contract, or "plausible theory of the

19  contract's general subject matter, framework, or intent."  *See Advanced Micro Devices*, 9 Cal. 4th at

20  381.

21          Further analysis of the RMB 66,784,745.30 penalty interest amount shows that it is based on a

22  figure that bears no relationship to the Termination Agreement.  Using the penalty interest rate (18%

23  per annum) and the Tribunal's time period of May 30, 2015, to November 30, 2017 (915 days, or

24  2.54166 years), the principal amount appears to be RMB 145,977,629.  This amount does not appear

25  in the Termination Agreement – indeed, the Tribunal's calculation of amounts due for both the

26  Termination Agreement and the Settlement Agreement, after relevant offsets, is only RMB

27  55,427,195.39 (*see supra* § II(d); Dkt. 1-3, p. 76).  Furthermore, that figure is based in part on the 12-

28

                                                20

1    28-2015 Loan from Xiamen Bank, which even if correctly determined (and Respondent Lin

2    maintains it is not) could not be subject to the penalty interest in the Letter of Commitment, given that

3    there is no obligation as to that loan in the Termination Agreement.[11]  In any case, the Settlement

4    Agreement makes no reference to the Letter of Commitment, so that the penalty interest could not

5    apply to any outstanding loan obligation under the Settlement Agreement.  (Lin Decl., Ex. I).

6         That principal figure also does not appear in the Letter of Commitment, which refers to (i)

7    "Settled and Unpaid Funds" in the amount of RMB 218,307,429; and (ii) all funds that Petitioner

8    requested Allscore to repay certain users in the amount of RMB 28,926,130.79.  (Lin Decl., Ex. K).

9    But, the principal could not be calculated based on these amounts described in the Letter of

10   Commitment, since the Termination Agreement purported to resolve the amounts due under that

11   Letter, as well as the 2014 POS Collection Service Agreement that is referenced in the Letter.  (*See*

12   Dkt. 1-4, pp. 87-88, "Whereas" ¶ 3, referencing these agreements as part of the Collection

13   Agreements to be resolved).  That is particularly true given that the Letter of Commitment was

14   executed on May 20, 2015, and the Termination Agreement, which resolved amounts due under the

15   Letter of Commitment and other agreements, was executed four months later, on September 16, 2015.

16   To the extent the Tribunal calculated the penalty interest based on the principal amount in the Letter

17   of Commitment, those amounts were superseded by the Termination Agreement.  The Tribunal erred

18   in "imposing a new obligation . . . not found in any agreement between the parties to support [the]

19   award."  *Keebler*, 80 F.3d at 288.

20        Of course, if the calculated principal amount above were derived from any other instrument,

21   that would be outside the scope of the Termination Agreement and Settlement Agreement, and this

22   component of the award would still be invalid as being outside the scope of the arbitration agreement.

23        Because there is no basis for this component of the Termination Agreement, the Tribunal

24   exceeded its authority by imposing penalty interest that has no basis in the Termination Agreement or

25   the Settlement Agreement.

26

27   _____
     [11] If the Court holds that the 2019 Award is defective for being based on the 12-28-2015 Loan from
28   Xiamen Bank and the penalty interest amount is based in part on that loan, then the penalty interest as
     a result cannot stand as having been calculated on that improper amount.

**D.**     **Recognition of the 2019 Award Is Moot as There Are No Damages Due Petitioner Once Those Parts of the Award Corresponding to the 12-28-2015 Loan and Penalty Interest Are Eliminated**

As noted above, the outstanding principal amount due under the 2019 Award was RMB 55,427,195.39 (RMB 173,825,091.50 + RMB 8,950,306.72 + RMB 82,567,667.30 - RMB 202,666,968 - RMB 7,248,902.13).  (Dkt. 1-3, pp. 76, 80).  The 2019 Award also included RMB 66,784,745.30 in penalty interest and RMB 1,806,557.63 interest on the 12-28-2015 Loan.  (*Id.*, pp. 77, 80).  Thus, if the Court rejects the corresponding portions of the 2019 Award attributable to the 12-28-2015 Loan (i.e., RMB 82,567,667.30 and RMB 1,806,557.63 loan interest) and to the penalty interest (RMB 66,784,745.30), those amounts would be deducted from the 2019 Award, which results in a negative amount, i.e., negative RMB 27,140,471.91.  Moreover, the Award should not be confirmed as to the award of RMB 400,000 in attorney's fees and for RMB 934,328.50 in arbitration fees (*Id.*, pp. 79-80), given that Petitioner should not be deemed to have prevailed for the reasons above.  In any event, the negative amount above would more than offset these amounts.  Accordingly, confirmation of whatever is left of the 2019 Award would be moot.

The New York Convention makes clear that nothing remains pending in the case, should the Court deny confirmation of the 2019 Award.  "The Court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said [New York] Convention."  9 U.S.C. § 207.  This structure mirrors that in the FAA, which provides that, on application "for order confirming the award . . . the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title."  9 U.S.C. § 9.  The Supreme Court has held that "the grounds for vacatur and modification" in these portions of the FAA "are exclusive."  *Hall Street Assocs. v. Mattel, Inc.*, 552 U.S. 576, 581 (2008).  There is no authority to permit recalculation of any of these components of the Award.  Accordingly, upon denial of confirmation, the case should be closed.

///

///

///

22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## IV. <u>CONCLUSION</u>

For the reasons set forth herein, Respondent Lin respectfully requests that the Court deny the
Petition.


Dated: December 7, 2022                    PILLSBURY WINTHROP SHAW PITTMAN LLP
                                           RONALD L. CHENG
                                           MICHELLE K. NG (*admitted pro hac vice*)


                                           By:    ___/s/____ *RONALD L. CHENG*_____
                                                       RONALD L. CHENG

                                           *Attorneys for Respondent Yao Lin*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Respondent Yao Lin, certifies that this brief contains 6,825 words, which:

   X   complies with the word limit of L.R. 11-6.1.

   ____ complies with the word limit set by court order dated [date].

Dated: December 7, 2022

PILLSBURY WINTHROP SHAW PITTMAN LLP
RONALD L. CHENG
MICHELLE K. NG (*admitted pro hac vice*)

By:   */s/*   *RONALD L. CHENG*
       RONALD L. CHENG

*Attorneys for Respondent Yao Lin*

24

4873-2262-2267

# EXHIBIT 8

RECORDING REQUESTED BY:
STEWART TITLE OF CALIFORNIA

AND WHEN RECORDED MAIL TO:

Yao Lin and Jia Chen
27487 Latigo Bay View Drive
Malibu, CA 90265

Order No.: 01880-276274
Escrow No.: TC-1473-CS
A.P.N.: 4470-019-017

# 10.

SPACE ABOVE THIS LINE IS FOR RECORDER'S USE

## GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S)
DOCUMENTARY TRANSFER TAX IS $ 3,102.00          CITY TRANSFER TAX IS $.00
[ X ]    computed on full value of property conveyed, or
[   ]    computed on full value less value of liens or encumbrances remaining at time of sale.
[   ]    unincorporated area    [ X ] City of **Malibu** AND

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,
**Scott J. Sokol and Carol A. Sokol, Trustees of The Scott and Carol Sokol 1999 Trust dated December 6, 1999**
hereby GRANT(S) to
**Yao Lin and Jia Chen, Husband and Wife as Community Property with Right of Survivorship**
the following described real property in the County of **Los Angeles**, State of California:

**Complete legal description is attached hereto and made a part hereof as Exhibit "A"**

AKA: 31663 Broad Beach Road, Malibu, CA 90265
Dated:  July 26, 2017

The Scott and Carol Sokol 1999 Trust dated
December 6, 1999

By: Scott J. Sokol, Trustee

By: Carol A. Sokol, Trustee

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the
document to which this certificate is attached, and not the truthfulness, accuracy or validity of that document.

STATE OF CALIFORNIA
COUNTY OF  Los Angeles          )SS.

On August 29, 2017        before me  Cynthia Schmon          Notary Public, personally appeared
**Scott J. Sokol and Carol A. Sokol** who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies) and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s),
acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
          Signature of Notary

CYNTHIA SCHMON
Commission # 2127343
Notary Public - California
Los Angeles County
My Comm. Expires Oct 16, 2019



**This page is part of your document - DO NOT DISCARD**





# 20171119163

**Pages:
0003**

**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**09/29/17 AT 08:00AM**

| | |
|---|---|
| FEES: | 25.00 |
| TAXES: | 3,102.00 |
| OTHER: | 0.00 |
| PAID: | 3,127.00 |



**L E A D S H E E T**



201709293290039

**00014306712**



008623537

**SEQ:
01**

SECURE  -  8:00AM



**THIS FORM IS NOT TO BE DUPLICATED**

E08_170929_5...91

## EXHIBIT "A'

The land referred to herein is situated in the State of California, County of Los Angeles, City of Malibu and described as follows:

Those portions of Lots 4, 5 and 7 of Tract No. 20658, in the City of Malibu, County of Los Angeles, State of California, as per map recorded in Book 579, Pages 9 and 10 of maps, in the Office of the County Recorder of said County, described as follows:

Beginning at the Northeast corner of said Lot 4, thence along the Easterly line of said Lot 4, South 10° 05' 30" West 82.00 feet to the Easterly prolongation of the Northerly line of Lot 5; thence along said prolongation and along said Northerly line North 82° 02' 55" West 76.00 feet to a line parallel with the Easterly line o said Lot 5 that passes through point in the Southerly line of said lot 5 distant North 79° 54' 30' West 76.00 feet from the Southeast, corner of said Lot 4; thence along said parallel line, South 10° 05'30" West 100.00 feet to the Southerly line of said lot 5; thence along said southerly line, North 79° 54' 30" West 10.00 feet to a point in said Southerly line distant South 79° 54' 30" East 69.00 feet from the Southwest corner of said Lot 5; thence parallel with the Easterly line of said lot 5, North 10° 05' 30" East 99.50 feet to the Northerly line of said Lot 5; thence Northwesterly, in a direct line South 70° 43' 58" West 39.00 feet from the most Northerly corner of said Lot 7; thence along said Northwesterly line, North 70° 43' 58" East 39.00 feet to said most Northerly corner; thence along the Northeasterly line of Lots 7 and 4, South 66° 28' 30" East 107.11 feet to the point of beginning.

Except therefrom all oil, gas, minerals and other hydrocarbon, below a depth of 500 feet, without the right of surface entry, as reserved in instrument of record.

# EXHIBIT 9

**WeChat Transfer Record (01/30/2018 via email)**

Payment: ¥20000.00

Beneficiary: tt

Transfer instructions: WeChat Transfer

Transfer time: 2018-01-16 11:00:44

Payment method: CMBC(China Merchants Bank)

Bill number: 100005020118011600057211585889111615

4/20/23, 12:04 PM

0 3,024×4,032 pixels



# EXHIBIT 10

# 15

## Memorandum of Agreement

**Party 1: Yao Lin (Male)**
ID Number:321026197211050034
Address: Lijing Huayuan 7-3-3, Shunyi District, Beijing

**Party 2: Jia Chen (Female)**
ID Number: 450305197602041023
Address: Lijing Huayuan 7-3-3, Shunyin District Beijing

Since Party 1 (Yao Lin) broke her promise and did not break up with the third party, which made it impossible for the two parties to continue, we agree on the children and property as follows:
1. For the sake of the children, the parties will not go through the divorce procedure after separation, and will not inform the children and both parents. However, if one of the parties requests a divorce, the other party shall cooperate.

2. The custody of the two children shall be given to Party 2 (Jia Chen), and Party 1 (Yao Lin) shall have access to the children with the consent of Party 2 (Jia Chen), not less than once a week and not less than four hours a time.

3. All property and vehicles in the name of Party 2 (Jia Chen) shall belong to Party 2 (Jia Chen) and all property and vehicles in the name of Party 1 (Yao Lin) shall belong to Party 1 (Yao Lin).
The property in the U.S. in the joint name of both parties shall belong to Party 2 (Jia Chen), and Party 1 (Yao Lin) shall assist in the transfer process as soon as possible.

4. Party 1 (Yao Lin) owns or actually holds the company owned by Party 1 (Yao Lin), and Party 2 (Jia Chen) shall assist in the business or internal procedures.

5. Party 2 (Jia Chen) undertakes to pay the mortgage in his name and Party 1 (Yao Lin) undertakes to pay Party 2 (Jia Chen) and the children US$10,000 or the equivalent in RMB every month for their living expenses. Special expenses such as the child's education and marriage will be paid by Party 1 (Yao Lin) according to the actual amount incurred. After the child turns 21, Party 1 (Yao Lin) will pay Party 2 (Jia Chen) $50,000 per month until Party 2's (Jia Chen's) death.

6. The bank accounts, financial accounts, debts and liabilities in the name of Party 2 (Jia Chen) shall be borne by Party 2 (Jia Chen), and the bank accounts, financial accounts, debts and liabilities in the name of Party 1 (Yao Lin) shall be borne by Party 1 (Yao Lin).
Since Party 2 (Jia Chen) has been managing and using several joint bank accounts and financial accounts in the United States, they will continue to be managed and used by Party 2 (Jia Chen) from the date of signing this agreement until the date of closing the accounts. All cash, stocks, funds and earnings in the account belong to Party 2 (Jia Chen) and Party 1 (Yao Lin) may not claim rights to them. In order for Party 1 (Yao Lin) to pay Party 2's (Jia Chen) living expenses and other activities related to bank transfers, the above account will not be closed for the time being. However, Party 1 (Yao Lin) shall cooperate with Party 2 (Jia Chen) if Party 2 (Jia Chen) requests to close the account.

Landford, the company of the two parties in the United States, has no business operations and is owned by Party 2 (Jia Chen) since the date of signing. Party 1 (Yao Lin) should assist in handling the change of shareholders.

7. The date of signing is January 31, 2018, and the agreement is effective immediately upon signing.

Party 1: Yao Lin
01/31/2018

Party 2: Jia Chen
01/31/2018

男方：林耀

身份证：321026197211050034

住址：北京市顺义区丽京花园7-3-3

女方：陈佳

身份证：450305197602041023

住址：北京市顺义区丽京花园7-3-3

因男方破坏承诺，未与第三者分手，致使双方无法继续，现就孩子与财产约定如下：

1. 为了孩子，双方分居但暂不办理离婚手续，也不告之孩子和双方父母。但如一方要求办理离婚手续，另一方应予以配合。

2. 两个孩子的抚养权归女方。男方在女方同意下可以探望孩子，每周不少于一次，一次不少于四个小时。

3. 女方名下的房子和车辆全部归女方所有。男方名下的房子和车辆归男方所有。

双方在美国共同名下的房子归女方所有，男方应尽快协助办理过户手续。

4. 男方拥有或是实际持有的公司由男方所有，女方应协助办理工商手续或是公司内部手续。

5. 女方承诺支付其名下房屋贷款，男方承诺每个月支付女方和孩子十万美元或等值人民币做为生活费。孩子教育和结婚等特殊支出按实际发生额由男方支付。孩子21岁之后，男方每月支付女方五万美元直至女方身故。

6. 女方名下的银行账号、理财账号、债权和债务由女方承担。男方名下的银行账号、理财账号、债权债务由男方承担。

因为双方在美国的多个联名银行账号和理财账号一直由女方管理和使用，所以自本协议签字之日起至关闭账号之日，继续由女方管理和使用。账号内的现金、股票、基金和收益等全部归女方，男方不得主张权利。为便于男方支付女方生活费用的银行汇款的相关活动，暂不关闭上述账号。但如女方要求关闭账号，男方亦予以配合。

双方在美国的公司Lanford并无经营，自签字之日归女方所有，男方亦协助办理股东变更。

7. 本签订日为2018年1月31日，签订日本协议立即生效。

林娟
2018.1.31

陈佳
2018.01.31

# EXHIBIT 11

**FARMERS**
INSURANCE

National Document Center
P.O. Box 268994
Oklahoma City, OK 73126-8994

November 13, 2018

014177

YAO LIN
27487 LATIGO BAY VIEW DR
MALIBU CA 90265-2866



**FARMERS**
INSURANCE

Toll Free: (800) 435-7764
Email: myclaim@farmersinsurance.com
National Document Center
P.O. Box 268994
Oklahoma City, OK 73126-8994
Fax: (877) 217-1389

November 12, 2018

YAO LIN
27487 LATIGO BAY VIEW DR
MALIBU CA 90265-2866

| | | |
|---|---|---|
| RE: | Insured: | Yao Lin |
| | Claim Unit Number: | 3011899156-1-1 |
| | Policy Number: | 0986906569 |
| | Loss Date: | 11/10/2018 |
| | Location of Loss: | 27487 Latigo Bay View Dr, Malibu, CA |
| | Subject: | Claim Outcome Letter |

Dear Mr. Lin:

Thank you for choosing us to provide for your insurance needs. We value you as a customer and appreciate the opportunity to be of service.

You reported fire damage to your home. You asked us to review for coverage under your policy.

As we discussed on November 12, 2018, my investigation found your policy has the Fair Plan companion Endorsement, and the endorsement specifically excludes damage caused by a fire. You will need to review with the California Fair Plan to review your policy through that insurance. Unfortunately, there is no coverage for your claim based on the facts known to us at the present time.

You may wish to review these provisions of your Next Generation Homeowners Policy California, 3rd Ed, as endorsed. They form the basis for our decision:

We refer you to the following language in your CA104 1st Fair Plan Companion endorsement:

...

For a reduction in premium, this endorsement restricts and eliminates coverage under your Farmers Next Generation Homeowners policy for any peril which is covered or which is available for coverage by additional purchase under a California Fair Plan Association policy ("the FAIR Plan policy") whether or not you actually purchase coverage for any such additional peril. **Please read this endorsement carefully.**

**SECTION I - Coverage A (Dwelling), Coverage B (Separate Structures), Coverage C (Personal Property), Coverage D (Loss of Use), and Extensions of Coverage**

You agree:

Please refer to the Section I – Property Conditions part of your policy, which states:

SECTION I - PROPERTY CONDITIONS

...

13.  Suit Against Us.

No suit or other action can be brought against us, our agents or our representatives unless there has been full compliance with all the terms of this policy, including submission to requested examinations under oath. Suit on or arising out of the SECTION I - PROPERTY COVERAGE of this policy must be brought within one year after inception of the loss or damage.

In addition, we may deny a claim based on the applicable California statute of limitations.

We've completed the adjustment of your loss and we are closing your claim. While we welcome any additional information you may wish to provide, the claim will not be reopened unless we notify you of such in writing.

If you believe your claim has been wrongfully rejected or denied, in whole or in part, please contact us for further clarification. The state of California requires that we provide you with the following notice: You may also have the matter reviewed by writing to the California Department of Insurance, Consumer Services and Market Conduct Branch, Claims Services Bureau, 300 South Spring Street, South Tower, Los Angeles, CA 90013 or by calling 1-800-927-4357 or 1-213-897-8921.

If you have any questions, or additional information you think may affect your coverage, please contact me at (913) 577-7899.

Thank you.

Fire Insurance Exchange

Charles Olguin
Office Claims Representative
charles.olguin@farmersinsurance.com
(913) 577-7899

CC: SAMSON NG

4DAH80G4

A. Under any provision of **SECTION I - PROPERTY COVERAGE** of this Next Generation Homeowners policy which provides for coverage, including by way of example but not limited to under **COVERAGE D - LOSS OF USE** and under any Extension of Coverage, that any coverage by or for any of the following named perils is deleted and eliminated. We do not insure loss, damage or expense directly or indirectly caused by, arising out of, or resulting from these perils:

1 any fire or lightning.

1B. any type of internal explosion.

2. any windstorm or hail.

3. any type of explosion.

4. any riot or civil commotion, including looting occurring during a riot or civil commotion.

5. any aircraft, including self-propelled missiles and spacecraft.

6. any vehicle.

7. any type of smoke, including sudden and accidental damage from smoke.

8. any volcanic eruption.

9. any vandalism or malicious mischief.

This exclusion applies:

a. whether or not you actually purchase coverage for any optional peril under your FAIR Plan policy;

b. whether or not the loss, damage or expense directly or indirectly caused by, arising out of, or resulting from any of the perils is actually covered under your FAIR Plan policy; and

c. even if coverage for any of the named perils is provided under this Next Generation policy as a general coverage grant or as a specific or general exception to **Uninsured Types of Loss or Damage** or to **Excluded Causes of Loss or Damage.**

B. The Next Generation policy does not provide coverage for loss, damage or expense directly or indirectly caused by, arising out of, or resulting from any of the perils named in item A. above, whether optional or not, including by way of example but not limited to:

a. if you do not maintain your FAIR Plan policy in force, or it is cancelled or reduced; or

b. if coverage for loss, damage or expense under your FAIR Plan policy is not collectible.

This Next Generation policy does not serve as excess insurance or additional insurance should your FAIR Plan policy cover or partially cover loss, damage or expense arising out of any of the named perils listed in item A. above.

This endorsement is part of your policy. All other policy terms and conditions not in conflict with the terms of this endorsement apply.

_____  _____
Insured's Acceptance       Date

We reserve all rights and defenses under the policy and law and no activity on our part should be construed as a waiver. Even though only parts of the policy may be mentioned or quoted in this letter, additional portions if found to be relevant will be applied.

California law and regulations require that we provide you with written notice of any limitation period upon which we may rely to deny a claim.

# EXHIBIT 12

Yahoo Mail - Re: Malibu Emergency Relief Fund                                                          5:21 AM

## Re: Malibu Emergency Relief Fund

# 18

From:  Malibu Emergency Relief Fund (emergencyrelief@bgcmalibu.org)

To:    jiachenly@yahoo.com

Date:  Monday, December 31, 2018 at 12:35 PM PST


Good Afternoon,
We have received the photo of your ID and will be putting your application through to the committee awaited further information.
We will update you as soon as they have responded with a decision.

Happy Holidays!
Best,
BGCM Staff

On Thu, Dec 13, 2018 at 2:22 PM CJ <jiachenly@yahoo.com> wrote:

Here is my DL. Thanks



Yahoo Mail · Re: Malibu Emergency Relief Fund

Case 1:23-ap-01036-MB   Doc 28-2   Filed 05/15/25   Entered 05/15/25 22:53:40   Desc
Exhibit Declaration of Yao Lin Declaration of Jia Chen Exhibits 1 through 31   Page 67 of 251

23, 5:21 AM



SEX F          HAIR BLK        EYES BLK
HGT 5'-05"     WGT 100 lb      ISS
DD 03/09/201863605/BBFD/20              03/09/2018

Chiat

Sent from my iPhone

On Dec 12, 2018, at 11:16 AM, Malibu Emergency Relief Fund <emergencyrelief@bgcmalibu.org> wrote:

Hello Jia,

We are just following up, can you please provide us a copy of your ID to add to your file? Once we have this your application will be considered complete and the committee will let us know if you are approved for funding.

Best,
BGCM Staff

On Sat, Dec 8, 2018 at 4:55 PM Malibu Emergency Relief Fund <emergencyrelief@bgcmalibu.org> wrote:

Hi Jia,

We are so sorry for you current situation.
Thank you for you grant application and supporting documentation.

The grant committee will review next week and if we need more information someone will be in touch soon.

Blessings and stay strong.

The BGCM Team

Boys & Girls Clubs of Malibu
Malibu Emergency Relief Fund
Ph: 424-388-9862
www.bgcmalibu.org
If you have questions about our Emergency Relief Fund, please contact us at emergencyrelief@bgcmalibu.org or at
424.388.9862. Follow us to stay informed at: Facebook: @bgcmalibu90265 | Instagram: @bgcmalibu90265 | Twitter: @bgcmalibu
Donations/Volunteer ops at: https://bgcmalibu.org/

On Sat, Dec 8, 2018 at 3:06 PM CHEN, Jia <jiachenly@yahoo.com> wrote:

To Malibu Emergency Relief Fund

Please consider this letter as our application for financial assistance as Woolsey Fire victims.

Our home in Malibu was burn into ground in wild fire, and we also lost every personal belonging. No insurance coverage. Application form and supporting document are attached.

Reasons:

1. We have no insurance coverage for anything. No coverage for replacement, no coverage for compensation of personal belongings, no fee for rebuilding our house. We purchased homeowner insurance and paid thousands of dollars a year. But due to our insurance broker's mistake, he did not purchase fire coverage for us and we even didn't know it until we claimed for damage. Insurance company's disclaimer letter is attached.

2. I am pregnant for 36 weeks with diabetes and need to raise up two 5 years old twin sons, who studied in Webster and are members of Boys and Girls Club. We need assistance of housing rental, food, furniture, appliance, clothing, medication and child care.

3. My two sons and I are US legal permanent residents, and we pay property tax to the US government more than 90,000 dollars every year in the past.

4. We have to pay a total 348,000 dollars mortgage every year for our house, rental house and vehicle.

5. I am a house wife, and my husband is the only one at home who has job. But we are during divorce procedure since two months ago. Not sure about my future alimony on this stage, and the only income I have currently is the rental property income which is about 100,000 dollars per year. But comparing with cost to raise my children (2 twin boys at age 5 and one newborn is coming at the end of December), the property tax (90,000 dollars) and the mortgage (348,000 dollars), the 100,000 annual income is nothing and we do need assistance.

I would appreciate your consideration of my application. Thanks.

Best Regards

Jia

--

Boys & Girls Clubs of Malibu
Malibu Emergency Relief Fund
Ph: 424-388-9862
www.bgcmalibu.org
If you have questions about our Emergency Relief Fund, please contact us at emergencyrelief@bgcmalibu.org or at 424.388.9862. Follow us to stay informed at: Facebook: @bgcmalibu90265 | Instagram: @bgcmalibu90265 | Twitter: @bgcmalibu
Donations/Volunteer ops at: https://bgcmalibu.org/

--

Boys & Girls Clubs of Malibu
Malibu Emergency Relief Fund
Ph: 424-388-9862
www.bgcmalibu.org
If you have questions about our Emergency Relief Fund, please contact us at emergencyrelief@bgcmalibu.org or at 424.388.9862. Follow us to stay informed at: Facebook: @bgcmalibu90265 | Instagram: @bgcmalibu90265 | Twitter: @bgcmalibu
Donations/Volunteer ops at: https://bgcmalibu.org/

--

Boys & Girls Clubs of Malibu
Malibu Emergency Relief Fund
Ph: 424-388-9862

Yahoo Mail - Re: ... 12/22/23, 5:21 AM

Case 1:23-ap-01036-MB   Doc 28-2   Filed 05/15/25   Entered 05/15/25 22:53:40   Desc
Exhibit Declaration of Yao Lin Declaration of Jia Chen Exhibits 1 through 31   Page 69 of 251

www.bgcmalibu.org

If you have questions about our Emergency Relief Fund, please contact us at emergencyrelief@bgcmalibu.org or at 424.388.9862. Follow us to stay informed at: Facebook: @bgcmalibu90265 | Instagram: @bgcmalibu90265 | Twitter: @bgcmalibu
Donations/Volunteer ops at: https://bgcmalibu.org/

**** Please note the EMERGENCY RELIEF FUND WILL BE CLOSED FROM 12/24/18-1/3/19.  PLEASE SUMIT COMPLETED APPLICATIONS AND SUPPORTING DOCUMENTS PRIOR TO 12/19/18 FOR APPROVAL PRIOR TO THE WINTER HOLIDAY CIOSURE.  The Emergency Relief Fund will resume operations at 10:00 am on 1/4/19. Applications received during the closure will be reviewed upon return 1/4/19.***

# EXHIBIT 13

Document ID:     1000351983
Registration ID: 412637581
Disaster No:     4407
Document Type:   APPL
Subst Type:      APPEAL
Upload Date:     2018-11-24 20:07

To FEMA:

Please consider this letter as my appeal for my FEMA application.
My name is Jia CHEN, applying FEMA assistance today because my house in
Malibu was burn into ground in wild fire and we lost every personal belonging. I
am shocked to find that your agency decided that I am ineligible to the assistance
and would like to appeal.
Place and date of birth: China, Feb 04, 1976.  ( Green Card holder )
Current address: 1045 Avondale Rd. San Marino, 91108
My registration ID is 412637581; California state disaster: 4407.

Reasons:

1. We have no insurance coverage for anything. No coverage for
replacement, no coverage for compensation of personal belongings, no fee for
rebuilding our house. We purchased homeowner insurance and paid thousands of
dollars a year. But due to our insurance broker's mistake, he did not purchase fire
coverage for us and we even didn't know it until we claimed for damage.

2. I am pregnant for 34 weeks and need to raise up two 5 years old twin sons
and pay for my niece' tuition and living cost, who is studying in college.

3. My two sons and I are US legal permanent residents, and we pay property
tax to the US government more than 90,000 dollars a year in the past.

4. We have to pay a total 348,000 dollars mortgage every year for our house,
rental house and vehicle.

5. I am a house wife, and my husband is the only one at home who has job.
But we are during divorce procedure since two months ago.  Not sure about my
future alimony on this stage, and the only income I have currently is the rental
property income which is about 100,000 dollars per year.  But comparing with cost
to raise my children (2 twin boys at age 5 and one newborn is coming at the end of
December), the property tax (90,000 dollars) and the mortgage (348,000 dollars),
the 100,000 annual income is nothing and we do need assistance from FEMA.
I would appreciate your reconsideration of my FEMA application.  Thanks.

Best Regards
Jia

Chen

Date :  11/24/2018

# EXHIBIT 14

#20

RECORDING REQUESTED BY:

AND WHEN RECORDED MAIL TO:

JIA CHEN

THIS SPACE FOR RECORDER'S USE ONLY:

| AP#: 4460-035-010 | **GRANT DEED** |
|---|---|

THE UNDERSIGNED GRANTOR(S) DECLARE(S)

### DOCUMENTARY TRANSFER TAX is $ 0.00

[X] computed on full value of property conveyed, or
[ ] computed on full value less value of liens or encumbrances remaining at time of sale.
[ ] Unincorporated area   [ ] City of **AND**

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

**YAO LIN AND JIA CHEN, HUSBAND AND WIFE AS COMMUNITY PROPERTY WITH RIGHT OF
SURVIVORSHIP**

hereby GRANT(s) to:

**JIA CHEN, A MARRIED WOMAN AS HER SOLE AND SEPARATE PROPERTY**

the real property in the  County of LOS ANGELES, State of California, described as:

LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND MADE A PART HEREOF

**Also Known as:** 27487 LATIGO BAY VIEW DRIVE, MALIBU, CA 90265
"This conveyance establishes sole and separate property of a spouse, R & T 11911."

DATED: January 7, 2019                             Signature Page attached hereto
                                                   and made a part hereof

MAIL TAX STATEMENTS TO PARTY SHOWN BELOW; IF NO PARTY SHOWN, MAIL AS SHOWN ABOVE:

AP#: 4460-035-010

## SIGNATURE PAGE

**Title of Document: GRANT DEED**

**Date of Document: January 7, 2019**

YAO LIN
_____
YAO LIN

_____
JIA CHEN

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA            People's Republic of China)
COUNTY OF                      Municipality of Beijing
On    JAN 2 9 2019            Embassy of the United      } SS:
before me,    Morgan Kuehne    States of America
A Notary Public personally appeared    Consular Associate
        Yao Lin

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

~~I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.~~

WITNESS my hand and official seal.

Signature _____        (Seal)

## LEGAL DESCRIPTION
### EXHIBIT "A"

The land referred to herein is situated in the State of California, County of Los Angeles, City of Malibu and
described as follows:

Parcel 1:
Lot 10, of Tract No. 46851, in the City of Malibu, County of Los Angeles, State of California, as per map recorded
in Book 1171 Pages 62 to 73, inclusive of Maps, in the Office of the County Recorder of said
County.

Excepting therefrom all minerals, oil, petroleum, asphaltum, gas, coal and other thereof, but without
surface right of entry, as reserved by Marblehead Land Company, in deed recorded March 4, 1947 as
instrument No. 1036 in Book 24232, Page 380, of Official Records.


Parcel 2:
An easement for road purposes and ingress and egress over those certain strips of land designated as
"Private Driveway and Fire Lane" and "Private Streets", as designated and delineated on the map of said
Tract No. 46851.


APN: 4460-035-010

# EXHIBIT 15

\# 21

RECORDING REQUESTED BY:

AND WHEN RECORDED MAIL TO:

JIA CHEN

THIS SPACE FOR RECORDER'S USE ONLY:

AP#: 4470-019-017                      **GRANT DEED**

THE UNDERSIGNED GRANTOR(S) DECLARE(S)

**DOCUMENTARY TRANSFER TAX is $0.00**

[X] computed on full value of property conveyed, or
[ ] computed on full value less value of liens or encumbrances remaining at time of sale.
[ ] Unincorporated area   [ ] City of **AND**

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

**YAO LIN AND JIA CHEN, HUSBAND AND WIFE AS COMMUNITY PROPERTY WITH RIGHT OF SURVIVORSHIP**

hereby GRANT(s) to:

**JIA CHEN, A MARRIED WOMAN AS HER SOLE AND SEPARATE PROPERTY**

the real property in the  County of LOS ANGELES, State of California, described as:

LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND MADE A PART HEREOF

**Also Known as:** 31663 BROAD BEACH ROAD, MALIBU, CA 90265
"This conveyance establishes sole and separate property of a spouse, R & T 11911."

DATED: January 7, 2019                        **Signature Page attached hereto
                                              and made a part hereof**

MAIL TAX STATEMENTS TO PARTY SHOWN BELOW; IF NO PARTY SHOWN, MAIL AS SHOWN ABOVE:

AP#: 4470-019-017

## SIGNATURE PAGE

**Title of Document:  GRANT DEED**

**Date of Document:** January 7, 2019

_YAO LIN_     X AO L7N

_JIA CHEN_

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF
On ___ JAN 2 9 2019 ___
before me,    Morgan Kuehne
A Notary Public personally appeared
_Yao Lin_

People's Republic of China)
Municipality of Beijing )
Embassy of the United ) SS:
States of America )

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

~I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.~

WITNESS my hand and official seal.

Signature _____

(Seal)

## EXHIBIT "A"

### LEGAL DESCRIPTION

The land referred to herein is situated in the State of California, County of Los Angeles, City of Malibu and described as follows:

Those portions of Lots 4, 5 and 7 of Tract No. 20658, in the City of Malibu, County of Los Angeles, State of California, as per map recorded in Book 579, Pages 9 and 10 of maps, in the Office of the County Recorder of said County, described as follows:

Beginning at the Northeast corner of said Lot 4; thence along the Easterly line of said Lot 4, South 10° 05' 30" West 82.00 feet to the Easterly prolongation of the Northerly line of Lot 5; thence along said prolongation and along said Northerly line North 82° 02' 55" West 76.00 feet to a'line parallel with the Easterly line o said Lot 5 that passes through point in the Southerly line of said lot 5 distant North 79° 54' 30' West 76.00 feet from the Southeast, corner of said Lot 4; thence along said parallel line, South 10° 05'30" West 100.00 feet to the Southerly line of said lot 5; thence along said southerly line, North 79° 54' 30" West 10.00 feet to a point in said Southerly line distant South 79° 54' 30" East 69.00 feet from the Southwest corner of said Lot 6; thence parallel with the Easterly line of said lot 5, North 10° 05' 30" East 99.50 feet to the Northerly line of said Lot 5; thence Northwesterly, in a direct line South 70° 43' 58" West 39.00 feet from the most Northerly corner of said Lot 7; thence along said Northwesterly line, North 70° 43' 58" East 39.00 feet to said most Northerly corner; thence along the Northeasterly line of Lots 7 and 4, South 66° 28' 30" East 107.11 feet to the point of beginning.

Except therefrom all oil, gas, minerals and other hydrocarbon, below a depth of 500 feet, without the right of surface entry, as reserved in instrument of record.

APN: 4470-019-017

# EXHIBIT 16

# California All-Purpose Certificate of Acknowledgment

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

**State of California**

**County of Los Angeles** } s.s

On __March 11, 2019__ before me, __Brenda Machuca V.__, NOTARY PUBLIC,

personally appeared __JIA CHEN__

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Signature of Notary Public

BRENDA MACHUCA V.
Notary Public - California
Los Angeles County
Commission # 2194619
My Comm. Expires Apr 29, 2021

Seal

----------------------OPTIONAL INFORMATION----------------------

Although the information in this section is not required by law, it could prevent fraudulent removal and reattachment of this acknowledgment to an unauthorized document and may prove useful to persons on the attached document.

**Description of Attached Document**

The preceding Certificate of Acknowledgment is attached to a

document titled/for the purpose of __Grant Deed.__

__AP#: 4460-035-010__

Containing __3__ pages, and dated __Jan. 7, 2019__

BOE-502-A (P1) REV. 13 (06-17) ASSR-70 (REV. 8-17)

## PRELIMINARY CHANGE OF OWNERSHIP REPORT

To be completed by the transferee (buyer) prior to a transfer of subject property, in
accordance with section 480.3 of the Revenue and Taxation Code. A *Preliminary
Change of Ownership Report* must be filed with each conveyance in the
County Recorder's office for the county where the property is located.

| FOR ASSESSOR'S USE ONLY | | | |
|---|---|---|---|
| | 4460-035-010 | | |
| | ASSESSOR'S PARCEL NUMBER | | |
| | Yao Lin | | |
| | SELLER/TRANSFEROR | | |
| | BUYER'S DAYTIME TELEPHONE NUMBER | | |

27487 Latigo Bay View Dr, Malibu.

BUYER'S EMAIL ADDRESS

STREET ADDRESS OR PHYSICAL LOCATION OF REAL PROPERTY

CA. 90265-2866

( X ) YES ( ) NO This property is intended as my principal residence. If YES, please indicate the date of occupancy
or intended occupancy.

| MO | DAY | YEAR |
|---|---|---|

( ) YES ( X ) NO Are you a disabled veteran or an unmarried surviving spouse of a disabled veteran who was
compensated at 100% by the Department of Veterans Affairs?

MAIL PROPERTY TAX INFORMATION TO (NAME)
Mr. Buyer
Jia Chen

| MAIL PROPERTY TAX INFORMATION TO (ADDRESS) | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 5579 Angelus Ave | San Gabriel. | CA. | 91776 |

## PART 1.  TRANSFER INFORMATION            *Please complete all statements.*
This section contains possible exclusions from reassessment for certain types of transfers.

| YES | NO | | |
|---|---|---|---|
| (X) | ( ) | A. | This transfer is solely between spouses *(addition or removal of a spouse, death of a spouse, divorce settlement, etc.).* |
| ( ) | (X) | B. | This transfer is solely between domestic partners currently registered with the California Secretary of State *(addition or removal of a partner, death of a partner, termination settlement, etc.).* |
| ( ) | (X)* | C. | This is a transfer: ( ) between parent(s) and child(ren)   ( ) from grandparent(s) and grandchild(ren). |
| ( ) | (X)* | D. | This transfer is the result of a cotenant's death.  Date of death _____ |
| ( ) | (X)* | E. | This transaction is to replace a principal residence by a person 55 years of age or older. Within the same county? ( ) YES ( ) NO |
| ( ) | (X)* | F. | This transaction is to replace a principal residence by a person who is severely disabled as defined by Revenue and Taxation Code section 69.5. Within the same county? ( ) YES ( ) NO |
| ( ) | (X) | G. | This transaction is only a correction of the name(s) of the person(s) holding title to the property *(e.g., a name change upon marriage).* If YES, please explain: _____ |
| ( ) | (X) | H. | The recorded document creates, terminates, or reconveys a lender's interest in the property. |
| ( ) | (X) | I. | This transaction is recorded only as a requirement for financing purposes or to create, terminate, or reconvey a security interest *(e.g., cosigner).* If YES, please explain: _____ |
| ( ) | (X) | J. | The recorded document substitutes a trustee of a trust, mortgage, or other similar document. |
| | | K. | This is a transfer of property: |
| ( ) | (X) | | 1. to/from a revocable trust that may be revoked by the transferor and is for the benefit of [ ] the transferor, and/or [ ] the transferor's spouse [ ] registered domestic partner. |
| ( ) | (X) | | 2. to/from an irrevocable trust for the benefit of the [ ] creator/grantor/trustor and/or [ ] grantor's/trustor's spouse [ ] grantor's/trustor's registered domestic partner. |
| ( ) | (X) | L. | This property is subject to a lease with a remaining lease term of 35 years or more including written options. |
| ( ) | (X) | M. | This is a transfer between parties in which proportional interests of the transferor(s) and transferee(s) in each and every parcel being transferred remain exactly the same after the transfer. |
| ( ) | (X) | N. | This is a transfer subject to subsidized low-income housing requirements with governmentally imposed restrictions, or restrictions imposed by specified nonprofit corporations. |
| ( ) | (X)* | O. | This property is subject to a lease with a remaining lease term of 35 years or more including written options. This transfer is to the first purchaser of a new building containing an active solar energy system. |
| ( ) | (X) | P. | Other. This transfer is to _____ |

*Please refer to the instructions for Part 1

Please provide any other information that will help the Assessor understand the nature of the transfer.

THIS DOCUMENT IS NOT SUBJECT TO PUBLIC INSPECTION

EXHIBIT 17

# California All-Purpose Certificate of Acknowledgment

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

**State of California**

} s.s

**County of Los Angeles**

On _March 11, 2019_ before me, _Brenda Machuca V._, NOTARY PUBLIC,

personally appeared _JiA CHEN_

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Signature of Notary Public

BRENDA MACHUCA V.
Notary Public - California
Los Angeles County
Commission # 2194619
My Comm. Expires Apr 29, 2021

Seal

--------OPTIONAL INFORMATION--------
Although the information in this section is not required by law, it could prevent fraudulent removal and reattachment of this acknowledgment to an unauthorized document and may prove useful to persons on the attached document.

## Description of Attached Document

The preceding Certificate of Acknowledgment is attached to a

document titled/for the purpose of _GRANT Deed._

_APt: 4470 - 019 - 017_

Containing _3_ pages, and dated _Jan. 7, 2019_



**This page is part of your document - DO NOT DISCARD**

# 20190238746





**Pages:**
**0005**

**Recorded/Filed in Official Records**
**Recorder's Office, Los Angeles County,**
**California**

**03/18/19 AT 08:00AM**

| | |
|---|---|
| FEES: | 31.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 75.00 |
| PAID: | 106.00 |



**L E A D S H E E T**



201903180290018

00016375340

009695517

**SEQ:**
**01**

SECURE - 8:00AM



**THIS FORM IS NOT TO BE DUPLICATED**

E08_190318_6 65

BOE-502-A (P1) REV. 13 (06-17) ASSR-70 (REV. 8-17)

## PRELIMINARY CHANGE OF OWNERSHIP REPORT

To be completed by the transferee (buyer) prior to a transfer of subject property, in accordance with section 480.3 of the Revenue and Taxation Code. A *Preliminary Change of Ownership Report* must be filed with each conveyance in the County Recorder's office for the county where the property is located.

FOR ASSESSOR'S USE ONLY

4470-019-017
ASSESSOR'S PARCEL NUMBER
Yao Lin
SELLER/TRANSFEROR

BUYER'S DAYTIME TELEPHONE NUMBER

BUYER'S EMAIL ADDRESS

31663 Broad Beach Rd
STREET ADDRESS OR PHYSICAL LOCATION OF REAL PROPERTY

Malibu, CA. 90265-2616

( ) YES  (X) NO This property is intended as my principal residence. If YES, please indicate the date of occupancy [ MO | DAY | YEAR ]
or intended occupancy.

( ) YES  (X) NO Are you a disabled veteran or an unmarried surviving spouse of a disabled veteran who was compensated at 100% by the Department of Veterans Affairs?

MAIL PROPERTY TAX INFORMATION TO (NAME)
Mr. Buyer
Jia Chen

MAIL PROPERTY TAX INFORMATION TO (ADDRESS) | CITY | STATE | ZIP CODE
5579 Angelus Ave | San Gabriel | CA. | 91776

## PART 1. TRANSFER INFORMATION        *Please complete all statements.*

This section contains possible exclusions from reassessment for certain types of transfers

| YES | NO | | |
|---|---|---|---|
| (x) | ( ) | A. | This transfer is solely between spouses *(addition or removal of a spouse, death of a spouse, divorce settlement, etc.).* |
| ( ) | (x) | B. | This transfer is solely between domestic partners currently registered with the California Secretary of State *(addition or removal of a partner, death of a partner, termination settlement, etc.).* |
| ( ) | (x)* | C. | This is a transfer: ( ) between parent(s) and child(ren)  ( ) from grandparent(s) and grandchild(ren). |
| ( ) | (x)* | D. | This transfer is the result of a cotenant's death. Date of death |
| ( ) | (x)* | E. | This transaction is to replace a principal residence by a person 55 years of age or older. Within the same county? ( ) YES  ( ) NO |
| ( ) | (x)* | F. | This transaction is to replace a principal residence by a person who is severely disabled as defined by Revenue and Taxation Code section 69.5. Within the same county? ( ) YES  ( ) NO |
| ( ) | (x) | G. | This transaction is only a correction of the name(s) of the person(s) holding title to the property *(e.g., a name change upon marriage).* If YES, please explain: |
| ( ) | (x) | H. | The recorded document creates, terminates, or reconveys a lender's interest in the property. |
| ( ) | (x) | I. | This transaction is recorded only as a requirement for financing purposes or to create, terminate, or reconvey a security interest *(e.g., cosigner).* If YES, please explain: |
| ( ) | (x) | J. | The recorded document substitutes a trustee of a trust, mortgage, or other similar document. |
| ( ) | (x) | K. | This is a transfer of property: |
| ( ) | (x) | | 1. to/from a revocable trust that may be revoked by the transferor and is for the benefit of [ ] the transferor, and/or [ ] the transferor's spouse [ ] registered domestic partner. |
| ( ) | (x) | | 2. to/from an irrevocable trust for the benefit of the [ ] creator/grantor/trustor and/or [ ] grantor's/trustor's spouse [ ] grantor's/trustor's registered domestic partner. |
| ( ) | (x) | L. | This property is subject to a lease with a remaining lease term of 35 years or more including written options. |
| ( ) | (x) | M. | This is a transfer between parties in which proportional interests of the transferor(s) and transferee(s) in each and every parcel being transferred remain exactly the same after the transfer. |
| ( ) | (x) | N. | This is a transfer subject to subsidized low-income housing requirements with governmentally imposed restrictions, or restrictions imposed by specified nonprofit corporations. |
| ( ) | (x)* | O. | This transfer is to the first purchaser of a new building containing an active solar energy system. |
| ( ) | (x) | P. | Other. This transfer is to |

*Please refer to the instructions for Part 1

Please provide any other information that will help the Assessor understand the nature of the transfer.

THIS DOCUMENT IS NOT SUBJECT TO PUBLIC INSPECTION

# EXHIBIT 18

#27

Mr. Lin Yao
Chairman
Allscore Payment Service Co., Ltd
1/F Floor, Zhong Hai International Center
28 West Street Pinganli, Xicheng District, Beijing China

May 31, 2019

We are pleased to submit attached term sheet to indicate our intention to cooperate with Allscore Payment Service Co., Ltd providing on line payment service, prepaid card and cross border payment services in China

Wirecard AG is a leading international fintech company with a full banking license, listed on the German stock market (DAX 30 companies) and is headquartered in Munich. The company offers electronic payment transaction solutions, full banking services, clearing services as well as issuing and processing of physical and virtual payment cards.

Based on Sino-Germany high level financial framework agreement signed in 2019, Chinese government welcomes qualified German institution to join the RMB cross-border payment system for cross border RMB clearing and settlement business. Under this provision, we believe that our two companies' joint efforts could further develop and enhance the overall strength of the payment industry in China.

If the foregoing is satisfactory please indicate your agreement with the foregoing by countersigning a copy of this letter and returning it to our attention. We look forward to proceeding together on this cooperation.

Georg Von Waldenfels
Executive Vice President
Wirecard AG

Thorsten Holten
Executive Vice President
Wirecard AG

Lin Yao
Allscore Payment Service Co. Ltd

wirecard

Sent from my iPhone

EXHIBIT 19

**Transfer Record with PianPian Liu**

Time: 01/07/2019 – 01/06/2020
Payment: ¥5,275,000.00
Income: ¥1,290,000.00
Total: 14 transactions

Date: 11/19/2019
Time: 08:19:19
Card number ending with 8356
+ ¥100，000.00

Date: 11/04/2019
Time: 12:21:40
Card number ending with 8356
+ ¥200,000.00

Date: 11/01/2019
Time: 11:47:36
Card number ending with 8356
+ ¥500,000.00

Date: 10/31/2019
Time: 10:39:51
Card number ending with 8356
+ ¥200,000.00

Date: 10/24/2019
Time: 06:17:11
Card number ending with 8356
- ¥ 1,000,000.00

Date: 08/19/2019
Time: 14:49:17
Card number ending with 8356
- ¥ 1,000,000.00

Date: 08/19/2019
Time: 14:48:12
Card number ending with 8356
- ¥ 1,000,000.00

Date: 08/19/2019
Time: 14:47:13
Card number ending with 8356

- ￥1,000,000.00

Date: 08/19/2019
Time: 14:46:16
Card number ending with 8356
- ￥1,000,000.00

# EXHIBIT 20

**WeChat chat history between Jia and Sun**

2019-09-05 --- 2019-9-10

Jia(09/05/2019 11:20 PM): Sun, please help us to draft a divorce agreement. Lin agreed to leave the house naked, and I left him a car and the house in Zhenjiang. The point was to make sure that when he sold the company, all the income, direct or indirect, would go to me and my three sons. Since the three children are too young for me to work outside the home, I need property protection. Can you do it?

Jia(09/05/2019 11:23 PM): I have custody of children and Lin waives visitation rights.

Sun(09/05/2019 11:37 PM): I can draft it.

Jia(09/05/2019 11:37 PM): Draft as soon as possible, I want to do it as soon as possible.

Jia(09/05/2019 11:39 PM): You promised me at the time that you would protect the interests of me and my three children, help me.

Sun(09/05/2019 11:42 PM): I will draft as soon as possible.

Jia(09/05/2019 11:42 PM): The house in Beijing has actually been mortgaged. The only hope for me and my three sons is the income from the sale of the company, so the focus of the agreement is how to ensure the sale.

Jia(09/05/2019 11:44 PM): You should have communicated with Lin, he agreed.

Sun(09/05/2019 11:45 PM): No communication.

Jia(09/05/2019 11:49 PM): He agreed to financially compensate me and my three children as much as possible. However,   because the company is not for sale at present, I must guarantee this income to support my three children. You also know that there are no assets in the United States, only loans.

Sun(09/05/2019 11:58 PM): Got it, drafted up for your review.

Jia(09/06/2019 12:01 AM): Thank you Attorney Sun.

Jia(09/10/2019 09:35 PM): Is the agreement drafted? I hope to get it next week. Regarding the interests of the sale of the company, can it be guaranteed by transferring all the shares of the relevant company to me?

Sun(09/10/2019 09:50 PM): I think ok to do that. (Attached Divorce Agreement)

# EXHIBIT 21

**Divorce Agreement**

**Party 1: Yao Lin (Male)**
ID Number:321026197211050034

**Party 2: Jia Chen (Female)**
ID Number: 450305197602041023

The man and the woman registered their marriage in Beijing on April 20, 1999, and had three sons after the marriage: Lin Ruogu (date of birth: June 20, 2013), Lin Ruoli (date of birth: June 20, 2013), and Lin Ruoya (date of birth: December 20, 2018). Now, due to the cheating of the male party, the relationship between the two parties has broken down and they are voluntarily divorced. After friendly consultation, the following agreement was reached on divorce, property division and child support:

**Article 1 Divorce**
The man and woman voluntarily divorce and dissolve the marital relationship between the two parties.

**Article 2 Child support**
2. 1 Custody
Both parties have three sons after marriage, all three children will be raised by the woman after the divorce.
2.2 Alimony
The man shall pay monthly support of RMB 1 million until December 2039. Starting from January 2040, the man will pay the woman 300,000 RMB per month until the woman's death. Payments will be made in the following manner:
Cash payment on the 1st of each month or transfer to the account designated by the female.
In case of major medical and educational expenses for the child and the woman, such as facing further education, sudden major illness, etc., which require a large amount of financial expenses, the man will bear this additional expense
2.3 Visiting rights
With the consent of the woman, the man can visit the children.

**Article 3 Division of property and debts**
Since the man is fully responsible for the breakdown of the marriage, the man agrees to be netted out of the marriage and all property will belong to the woman (except as otherwise agreed in this agreement) to ensure that the woman has the ability to raise the children and support herself if the man is unable or does not pay alimony, living expenses or compensation on time.
3.1 Property purchased after marriage and agreed to be owned by the woman at the time of purchase and in the woman's name shall belong to the woman.
(1) House
The property located at No. 18, District 6, Lijing Garden, No. 89, Airport Road, Chaoyang District, Beijing (Property Certificate No. X No. 1161440 for the garage and Property Certificate No. X No. 1161441 for the residence).

(2) Automobile

One Volkswagen Beetle, license plate No. Beijing KF3122.

3.2 The car purchased after the marriage and in the name of the man shall belong to the man.

One Chrysler Grand Jaguar, license plate No. Beijing FK1129.

3.3 The debts in the name of the female party shall belong to the female party, and the debts in the name of the female party shall be paid by the female party alone. The claims in the name of the male party shall belong to the male party, and the debts in the name of the male party shall be repaid by the male party alone.

3.4 Both parties have no common claims and debts. If a common debt is found after the two marriages, the debt belongs to the woman. If a common debt is found after the divorce, the debt shall be repaid by the male party alone.

3.5 Equity in the company

After the divorce, the man will transfer 100% of the shares of Beijing Longhe Trade Co., Ltd. held in his name to the woman, and the man will cooperate in the registration procedures for industrial and commercial changes.

3.6 Bank deposits and marketable securities (stocks, bonds, shares of investment funds, financial products, etc.) in the respective names of both parties shall belong to each of them.

3.7 Compensation fee

During the marriage, the man agrees to give the woman financial compensation in the amount of RMB 10 million, which will be paid within five years after the divorce, because the woman has paid more obligations such as raising children and taking care of the elderly.

3.8 Confirmation of common property and debts

The parties hereby acknowledge that they have disclosed all property and claims and debts of both parties. If either party violates such disclosure obligation by concealing, transferring or hiding the common property and claims of the spouses, such concealed, transferred or hidden common property and claims of the spouses shall be fully owned by the other party.

3.9 After the parties have distributed and arranged the relevant property in accordance with the above agreement, there shall be no other property disputes between the parties.

**Article 4 Others**

4.1 This agreement shall take effect after both parties have signed and after the divorce of their marriage has been registered by the Civil Affairs Bureau.

4.2 This agreement is made in three copies, each with the same legal effect; one copy for each party and the other copy shall be retained by the marriage registration authority of the Civil Affairs Bureau.

Male Party: Yao Lin
09/12/2019

Female Party: Jia Chen
09/12/2019

EXHIBIT 22

DIVORCE CERTIFICATE
(Seal) Special seal for Divorce Certificate Administration of the
Ministry of Civil Affairs of the People's Republic of China

Both sides applied for divorce. Upon due examination it is ascertained to be in conformity with the Marriage Law of
the People's Republic of China. They are allowed to register and are given this certificate.
Beijing Shunyi District People's Government (special seal for marriage registration)
Registrar:

Bearer of Certificate: Chen Jia
Date of Issue: September 12, 2019
# L110113-2019-002752
Remark:

Name: Chen Jia
Sex: female
Date of Birth: February 4, 1976
Nationality: Chinese
ID Card No.: 450305760204102
Name: Lin Yao
Sex: male
Date of Birth: November 5, 1972
Nationality: Chinese
ID Card No.: 321026721105003



持 证 人
陈佳

登记日期
2019 年 09 月 12 日

离婚证字号
L110113-2019-002752

备注



姓名 陈佳　　　　　　　　　　性别 女
国籍 中国　　　　　　　　　　出生日期 1976年02月04日
身份证件号 450305197602041023

姓名 林耀　　　　　　　　　　性别 男
国籍 中国　　　　　　　　　　出生日期 1972年11月05日
身份证件号 321026197211050034

# EXHIBIT 23

**Execution Version**

Dated                    2020

**Joy Dragon Consultants Co., Ltd.**

and

**Shanghai Aiwu Investment Management Co., Ltd.**

and

**The persons named in Part 1 of Schedule 2**

and

**Wirecard Acquiring & Issuing GmbH**

**EQUITY INTEREST TRANSFER AGREEMENT**

relating to

**Beijing Apple Information Consulting Co., Ltd.**

K&L GATES

K&L Gates LLP Shanghai Representative Office
Suite 3708, Park Place
1601 Nanjing West Road
Jing An District,
Shanghai 200040, China

Tel: 86 21 2211 2000

## Contents

| 1 | INTERPRETATION | 1 |
|---|---|---|
| 2 | AGREEMENT TO TRANSFER | 2 |
| 3 | CONSIDERATION | 2 |
| 4 | CONDITIONS PRECEDENT | 4 |
| 5 | UNDERTAKINGS | 5 |
| 6 | COMPLETION | 7 |
| 7 | COMPLETION ACCOUNTS | 8 |
| 8 | EARN OUT | 13 |
| 9 | WARRANTIES | 17 |
| 10 | GUARANTEE | 21 |
| 11 | TERMINATION | 22 |
| 12 | CONFIDENTIALITY | 23 |
| 13 | NOTICES | 23 |
| 14 | MISCELLANEOUS | 23 |

Schedule 1 Definitions ........................................................................28

Schedule 2 ..........................................................................................36

    Part 1 : Particulars of Warrantors .......................................36

    Part 2 : Particulars of the Sellers and their respective Equity Interests ..............36

Schedule 3 Conditions Precedents ........................................................37

Schedule 4 Transfer Completion Obligations ........................................39

Schedule 5 Warranties ........................................................................40

Schedule 6 ..........................................................................................62

    Part 1 : Completion Accounts format ...................................62

    Part 2 : Holdback Statement format ....................................63

Schedule 7 EBITDA Statement ...........................................................64

**THIS AGREEMENT** is made on                    2020

**BETWEEN:**

**(1)**   **Joy Dragon Consultants Co., Ltd.,** a limited liability company established and existing under the laws of Hong Kong with its legal address at Flat/RM A 12/F Kiu Fu Commercial Bldg, 300 Lockhart Road, Wan Chai, Hong Kong ("**Joy Dragon**");

**(2)**   **Shanghai Aiwu Investment Management Co., Ltd. ,** a limited liability company established and existing under the laws of the PRC with its legal address at Room 03, 20th Floor, No. 68, Lane 1399, Husong Road, Songjiang District, Shanghai, PRC ("**Aiwu**");

each of Joy Dragon and Aiwu a "**Seller**" and collectively the "**Sellers**"

**(3)**   **The Persons** named in Part 1 of Schedule 2 (each a "**Warrantor**" and collectively the "**Warrantors**"); and

**(4)**   **Wirecard Acquiring & Issuing GmbH**, a limited liability company established and existing under the laws of Germany with its legal address at Einsteinring 35, 85609 Aschheim, Munich, Germany ("**Investor**" and "**Purchaser**"),

each a "**Party**" and collectively the "**Parties**".

**RECITALS:**

(A)   The Sellers, as at the date of this Agreement, are the sole shareholders of Beijing Apple Information Consulting Co., Ltd., a limited liability company established and existing under the laws of the PRC (as defined below) with its legal address at Suite 401-08, Building 28, Ping'anli West Street, Xicheng District, Beijing, PRC ("**Company**").

(B)   On or before the date of this Agreement, the Parties (other than Shi Yonglei) entered into together with various other parties the Framework Agreement and other Transaction Documents, which among other things, contemplate the Investor becoming a shareholder of the Company with an 80% Equity Interest, through a subscription for 9.36% of the Equity Interest, and following the completion of which a transfer by the Sellers of an aggregate Equity Interest equal to 70.64% of the Registered Capital to the Investor as further set out under this Agreement.

(C)   The Parties agree to enter into this Agreement to set out the terms of the equity interest transfer in recital (B).

**IT IS AGREED** as follows:

**1**         **INTERPRETATION**

In this Agreement, unless the context otherwise requires, the provisions in this Clause 1 apply.

1.1      Definition

Capitalised terms used in the English version of this Agreement and terms in bold text in the Chinese version of this Agreement shall have the meanings ascribed to them in Schedule 1.

1.2      Interpretation

1.2.1      a reference to any PRC government authority or department includes such authority or department at central, provincial, municipal and other levels and their successor authority or department;

1.2.2      a reference to PRC Law shall include any laws, regulations, rules, and regulatory documents publicly promulgated by the PRC and any substitution, amendment and subsidiary legislation under it from time to time;

1.2.3  a reference to any document includes any amendment, novation, supplementation or replacement from time to time;

1.2.4  words in the singular in the English version includes its plural form and vice versa;

1.2.5  a reference to a Clause, Section, Schedule or Annexure is to a clause or section of or a schedule or annexure to this Agreement;

1.2.6  a reference to any person includes an individual, a body corporate, an unincorporated body or other entity, whether or not having separate legal personality;

1.2.7  words denoting a gender include all genders;

1.2.8  the headings of Clauses and Sections are inserted for convenience only and shall not affect the construction of this Agreement;

1.2.9  a reference to time is to the local time in Beijing in the PRC; and

1.2.10  if any right or obligation under this Agreement falls due on a date which happens not to be a Business Day, this right or obligation shall instead fall due on the next succeeding Business Day after the stated date.

## 2    AGREEMENT TO TRANSFER

2.1  Transfer

Subject to the terms of this Agreement, the Sellers (each as to those of the Equity Interest specified against its name in Column C of Part 2 of Schedule 2) agree to sell and transfer, and the Investor agrees to purchase and accept the transfer of, the Sale Equity Interest free from all Encumbrances and together with all rights attaching to them ("**Transfer**").

2.2  Consent of the shareholders

2.2.1  Each Seller irrevocably consents to the Transfer and shall exercise its shareholder rights to cause the Company to pass the necessary board and shareholder resolutions for the consummation in respect of the Transfer.

2.2.2  Each Seller waives all pre-emptive rights and rights of first refusal that it may have or be entitled to in respect of the Transfer, whether or not these rights are granted by the articles of association of the Company or PRC Law.

## 3    CONSIDERATION

3.1  Purchase Price

The consideration for the Sale Equity Interest shall be the aggregate cash sum of EUR 78,695,023 ("**Purchase Price**"), comprising the following amounts:

3.1.1  EUR  61,987,604 ("**Base Purchase Price**"); and

3.1.2  EUR 16,707,419 ("**Maximum Earn Out**"),

which shall be payable in cash in accordance with this Clause 3 and Clause 6, and calculated and adjusted in accordance with Clauses 7 and 8.

3.2  Prepayment

Subject to (i) the Subscription Completion occurring and (ii) the application to the PBOC having been made in accordance with Clause 4.5 and in reliance on the Warranties and the Aiwu Warranties, the Investor shall pay the Prepayment Amount to Joy Dragon in the manner referred to in Clause 3 and ensure that this payment is credited to the relevant account in

accordance with Clause 3.3.1 in full without any deduction no later than three Business Days after the date on which the Investor receives the written notice delivered in accordance with Clause 4.5.2. If Transfer Completion does not occur and the Investor terminates this Agreement pursuant to Clause 6.4.1(i), Joy Dragon shall refund any Prepayment Amounts received by it pursuant to this Clause 3.2 by crediting the account of the Investor in accordance with Clause 3.3.1 in full without any deduction no later than seven Business Days after the date of termination. The "**Prepayment Amount**" shall mean the aggregate amount of EUR 28,206,379 to be paid to Joy Dragon in accordance with this Clause 3.2.

3.3    Method of Payment

    3.3.1    Wherever in this Agreement provision is made for the payment by one party to the other party, the payment shall be effected by wire transfer to the following accounts unless the party entitled to the payment notify the other party in writing of the details of another bank account in lieu of the one set out below at least three Business Days before the date on which the payment is due (provided, however, that the bank account designated by any Seller shall not be changed except with the written consent of the other Seller):

        (i)    for payment to Joy Dragon:

| | |
|---|---|
| Name of holder | : |
| Bank account number | : |
| Bank name | : |
| Bank branch | : |
| Bank address | : |
| SWIFT Code | : |

        (ii)    for payment to Aiwu:

| | |
|---|---|
| Name of holder | : |
| Bank account number | : |
| Bank name | : |
| Bank branch | : |
| Bank address | : |
| SWIFT Code | : |

        (iii)    for payment to the Investor:

| | | |
|---|---|---|
| Name of holder | : | Wirecard Acquiring & Issuing GmbH |
| Bank account number | : | DE18 5123 0800 0000 0526 76 |
| Bank name | : | Wirecard Bank AG |
| Bank branch | : | n/a |
| Bank address | : | Einsteinring 35, 85609 Aschheim, Germany |
| SWIFT Code | : | WIREDEMMXXX |

    3.3.2    Payment shall be deemed to have been made by the paying party if so made by wire transfer in accordance with Clause 3.3.1.

    3.3.3    Aiwu shall obtain the foreign exchange business registration certificate (外汇业务登记凭证) to open its special domestic account for asset realization (境内资产变现专

戶) to receive payment of its share of the Purchase Price no later than two Business Days  preceding the relevant payment date.

3.4     Payment in foreign currency

    3.4.1     Except as otherwise stipulated in this Agreement, if and to the extent any amount relevant to the calculation or determination of a certain payment to be made under this Agreement is denominated in RMB, that RMB-denominated amount shall be converted at the Applicable Rate into Euro for the calculation or determination of the payment to be made by the Investor in Euro.

    3.4.2     Payment of the Euro sum in accordance with Clause 3.4.1 shall be deemed to be satisfaction in full of the Investor's obligation to make payment of the corresponding amount in RMB.

## 4     CONDITIONS PRECEDENT

4.1     Conditions Precedent

Completion of the Transfer shall be conditional upon the fulfilment or waiver of the conditions set out in Schedule 3.

4.2     Waiver

The Investor may, at any time by giving written notice to other Parties, conditionally or unconditionally waive all or any part of the Conditions Precedent, to the extent legally permissible under the Applicable Laws.

4.3     Notice

Each Seller shall promptly, but in no event later than the next Business Day after becoming aware of the following, give written notice to the Investor of:

    4.3.1     the receipt of any formal response from the PBOC, MIIT, MOFCOM or any other Approval Authority, including any response to the effect that it would not be possible in practice for any approval, registration or filing necessary for the entry into and the legal enforceability and performance of this Agreement and any other approvals set out in Schedule 3, to be obtained or effected (either at all or without alteration in any material respect to the terms or any of the Transaction Documents or that any approval, registration or filing that has been granted or made would be or has been revoked, amended or supplemented), and in addition, the Company shall orally communicate any informal responses of this nature from any of the Approval Authorities;

    4.3.2     the result of any communication with the relevant PRC Approval Authorities, including any formal or informal response relating to the likelihood and timing of obtaining or effecting any approval, registration or filing;

    4.3.3     the receipt of any formal or informal response from the PBOC to the effect that it would object or otherwise consider inappropriate for any of the Subscription, Longhe Transfer and CJ Transfer to have been completed; and

    4.3.4     the satisfaction of all Conditions Precedent (other than the Condition Precedent set out in Paragraph 10 of Schedule 3).

4.4     Responsibility for Satisfaction of Conditions Precedent

    4.4.1     Each of Joy Dragon and Lin Yao shall, and shall procure that the Company and AllScore (as the case may be), use all reasonable endeavours to procure that the Conditions Precedent are fulfilled as soon as reasonably practicable.

4.4.2 Without prejudice to Clause 4.4.1, the Parties agree that all requests and enquiries from PBOC, MOFCOM, MIIT, SAMR or any other Approval Authorities shall be dealt with by the Company, AllScore and the Investor in consultation with each other, and the Company, AllScore and the Investor shall promptly cooperate with and provide all necessary information and assistance reasonably required by any Approval Authority upon being requested to do so by the other.

4.5 Application to PBOC

4.5.1 Without limiting Clause 4.4.1, each of Joy Dragon, Lin Yao and the Company shall procure that AllScore make an application to the PBOC on the next Business Day following the date of this Agreement for its approval of the Investor becoming the ultimate controlling shareholder of AllScore on the Transfer Completion, which supporting documents includes without limitation originals of the executed originals of this Agreement, the Subscription Agreement, the Longhe EITA and the CJ EITA.

4.5.2 The Sellers shall notify the Investor in writing on the date on which the application to the PBOC have been made in accordance with Clause 4.5.

## 5 UNDERTAKINGS

5.1 Undertakings

Each of Joy Dragon and Lin Yao undertakes to the Investor that prior to Transfer Completion:

5.1.1 as soon as reasonably practicable after the date of this Agreement, it shall use its best endeavours to make all consultations, filings and registrations as are necessary and provide all information necessary to the relevant PRC Tax authorities in order to obtain the Withholding Tax Certificate;

5.1.2 the Company and AllScore will carry on business only in the ordinary and usual course;

5.1.3 each Operational Licence will remain in full force and effect (except as otherwise consented to in writing by the Investor);

5.1.4 the Investor and its agents will, upon reasonable notice, be allowed reasonable access to senior management members and the books and records of the Company and AllScore;

5.1.5 it will provide all information regarding the businesses and affairs of each of the Company and AllScore as the Investor may require;

5.1.6 each of the Company and AllScore, in a timely manner, signs all necessary documentation, completes all necessary procedures and applies for all necessary approvals from the PBOC, MOFCOM, MIIT and other relevant PRC Approval Authorities in respect and in view of the approval of the Transaction Documents and the transactions they contemplate.

5.1.7 it shall not take any action which would constitute or could reasonably be likely to give rise to a breach of the representations or warranties given by it under Clauses 9.1.1 and 9.1.2.

5.1.8 Joy Dragon shall use their best endeavours to settle all Related Party Receivables as at the date of this Agreement.

5.2     Restrictions

Without prejudice to the generality of Clause 5.1, each of Joy Dragon and Lin Yao shall cause the Company and AllScore not to, prior to Transfer Completion, without the prior written consent of the Investor, do or agree to do any of the following:

5.2.1     increase or decrease the Registered Capital or the registered capital of AllScore;

5.2.2     do or permit to be done, anything that may cause the Operational Licences to be revoked, cancelled or have its renewal application refused, rejected, not otherwise accepted by the issuing PRC governmental authority;

5.2.3     undertake any form of reorganisation, including without limitation any acquisition, merger, consolidation, asset or share transfer, restructuring or group structuring;

5.2.4     incur any expenditure on capital account;

5.2.5     dispose of or grant any option or right of pre-emption in respect of any part of its assets;

5.2.6     borrow or lend any money (cumulatively in excess of RMB 10,000,000);

5.2.7     enter into any unusual or abnormal contract or commitment, or enter into any leasing, hire purchase or other agreement or arrangements for payment on deferred terms;

5.2.8     declare, make or pay any dividend or other distribution or do or allow to be done anything which renders its financial position less favourable than at the date of this Agreement;

5.2.9     grant, issue or redeem any mortgage, charge, debenture or other security or give any guarantee or indemnity, or otherwise permit any Encumbrance to be effected or registered against the Registered Capital or the registered capital of AllScore;

5.2.10     make any change in the terms and conditions of employment of any of its directors or employees or employ or terminate (except for good cause) the employment of any person or make any arrangements with any unions;

5.2.11     make, or announce to any person any proposal to make, any change or addition to any retirement, death or disability benefit of or in respect of any of its directors or employees or former directors or former employees (or any dependant of any of these persons) or grant or create any additional retirement/death/disability benefit (as so defined) or, without limiting the foregoing, take any action or allow any action to be taken other than in the ordinary course or omit to take any action necessary or prudent for the ordinary proper operation of any provident fund or pension schemes of the Company and AllScore;

5.2.12     permit any of its insurances to lapse or do anything which would make any policy of insurance void or voidable;

5.2.13     create, issue, purchase or redeem any class of shares or loan capital;

5.2.14     settle any existing or initiate any new litigation;

5.2.15     change the accounting procedures, principles or practices of any member of the PRC Group;

5.2.16     take or refrain from taking any action which may cause any major impediment or undue delay to Transfer Completion;

5.2.17   undertake any activity which would have constituted a breach of any of the Transaction Documents (and to the extent that it is in Agreed Terms, as if this Transaction Document has become effective);

5.2.18   sell any assets; and

5.2.19   undertake any action what could lead to the payment license being endangered or omit any action to eliminate the risk the payment license being endangered.

5.3   Undertakings by Investor

Prior to Transfer Completion, the Investor undertakes to the Company that it shall not take or refrain from taking any action which would materially affect or could reasonably be likely to have a material effect on the satisfaction of the Conditions Precedent.

5.4   Undertakings by Aiwu

Prior to Transfer Completion, Aiwu undertakes to the Investor that it shall not take or refrain from taking any action which would result in any of the undertakings and obligations under Clauses 5.1 and 5.2 to be breached.

**6   COMPLETION**

6.1   Date and Place

Subject to compliance with Clause 4.1, Transfer Completion shall take place in Beijing 11 Business Days following the service of a notice or waiver referred to in Clause 4.2 with respect to the last condition to be satisfied or the service of the notice referred to in Clause 4.3.4, or at any other place or on any other date as the Investor and the Sellers may agree.

6.2   Obligations on Transfer Completion

On Transfer Completion, each Party shall procure that its obligations specified in Schedule 4 are fulfilled.

6.3   Payment for Transfer

Subject to compliance by the Sellers with Clauses 4.1 and Clause 6.1 and in reliance on the Warranties and the Aiwu Warranties, the Investor shall on or before the Transfer Completion Date pay the Preliminary Completion Payment to the Sellers in accordance with Schedule 2 in the manner referred to in Clause 3 and ensure that this payment is credited to the accounts in accordance with Clause 3.3.1 in full without any deduction. The "**Preliminary Completion Payment**" means the sum of

(i)   the Base Purchase Price in accordance with Clause 3.1.1;

(ii)   less the Prepayment Amount;

(iii)   less 80% of the Preliminary Net Debt amount;

(iv)   less 80% of the Preliminary Holdback Amount;

(v)   less 20% of the Preliminary Accumulated Losses; and

(vi)   less the Withholding Amount.

on the basis of the Preliminary Completion Accounts, provided that if the aggregate of the amounts in paragraphs (iii), (iv) and (v) above (the "Aggregate 80% Deductions") exceed EUR 33,781,186, the deductions in excess over such amount, and any corresponding adjustment payments pursuant to Clause 7.2.1, shall be borne by and made against the consideration payable to Joy Dragon only and not Aiwu.

6.4       Failure to Complete

6.4.1     If the provisions of Clause 5 and this Clause 6 are not fully complied with by the Sellers on or before the date set for Transfer Completion, the Investor may exercise any of the following rights by notice in writing to the Sellers served on this date:

(i)       to terminate this Agreement and the other Transaction Documents without liability on the part of the Investor;

(ii)      to effect Transfer Completion as soon as practicable having regard to the defaults which have occurred; or

(iii)     to fix a new date for Transfer Completion, in which case the foregoing provisions of this Clause 6 shall apply to Transfer Completion as so deferred.

6.4.2     For the avoidance of doubt, the foregoing rights of the Investor shall be in addition to and without prejudice to all other rights available to it and its legal successors including the right to claim damages.

6.5       Post-Transfer Procedures

The Parties shall, as soon as practicable after the Transfer Completion Date (but in any event no later than 30 days after the date of a written request from the Company or the Investor), take all necessary actions considered necessary or desirable by the Sellers or the Investor to complete in accordance with PRC Law all other formalities, filings, notifications and registrations associated with the transactions contemplated under this Agreement and any other Transaction Document.

**7         COMPLETION ACCOUNTS**

7.1       Preparation of Completion Accounts

7.1.1     The Investor shall:

(i)       cause the Company and Allscore to prepare a draft of the consolidated Completion Accounts in accordance with applicable PRC accounting standards and on the same basis and using the same accounting principles, practices, policies and procedures as applied in the preparation of the Audited Accounts and in the format set out in Part 1 of Schedule 6;

(ii)      by extracting the relevant items from the draft Completion Accounts, prepare or cause to be prepared a draft of the net debt calculation and the draft Holdback Statement in the format set out in Part 2 of Schedule 6; and

(iii)     deliver the draft Completion Accounts and the draft net debt calculation and the draft Holdback Statement to the Sellers by no later than 90 Business Days following the Completion Date.

7.1.2     The Sellers shall within the period of 20 Business Days following delivery of the draft Completion Accounts and the draft Holdback Statement to them pursuant to Clause 7.1.1 (the "**Initial Agreement Period**") either:

(i)       confirm their agreement with the draft Completion Accounts and/or draft net debt calculations and draft Holdback Statement so delivered; or

(ii)      give notice in writing to the Investor that the Sellers dispute the draft Completion Accounts and/or the draft Holdback Statement (a "**Completion Accounts Dispute Notice**").

7.1.3     Any Completion Accounts Dispute Notice shall set out in reasonable detail:

(i) the matters which are disputed (the "**Completion Accounts Disputed Matters**");

(ii) the reasons why such matters are disputed; and

(iii) the resulting adjustments which, in the opinion of the Sellers, should be made to the draft Completion Accounts and/or draft Holdback Statement.

A Completion Accounts Dispute Notice shall only be valid for the purposes of this Agreement if it is served prior to the expiry of the Initial Agreement Period and includes the information required by this Clause 7.1.3.  Except for matters specifically set out in a valid Completion Accounts Dispute Notice served prior to the expiry of the Initial Agreement Period, the Sellers shall be deemed to have agreed in full with the draft Completion Accounts and the draft Holdback Statement.

7.1.4   If the Sellers:

(i) do not serve a valid Completion Accounts Dispute Notice prior to the expiry of the Initial Agreement Period; or

(ii) during the Initial Agreement Period confirms by notice in writing their agreement with the draft Completion Accounts and the draft Holdback Statement (either as delivered in accordance with Clause 7.1.1 or as modified in such manner as shall be agreed between the Investor and the Sellers),

the draft Completion Accounts and the draft Holdback Statement shall constitute the Completion Accounts and the Holdback Statement for the purposes of this Agreement and shall be final and binding on the Investor and the Sellers.

7.1.5   If the Sellers serve a valid Completion Accounts Dispute Notice prior to the expiry of the Initial Agreement Period, then the Sellers and the Investor shall meet and discuss the Completion Accounts Disputed Matters and (acting in good faith) shall use their respective reasonable endeavours (in conjunction with their respective accountants) to reach agreement on the Completion Accounts Disputed Matters as soon as reasonably practicable and in any event within the period of 20 Business Days following the date of service of the Completion Accounts Dispute Notice (or such longer period as may be agreed in writing between the Sellers and the Investor) (the "**Completion Accounts Dispute Resolution Period**") and either:

(i) if the Investor and the Sellers reach agreement on the Completion Accounts Disputed Matters during the Completion Accounts Dispute Resolution Period, the draft Completion Accounts and the draft Holdback Statement shall be modified to reflect such agreement and, as so modified, shall constitute the Completion Accounts and the Holdback Statement for the purposes of this Agreement and shall be final and binding on the Sellers and the Investor; or

(ii) if the Investor and the Sellers do not reach agreement on the Completion Accounts Disputed Matters prior to the expiry of the Completion Accounts Dispute Resolution Period, then either the Investor or the Sellers may refer the Completion Accounts Disputed Matters to such independent firm of chartered accountants (the "**Independent Firm**") as may be agreed between the Investor and the Sellers or, in default of such agreement within 10 Business Days following the expiry of the Completion Accounts Dispute Resolution Period, as may (on the application of either the Investor or the Sellers) be nominated by the President for the time being of the Chinese Institute of Certified Public Accountants.

7.1.6 Where a reference is made to an Independent Firm pursuant to Clause 7.1.5, the Investor and the Sellers (acting in good faith) shall use their respective reasonable endeavours to agree with the Independent Firm as soon as reasonably practicable following its acceptance of such reference the Independent Firm's detailed terms of reference and the procedures which are to apply in relation to the hearing, consideration and determination by the Independent Firm of the Completion Accounts Disputed Matters.  The following general terms of reference and procedures shall apply in any event:

(i) the Independent Firm shall be instructed to make a determination only in relation to the Completion Accounts Disputed Matters specified in the Completion Accounts Dispute Notice and to make such determination in accordance with the accounting principles, practices, policies and procedures referred to in Clause 7.1.1;

(ii) the Sellers (acting jointly) and the Investor shall each prepare a written submission to the Independent Firm on the Completion Accounts Disputed Matters specified in the Completion Accounts Dispute Notice and shall deliver copies of their respective submissions to the Independent Firm and to each other within 20 Business Days following the acceptance by the Independent Firm of the reference to it;

(iii) following delivery of their respective submissions pursuant to paragraph (ii), the Sellers (acting jointly) and the Investor shall each have the opportunity to comment once only on the other party's submission.  Any such comments shall be in writing and shall be delivered to the Independent Firm and copied to the other party not later than 10 Business Days following the expiry of the 20 Business Day period referred to in paragraph (ii);

(iv) any information provided by either the Sellers (acting jointly) or the Investor in response to a subsequent request or enquiry by the Independent Firm shall be copied to the other party at the same time as it is delivered to the Independent Firm and, unless otherwise directed by the Independent Firm, such other party shall have the opportunity to comment once only on that information.  Any such comments shall be in writing and shall be delivered to the Independent Firm and copied to the party who provided the information not later than 10 Business Days after receipt of such information by the commenting party.  Thereafter, neither the Investor nor the Sellers shall be entitled to make further statements or submissions except insofar as the Independent Firm so requests (in which case it shall, on each occasion, give the other party 10 Business Days to comment on any statement or submission so made);

(v) in addition to the procedures set out above, the Independent Firm may, in its reasonable discretion, stipulate other procedures which are to apply in relation to the hearing, consideration and determination by it of the Completion Accounts Disputed Matters (which may include inviting the Sellers (acting jointly) and the Investor to make oral submissions).

(vi) the Independent Firm shall be requested to make its determination in relation to the Completion Accounts Disputed Matters and to notify the same to the Investor and the Sellers within 90 Business Days after its acceptance of the reference to it (or such longer period as the Independent Firm may reasonably determine).  In making its determination, the Independent Firm shall state what adjustments (if any) are necessary to the draft Completion Accounts

and/or the draft Holdback Statement to determine finally the Net Debt and the Holdback Amount and shall give its reasons therefor;

(vii)    in making its determination, the Independent Firm shall act as an expert and not as an arbitrator and the determination of the Independent Firm shall, in the absence of fraud or manifest error, be final and binding on the Investor and the Sellers;

(viii)    following the notification of the Independent Firm's determination to the Investor and the Sellers, the draft Completion Accounts and the draft Holdback Statement shall be amended as necessary to reflect the decision of the Independent Firm in relation to the Completion Accounts Disputed Matters and, as so amended, shall constitute the Completion Accounts and the Holdback Statement and shall be final and binding on the Sellers and the Investor;

(ix)    the fees and expenses of the Independent Firm shall be borne by the Investor and the Sellers in the proportions it directs or, in the absence of any such direction, equally between the Investor on the one hand and the Sellers on the other (and as between the Sellers, apportioned between them in proportion to their respective shareholding in the Company); and

(x)    the Investor and the Sellers shall provide or (so far as lies within their respective power) procure others to provide to the Independent Firm all such information and documentation as the Independent Firm shall reasonably require to assist it in reaching its determination.

7.1.7    The Investor and the Sellers shall bear their own respective costs incurred in connection with the preparation, review and finalisation of the draft Completion Accounts and the draft Holdback Statement and the agreement or determination of the Net Debt and the Holdback Amount (including any costs incurred in connection with any reference to an Independent Firm pursuant to this Clause 7.1).

7.2    Adjustment of Base Purchase Price and Holdback

7.2.1    Within five Business Days of the finalisation of the Completion Accounts and the Holdback Statement in accordance with Clause 7.1:

(i)    if the Net Debt is positive but less than the Preliminary Net Debt, the Investor shall pay to the Sellers their pro rata share of 80% of the shortfall;

(ii)    if the Net Debt is positive but more than the Preliminary Net Debt, each of the Sellers shall pay to the Investor their pro rata share of 80% of the excess;

(iii)    if the Net Debt is negative but more than the Preliminary Net Debt, the Investor shall pay to the Sellers their pro rata share of 80% of the excess;

(iv)    if the Net Debt is negative but less than the Preliminary Net Debt, each of the Sellers shall pay to the Investor their pro rata share of 80% of the shortfall;

(v)    if the Holdback Amount is less than the Preliminary Holdback Amount, the Investor shall pay to the Sellers their pro rata share of 80% of the shortfall; and

(vi)    if the Holdback Amount is more than the Preliminary Holdback Amount, each of the Sellers shall pay to the Investor their pro rata share of 80% of the excess.

(vii)    If the Accumulated Losses is more than the Preliminary Accumulated Losses, each of the Sellers shall pay to the Investor their pro rata share of 20% of the excess;

(viii)    If the Accumulated Losses is less than the Preliminary Accumulated Losses, the Investor shall pay to the Sellers their pro rata share of 20% of the shortfall.

provided that if the Aggregate 80% Deductions (as defined in Clause 6.3) exceedEUR 33,781,186 , the payments pursuant to paragraphs (ii), (iv), (vi) and (vii) above) in respect of the excess over such amount, shall be payable by Joy Dragon and/or the JD Warrantor and not Aiwu or the Aiwu Warrantor,  any payment due to the Sellers and any payment due from the Sellers pursuant to this Clause 7.2 shall be netted off.

7.2.2    If any amount is due pursuant to this Clause 7.2 to the Sellers, the Investor shall pay such amount, net of the Withholding Amount in respect of such payments, to the Sellers in the manner referred to in Clause 3 and shall ensure the payment is credited to the accounts in accordance with Clause 3.3.1 in full without any deduction, provided that where the Investor seeks to pay that amount to a Seller, but is unable to do so for reasons not attributable to the Investor, such non-payment shall be deemed not to be a breach by the Investor of any of its obligations pursuant to this Agreement, and the Investor and the relevant Seller shall negotiate in good faith to reach an alternative arrangement.

7.2.3    If any amount is due pursuant to this Clause 7.2 to the Investor, the Sellers shall pay such amount to the Investor in the manner referred to in Clause 3 and shall ensure the payment is credited to the accounts in accordance with Clause 3.3.1 in full without any deduction.

7.3    Subsequent Adjustments of Holdback

7.3.1    Following Transfer Completion, the Investor shall procure that the Company prepares audited financial statements for (i) each subsequent fiscal year until 31 December 2022, and (ii) the stub period ending on the immediately preceding month end prior to the Notice of Exercise of Call Option pursuant to the Longai Call Option Agreement and the Aiwu Call Option Agreement (the "**Call Options Holdback Statement**"), in each case in accordance with applicable laws and accounting standards.  Based on such audited financial statements, the Investor shall prepare a Holdback Statement for such subsequent period end showing the line items set out in Part 2 of Schedule 6 as at the relevant dates (the "**Subsequent Period Holdback Statements**"), and provide such Subsequent Period Holdback Statement to the Sellers within five months from the end of the relevant period.

7.3.2    In respect of Subsequent Period Holdback Statements up to and including  the Call Options Holdback Statement, the Holdback Amount shall be adjusted as follows:

(i)    within five Business Days of the delivery of the Subsequent Period Holdback Statement, if the Related Party Receivables is less than in the Holdback Statement (in the case of the first Subsequent Period Holdback Statement) or previous Subsequent Period Holdback Statement, the Investor shall pay to the Sellers their pro rata share of 80% of the shortfall; This does not apply insofar the reduction of the Related Party Receivables was taken into account within the profit and loss statement.

(ii)    within five Business Days of the delivery of the Subsequent Period Holdback Statement for the fourth financial year following the relevant period, if any Tax Liability or part thereof in respect of the financial years ended 31 December

2016 or 31 December 2017 has not been incurred by or charged to the Group, the Investor shall pay to the Sellers their pro rata share of 80% of such Tax Liability not incurred or charged; and

(iii)     within five Business Days of the delivery of the Subsequent Period Holdback Statement, upon production by the Sellers of evidence to the satisfaction of the Investor that PBOC has made a final determination that the PBOC Penalty will not be charged in part or in full, the Investor shall pay to the Sellers their pro rata share of 80% of the PBOC Penalty or reduction in such PBOC Penalty (as the case may be) unless such payment in respect of the PBOC Penalty has already been made in a prior period.

7.3.3     In respect of Subsequent Period Holdback Statement  for the fiscal year ended 31 December 2022, within five Business Days of the delivery of the Subsequent Period Holdback Statement the Holdback Amount shall be adjusted as follows:

(i)     if the Related Party Receivables is less than in the previous Subsequent Period Holdback Statement, the Investor shall pay to the Sellers their pro rata share of 100% of the shortfall; This does not apply insofar the reduction of the Related Party Receivables was taken into account within the profit and loss statement;

(ii)     if the Tax Liability or part thereof in respect of the financial year ended 31 December 2018 has not been incurred by or charged to the Group, the Investor shall pay to the Sellers their pro rata share of 100% of such Tax Liability not incurred or charged;

(iii)     upon production by the Sellers of evidence to the satisfaction of the Investor that PBOC has made a final determination that the PBOC Penalty will not be charged in part or in full, the Investor shall pay to the Sellers their pro rata share of 100% of the PBOC Penalty or reduction in such PBOC Penalty (as the case may be) unless such payment in respect of the PBOC Penalty has already been made in a prior period; and

(iv)     if any Holdback Amount shall remain following the adjustments set out in (i) to (iii) above, the remaining Holdback Amount shall be deemed to be extinguished in full and no further Holdback Amounts shall be payable to the Sellers.

7.3.4     If any amount is due pursuant to this Clause 7.3 to the Sellers, the Investor shall pay such amount to the Sellers in the manner referred to in Clause 3 and shall ensure the payment is credited to the accounts in accordance with Clause 3.3.1 in full without any deduction, provided that where the Investor seeks to pay that amount to a Seller, but is unable to do so for reasons not attributable to the Investor, such non-payment shall be deemed not to be a breach by the Investor of any of its obligations pursuant to this Agreement, and the Investor and the relevant Seller shall negotiate in good faith to reach an alternative arrangement.

## 8     EARN OUT

### 8.1     Preparation of Earn Out Accounts

8.1.1     The Investor shall:

(i)     cause the Company to prepare a draft of the consolidated Earn Out Accounts of Group, in accordance with applicable PRC accounting standards and on the same basis and using the same accounting principles, practices, policies and procedures as applied in the preparation of the Audited Accounts;

(ii)    based on the draft Earn Out Accounts, cause to be prepared the EBITDA Statements, showing the EBITDA of the Group and in the format and subject to the adjustments and deductions as set out in Schedule 7; and

(iii)    deliver the draft Earn Out Accounts and EBITDA Statements to the Sellers by no later than 90 Business Days following the end of the 2020 financial year.

8.1.2    The Sellers shall within the period of 20 Business Days following delivery of the draft Earn Out Accounts and EBITDA Statements to it pursuant to Clause 8.1.1 (the "**Earn Out Agreement Period**") either:

(i)    confirm their agreement with the draft Earn Out Accounts and EBITDA Statements so delivered; or

(ii)    give notice in writing to the Investor that the Sellers dispute the Earn Out Accounts and/or EBITDA Statements (an **"Earn Out Dispute Notice"**).

8.1.3    Any Earn Out Dispute Notice shall set out in reasonable detail:

(i)    the matters which are disputed (the "**Earn Out Disputed Matters**");

(ii)    the reasons why such matters are disputed; and

(iii)    the resulting adjustments which, in the opinion of the Sellers, should be made to the draft Earn Out Accounts and/or EBITDA Statements.

An Earn Out Dispute Notice shall only be valid for the purposes of this Agreement if it is served prior to the expiry of the Earn Out Agreement Period and includes the information required by this Clause 8.1.3. Except for matters specifically set out in a valid Earn Out Dispute Notice served prior to the expiry of the Earn Out Agreement Period, the Sellers shall be deemed to have agreed in full with the draft Earn Out Accounts and EBITDA Statements.

8.1.4    If the Sellers:

(i)    do not serve a valid Earn Out Dispute Notice prior to the expiry of the Earn Out Agreement Period; or

(ii)    during the Earn Out Agreement Period confirms by notice in writing their agreement with the draft Earn Out Accounts and EBITDA Statements (either as delivered in accordance with Clause 8.1.1 or as modified in such manner as shall be agreed between the Investor and the Sellers),

the draft Earn Out Accounts and EBITDA Statements shall constitute the Earn Out Accounts and EBITDA Statements for the purposes of this Agreement and shall be final and binding on the Investor and the Sellers.

8.1.5    If the Sellers serve a valid Earn Out Dispute Notice prior to the expiry of the Earn Out Agreement Period, then the Sellers and the Investor shall meet and discuss the Earn Out Disputed Matters and (acting in good faith) shall use their respective reasonable endeavours (in conjunction with their respective accountants) to reach agreement on the Earn Out Disputed Matters as soon as reasonably practicable and in any event within the period of 20 Business Days following the date of service of the Earn Out Dispute Notice (or such longer period as may be agreed in writing between the Sellers and the Investor) (the "**Earn Out Dispute Resolution Period**") and either:

(i)    if the Investor and the Sellers reach agreement on the Earn Out Disputed Matters during the Earn Out Dispute Resolution Period, the draft Earn Out Accounts and EBITDA Statements shall be modified to reflect such

agreement and, as so modified, shall constitute the Earn Out Accounts and EBITDA Statements for the purposes of this Agreement and shall be final and binding on the Sellers and the Investor; or

(ii)    if the Investor and the Sellers do not reach agreement on the Earn Out Disputed Matters prior to the expiry of the Earn Out Dispute Resolution Period, then either the Investor or the Sellers (acting jointly) may refer the Earn Out Disputed Matters to such Independent Firm as may be agreed between the Investor and the Sellers or, in default of such agreement within 10 Business Days following the expiry of the Earn Out Dispute Resolution Period, as may (on the application of either the Investor or the Sellers) be nominated by the President for the time being of the Chinese Institute of Certified Public Accountants.

8.1.6    Where a reference is made to an Independent Firm pursuant to Clause 8.1.5, the Investor and the Seller (acting in good faith) shall use their respective reasonable endeavours to agree with the Independent Firm as soon as reasonably practicable following its acceptance of such reference the Independent Firm's detailed terms of reference and the procedures which are to apply in relation to the hearing, consideration and determination by the Independent Firm of the Earn Out Disputed Matters. The following general terms of reference and procedures shall apply in any event:

(i)    the Independent Firm shall be instructed to make a determination only in relation to the Earn Out Disputed Matters specified in the Earn Out Dispute Notice and to make such determination in accordance with the accounting principles, practices, policies and procedures referred to in Clause 8.1.1;

(ii)    the Sellers (acting jointly) and the Investor shall each prepare a written submission to the Independent Firm on the Earn Out Disputed Matters specified in the Earn Out Dispute Notice and shall deliver copies of their respective submissions to the Independent Firm and to each other within 20 Business Days following the acceptance by the Independent Firm of the reference to it;

(iii)    following delivery of their respective submissions pursuant to paragraph (ii), the Sellers (acting jointly) and the Investor shall each have the opportunity to comment once only on the other party's submission. Any such comments shall be in writing and shall be delivered to the Independent Firm and copied to the other party not later than 10 Business Days following the expiry of the 20 Business Day period referred to in paragraph (ii);

(iv)    any information provided by either the Sellers (acting jointly) or the Investor in response to a subsequent request or enquiry by the Independent Firm shall be copied to the other party at the same time as it is delivered to the Independent Firm and, unless otherwise directed by the Independent Firm, such other party shall have the opportunity to comment once only on that information. Any such comments shall be in writing and shall be delivered to the Independent Firm and copied to the party who provided the information not later than 10 Business Days after receipt of such information by the commenting party. Thereafter, neither the Investor nor the Sellers (acting jointly) shall be entitled to make further statements or submissions except insofar as the Independent Firm so requests (in which case it shall, on each occasion, give the other party 10 Business Days to comment on any statement or submission so made);

(v) in addition to the procedures set out above, the Independent Firm may, in its reasonable discretion, stipulate other procedures which are to apply in relation to the hearing, consideration and determination by it of the Earn Out Disputed Matters (which may include inviting the Sellers and the Investor to make oral submissions);

(vi) the Independent Firm shall be requested to make its determination in relation to the Earn Out Disputed Matters and to notify the same to the Investor and the Sellers within 90 Business Days after its acceptance of the reference to it (or such longer period as the Independent Firm may reasonably determine). In making its determination, the Independent Firm shall state what adjustments (if any) are necessary to the draft Earn Out Accounts and EBITDA Statements to determine finally the EBITDA and shall give its reasons therefor;

(vii) in making its determination, the Independent Firm shall act as an expert and not as an arbitrator and the determination of the Independent Firm shall, in the absence of fraud or manifest error, be final and binding on the Investor and the Sellers;

(viii) following the notification of the Independent Firm's determination to the Investor and the Sellers, the draft Earn Out Accounts and EBITDA Statements shall be amended as necessary to reflect the decision of the Independent Firm in relation to the Earn Out Disputed Matters and, as so amended, shall constitute the Earn Out Accounts and EBITDA Statements and shall be final and binding on the Sellers and the Investor;

(ix) the fees and expenses of the Independent Firm shall be borne by the Investor and the Sellers in the proportions it directs or, in the absence of any such direction, equally between the Investor on the one hand and the Sellers on the other (and as between the Sellers, apportioned between them in proportion to their respective shareholding in the Company); and

(x) the Investor and the Sellers shall provide or (so far as lies within their respective power) procure others to provide to the Independent Firm all such information and documentation as the Independent Firm shall reasonably require to assist it in reaching its determination.

8.1.7 The Investor and the Sellers shall bear their own respective costs incurred in connection with the preparation, review and finalisation of the draft Earn Out Accounts and EBITDA Statements and the agreement or determination of the EBITDA (including any costs incurred in connection with any reference to an Independent Firm pursuant to this Clause 8.1.

## 8.2 Earn Out Consideration

8.2.1 If the 2020 EBITDA is equal to or exceeds 70% of EUR 7,804,573 (the "**2020 Earn Out Target**"), Earn Out Consideration (subject to the adjustment set out in Clause 8.2.2 below) shall be payable to the Sellers in the proportion set out in Schedule 2 in the amount equal to:

(i) the proportion of the 2020 EBITDA to the 2020 Earn Out Target (which shall be deemed equal to 1 where the proportion exceeds 1),

(ii) multiplied by the Maximum Earn Out Amount.

For the avoidance of doubt, no Earn Out Consideration shall be payable if the 2020 EBITDA is less than the 2020 Earn Out Target.

8.2.2    Within five Business Days of the finalisation of the relevant Earn Out Accounts and EBITDA Statement in accordance with Clause 8.1, the Earn Out Consideration (if any), net of the Withholding Amount in respect of such payments, shall be paid to the Sellers in the manner referred to in Clause 3, subject to the following adjustments:

(i)    a deduction of 80% of the Accumulated Losses as set out in the Earn Out Accounts,

(such adjustments, together the "**Accumulated Losses Adjustment**")

PROVIDED THAT the Earn Out Consideration shall not be reduced below zero.

8.2.3    The Earn Out Consideration (if any) shall be paid in the same currency which the Purchaser had elected to pay the Purchase Price pursuant to Clause 6.3.  If the Purchase Price was paid in Euros, for the purposes of calculating the Earn Out Consideration, amounts in RMB shall be converted to Euros at the Applicable Rate.

8.2.4    Notwithstanding anything to the contrary, any RMB amount relating to the determination of the EBITDA under this Clause 8 shall first be converted into EUR amounts at the average rate of exchange for RMB and EUR as quoted by the PBOC for the financial year 2020.

8.2.5    The Sellers hereby acknowledge and agree that the Earn Out Consideration is dependent on the 2020 EBITDA meeting certain specified hurdles, and the Investor makes no guarantee or assurance that there will be any Earn Out Consideration payable. However, the Parties agree that in the event that, prior to the payment of the Earn Out Consideration, a Material Adverse Event has occurred, which in the reasonable opinion of the Sellers, hinders the Sellers from reaching the 2020 Earn Out Target, the Sellers shall notify the Purchaser in writing of the Material Adverse Event and provide in sufficient detail the underlying facts and reasons for this opinion, following which, Parties shall discuss in good faith a possible extension of the Earn Out Target period until the end of the fiscal year 2021.

## 9    WARRANTIES

9.1    General Warranties

9.1.1    Each of Lin Yao and Joy Dragon jointly and severally warrants and represents to the Investor and its legal successors in the terms set out in Schedule 5, subject only to:

(i)    any matter which is fairly and fully disclosed in the Disclosure Letter and any matter expressly provided for under the terms of this Agreement or any other Transaction Document; and

(ii)    any matter or thing done or omitted to be done in accordance with this Agreement or any other Transaction Document, or otherwise at the request in writing or with the prior approval in writing of the Investor.

9.1.2    Each of the Aiwu Warrantor and Aiwu jointly and severally warrants and represents to the Investor and its legal successors that:

(i)    It and the Company is an entity duly incorporated and validly existing under the laws of its jurisdiction of incorporation with the full legal right, power and capacity to enter into and to perform this Agreement and any other agreements to be entered into by it pursuant to or in connection with this Agreement, which upon execution will constitute valid and binding obligations on it;

(ii)    it has taken all proper and necessary corporate actions to authorise it to execute and deliver this Agreement and any other agreements to be entered into by it pursuant to or in connection with this Agreement, and to perform and comply with the terms and conditions of this Agreement and such other agreements;

(iii)    its representative (whose signature appears on the execution page of this Agreement) has been duly authorised to execute this Agreement;

(iv)    the entry into and delivery of, when executed, and the performance of this Agreement and any other agreements to be entered into by it pursuant to or in connection with this Agreement will not result in any breach of its or any of its legal or contractual obligations or any material order, judgment, policy, regulation, decree or rule of any court, governmental agency or regulatory body by which it is bound, or result in any claim by a third party against the other Party;

(v)    it is the legal and beneficial owner of the Equity Interest set out against its name in Schedule 2 free and clear of all Encumbrances and it shall on Completion transfer that Equity Interest to the Purchaser free and clear of all Encumbrances together with all rights and advantages now or hereafter attaching thereto;

(vi)    all of the information set out in items 1 and 2 of Schedule 2 of the Subscription Agreement is true and accurate in all respects and not misleading in any respect;

(vii)    except as expressly provided in a Transaction Document, no licences, authorisations, registrations or other approvals (other than with SAMR) are necessary for undertaking each of the transactions contemplated by the Transaction Documents;

(viii)    all of the equity interests (including, without limitation, the Equity Interest) and registered capital of the Company that are held by Aiwu are duly created, authorised, validly issued and fully paid, and in each case in accordance with all Applicable Laws, and held of record and legally and beneficially owned by Aiwu as set out in Part 2 of Schedule 2;

(ix)    no Person has any option, warrant, right, call, commitment, conversion right, right of exchange or other agreement or any right or privilege (whether by law, pre-emptive or contractual) capable of becoming an option, warrant, right, call, commitment, conversion right, right of exchange or other agreement for the purchase from Aiwu of any of the Equity Interests and Aiwu is entitled to transfer to the Investor the full and lawful ownership of the Sale Equity Interest it holds on the terms of this Agreement without the consent of any party; and

(x)    Aiwu has not given any power of attorney or any other authority (express, implied or ostensible) which is still outstanding or effective to any person in respect of the registered capital legally and beneficially owned by him and the voting rights attached to that registered capital.

For the avoidance of doubt, except for the above warranties and representations in this Clause 9.1.2, Aiwu has no obligation under this Agreement to make any other warranties or representations to the Investor and its legal successor, which shall not be deemed as a violation of the clause 17.1.1(ix) of the Framework Agreement by Aiwu.

9.1.3   Each of the Warrantors and the Sellers acknowledges that the Investor has entered into this Agreement and the other Transaction Documents in reliance upon, amongst other things, the Warranties and the Aiwu Warranties.

9.1.4   Save as expressly otherwise provided, each of the Warranties and the Aiwu Warranties shall be separate and independent and shall not be limited by reference to any other paragraph of Schedule 5 or by anything in this Agreement.

9.1.5   Each of Lin Yao and Joy Dragon agrees and undertakes with the Investor to jointly and severally indemnify the Investor for all Losses suffered by the Investor which arise from or in relation to a breach of any of the Warranties.

9.1.6   Each of the Aiwu Warrantors and Aiwu agrees and undertakes with the Investor to indemnify the Investor for all Losses suffered by the Investor that arise from or in relation to a breach of any of the Aiwu Warranties.

9.1.7   Any statement qualified by the words "knowledge", "information", "belief", "is not aware of" or any similar expression shall, unless otherwise stated, be deemed to include a further statement that it has been made after due and careful enquiries.

9.2   Updating to Transfer Completion

9.2.1   Each of the JD Warrantors and Joy Dragon further warrants to and undertakes with the Investor and its legal successors that:

(i)   each of the Warranties will be true and accurate in all respects and not misleading in any respect at and prior to Transfer Completion as if they had been given on each day on and from the date of this Agreement up to and including Transfer Completion Date;

(ii)   the Warranties shall be given to the Investor and shall be given subject only to matters as are fully and fairly disclosed in sufficient detail in the Disclosure Letter to enable the Investor to assess their impact on the business and operations of the Company and AllScore and the nature and scope of the matter disclosed; and

(iii)   if after the signing of this Agreement and before Transfer Completion, any of the JD Warrantor and Joy Dragon becomes aware of any of the Warranties were unfulfilled, untrue, inaccurate or misleading in any respect at Transfer Completion, it shall as soon as practicable after it has become aware notify the Investor in writing in full of the same prior to Transfer Completion and each of the Warrantors and the Sellers (at their own cost) shall make any investigation concerning the event or matter which the Investor may require, provided that any notification given under this Clause 9.2.1.(iii) shall not operate as a disclosure under Clause 9.2.1.(ii).

9.2.2   Each of the Aiwu Warrantors and Aiwu further warrants to and undertakes with the Investor and its legal successors that:

(i)   each of the Aiwu Warranties will be true and accurate in all respects and not misleading in any respect at and prior to Transfer Completion as if they had been given on each day on and from the date of this Agreement up to and including Transfer Completion Date; and

(ii)   if after the signing of this Agreement and before Transfer Completion, any of the Aiwu Warrantor and Aiwu becomes aware of any of the Aiwu Warranties were unfulfilled, untrue, inaccurate or misleading in any respect at Transfer Completion, it shall as soon as practicable after it has become aware notify the Investor in writing in full of the same prior to Transfer Completion and each

of the Aiwu Warrantor and Aiwu (at their own cost) shall make any investigation concerning the event or matter which the Investor may require, provided that any notification given under this Clause 9.2.2(ii) shall not operate as a disclosure against the Aiwu Warranties given to the Investor.

9.3     Release by Investor

The Warranties, the Aiwu Warranties and all other provisions of this Agreement insofar as the same shall not have been performed at Transfer Completion shall not be limited, waived, extinguished or otherwise affected by Transfer Completion, or by any other event or matter whatsoever (including, without limitation, any satisfaction and/or waiver of any condition contained in Clause 4.1), except by a specific and duly authorised written waiver or release by the Investor.

9.4     Indemnity

9.4.1     Lin Yao undertakes to indemnify and keep indemnified the Investor at all times on a full indemnity basis and hold it harmless from and against, and covenants to pay to the Investor an amount equal to, all Losses which the Investor may sustain, incur or suffer directly or indirectly in connection with the breach of any Warranty or with any of the matters arising out of or in connection with any of the following matters that took place prior to Transfer Completion:

(i)     the Company's previously-held equity interest in and contractual arrangements with Shangyin Xinlian Data Service Co., Ltd. (商银信联数据服务有限公司);

(ii)     irregularities with registrations, filings and records with the relevant governmental registries and authorities;

(iii)     disqualification as a publicly raised fund sale payment and settlement institution;

(iv)     revocation of any Operational Licence (except as otherwise agreed to in writing by the Investor);

(v)     regulatory non-compliance by any Group Company;

(vi)     the failure of any Group Company to enter into employment contracts with its employees or to pay its employees remunerations or compensation for observation of non-compete obligations, or to make contributions to Social Security Funds, all of which in accordance with the relevant PRC labour laws and regulations;

(vii)     MIIT not having been notified of the Longhe Transfer;

(viii)     litigation.

9.4.2     The indemnity in Clause 9.4.1 shall not apply to the extent that:

(i)     the Losses is caused by the fraud, negligence or wilful misconduct of the Investor after Transfer Completion; and

(ii)     the Investor has relief under other Transaction Documents in respect of the same Losses.

9.4.3     Subject to Clause 9.4.4:

(i)     the Investor may deliver a notice of claim for indemnification under this Clause 6 at any time and from time to time prior to the date falling 24 months from the Transfer Completion Date but not after;

(ii)   Lin Yao shall not be liable under this Clause 9 in respect of any claim for indemnification by the Investor unless the aggregate amount of all claims for indemnification under this Clause 9 (disregarding the provisions of this Clause 9.4.3(ii)) exceeds RMB200,000.00, and where the aggregate Losses in respect of all indemnification claims by the Investor exceeds RMB200,000.00, Lin Yao shall be liable for the aggregate amount of all these indemnification claims; and

(iii)   the aggregate liability of Lin Yao under this Clause 9 shall not exceed the amount equal to the Purchase Price.

9.4.4   None of the limitations contained in Clauses 9.4.3(i), 9.4.3(ii) and 9.4.3(iii) shall apply to any claim that arises or is increased, or to the extent to which it arises or is increased, as the consequence of ,or which is delayed as a result of, (a) fraud (including fraud relating to Tax), willful misconduct, willful concealment or gross negligence by any of Lin Yao, Aiwu, the Company, AllScore and any director, officers, employee or agents of the Company or AllScore, and (b) any illegal or unlawful act of the Company, Lin Yao or Aiwu.

## 10   GUARANTEE

10.1   The JD Warrantor irrevocably guarantee to the Investor the due and punctual performance and observance by Joy Dragon of all its obligations, commitments, undertakings, warranties and indemnities under or in connection with this Agreement ("**Joy Dragon Guaranteed Obligations**") and agrees to indemnify the Investor against all losses, liabilities, costs (including legal costs), charges, expenses, actions, proceedings, claims and demands which the Investor may suffer through or arising from any breach by Joy Dragon of any of the Guaranteed Obligations.

10.2   The Aiwu Warrantor irrevocably guarantee to the Investor the due and punctual performance and observance by Aiwu of all its obligations, commitments, undertakings, warranties and indemnities under or in connection with this Agreement ("**Aiwu Guaranteed Obligations**", together with "**Joy Dragon Guaranteed Obligations**" "**Guaranteed Obligations**") and agrees to indemnify the Investor against all losses, liabilities, costs (including legal costs), charges, expenses, actions, proceedings, claims and demands which the Investor may suffer through or arising from any breach by Aiwu of any of the Guaranteed Obligations.

10.3   If and whenever a Seller defaults for any reason whatsoever in the performance of any of the Guaranteed Obligations, the Warrantor guaranteeing its obligation (being the JD Warrantor in the case of a default by Joy Dragon, and the Aiwu Warrantor in the case of a default by Aiwu) shall forthwith upon demand unconditionally perform (or procure performance of) and satisfy (or procure the satisfaction of) the Guaranteed Obligations in relation to which the default has been made in the manner prescribed by this Agreement and so that the same benefits shall be conferred on the Investor as they would have received if the Guaranteed Obligations had been duly performed and satisfied by the Seller.

10.4   The guarantee by each Warrantor under Clauses 10.1 and 10.2 ("**Guarantee**") shall be a continuing guarantee and shall remain in force until all Guaranteed Obligations have been performed or satisfied.

10.5   The Guarantee shall be in addition to and without prejudice to and not in substitution for any rights or security which the Investor may now or subsequently have or hold for the performance and observance of the Guaranteed Obligations.

10.6   As a separate and independent obligation, each Warrantor agrees that any of the Guaranteed Obligations (including any monies payable) shall be enforceable against and recoverable from

the Warrantor as though the same had been incurred by the Warrantor and the Warrantor was the principal obligor in respect of them and shall be performed or paid by the Warrantor on demand, irrespective of whether any steps or proceedings are or will be taken against any of the Sellers or any other person in respect of the Guaranteed Obligations.

10.7    The liability of each Warrantor under this Clause 10:

10.7.1    shall not be released or diminished by any variation of the Guaranteed Obligations or any forbearance, neglect or delay in seeking performance of the Guaranteed Obligations or any granting of time for the performance; and

10.7.2    shall not be affected or impaired by reason of any other fact or event which in the absence of this provision would or might constitute or afford a legal or equitable discharge or release or a defence to a guarantor.

## 11    TERMINATION

11.1    Termination by agreement

This Agreement may be terminated by agreement between all Parties in writing.

11.2    Termination by the Investor

Without limiting other provisions of this Agreement, the Investor may terminate this Agreement by written notice to the Sellers if:

11.2.1    any Seller is found to be in material breach of this Agreement or any of the Transaction Documents, which breach (where it can be remedied) remained unremedied 30 days from the date the breach is committed;

11.2.2    any formal response from any Approval Authority as mentioned in Clause 4.3.1 is given, or it is otherwise not possible in practice for any of the approvals, registrations and filings necessary for the entry into, and the legal enforceability and performance of this Agreement and any other approvals set out in Schedule 3 to be obtained or effected, or that any approval, registration or filing that has been granted or made would be or has been revoked, amended or supplemented;

11.2.3    any response from the PBOC mentioned in Clause 4.3.3 is given;

11.2.4    any of the Conditions Precedent is not fully satisfied or waived within 90 calendar days from the date of this Agreement or any later date as agreed in writing by the Investors and the Sellers;

11.2.5    any of the Warranties and the Aiwu Warranties was, when given, or will be or would be, at Transfer Completion (as if they had been given again at Transfer Completion) not complied with or otherwise untrue, inaccurate or misleading;

11.2.6    any event occurs which the Investor believes with sufficient grounds, would or would be likely to have a material adverse effect on the Investor's ability to enjoy rights under any Transaction Document;

11.2.7    any party to any Transaction Document has exercised, or sought to exercise, its right to terminate the Transaction Document (other than as a result of the occurrence of Transfer Completion); or

11.2.8    any of the Warrantors, Sellers, the Company and AllScore is declared insolvent or any valid order is made, petition or application accepted for hearing, or effective resolution passed or meeting convened for the purpose of winding up any of the Warrantors, Sellers, the Company and AllScore.

11.3    Termination by Sellers

If the provisions of Clause 6 (including the obligation to make payment under Clause 6.3) are not fully complied with by the Investor on the date set for Transfer Completion, any Seller may by notice in writing to the Investor served on this date to terminate this Agreement and the other Transaction Documents without liability on the part of the Sellers.

11.4    General

The rights of the Investor under Clause 11.2 are in addition to and without prejudice to the exercise of all other rights available to the Investor and its legal successors, including, but not limited to, the right to claim damages for breach of warranty. For the avoidance of doubt, a failure to exercise the termination rights under this Clause 10 by the Investor shall not constitute a waiver of any other rights of the Investor or its legal successors (as the case may be).

11.5    Accrued Liabilities

Termination of this Agreement for any cause shall not release a Party from any liability which at the time of or before termination has already accrued or may accrue to another Party.

11.6    Survival

Upon a termination of this Agreement, this Agreement shall cease to be of any effect except for Clauses 1, 6.4, 11.4 to 11.6 , 12, 13 and 14 which shall remain in force, and claims arising out of any antecedent breach of this Agreement shall remain valid.

## 12    CONFIDENTIALITY

Each Party shall observe and perform its obligations of confidentiality in accordance with clause 19 of the Framework Agreement.

## 13    NOTICES

Any notice, claim or demand in connection with this Agreement or with any arbitration under this Agreement shall be given in accordance with clause 20 of the Framework Agreement.

## 14    MISCELLANEOUS

14.1    Assignment

No Party may transfer or assign its rights or obligations under this Agreement without the prior written consent of each other Party. Any purported transfer in contravention of this Clause 14.1 shall be null and void ab initio. This Agreement shall be binding on and ensure to the benefit of the Parties and their successors and permitted assigns.

14.2    Variation

No amendment, modification or variation of this Agreement shall be effective unless in writing and signed by or on behalf of each of the Parties and made in accordance with PRC law.

14.3    No partnership, joint venture, joint operation or agency

Nothing in this Agreement shall be deemed to constitute a partnership, joint venture or joint operation between the Parties nor constitute a Party the agent of any other Party for any purpose. In particular, no Party shall hold itself out as the agent of any other Party for any purpose or represent that it has authority to bind any other Party in any way.

14.4    Further assurance

    14.4.1    Each Party shall, and shall use all commercially reasonable efforts to procure that any necessary third party shall, at any time upon request of another Party execute such documents and do such acts and things as the requesting Party may reasonably require for the purpose of giving to the requesting Party the full benefit of all the provisions of this Agreement. Each Party shall, and during such time as a Party holds equity interests in the Company that Party shall use its respective commercially reasonable endeavours to procure the Company to, do all such acts or things that may be necessary or reasonably required by the Investor to complete the transactions contemplated by this Agreement.

    14.4.2    Where any Transaction Document contains or refers to any obligation or duty imposed on or required to be carried out by the Company or AllScore, each of Joy Dragon and Lin Yao agree to cause the performance by the Company or AllScore (as the case may be) of the duty or obligation

    14.4.3    Each Party agrees that it will not do anything to prejudice, or do anything contrary or inconsistent with, the consummation of the matters contemplated by: (i) this Agreement; or (ii) the other executed Transaction Documents from time to time.

14.5    Severability

If any provision in this Agreement shall be held to be illegal, invalid or unenforceable, in whole or in part, this provision or part shall to that extent be deemed not to form part of this Agreement but the legality, validity and enforceability of the remainder of this Agreement shall not be affected.

14.6    Stamp duty

Unless otherwise provided in this Agreement, the Investor, on one hand, shall bear one-half of all stamp duty that is payable under PRC Law on the execution of this Agreement, the sale and purchase of the Sale Equity Interest under this Agreement, as well as all activities relating to the sale and purchase, and the Sellers, on the other hand, shall bear the other one-half of the stamp duty payable (and as between the Sellers, apportioned between them in proportion to their respective shareholding in the Company).

14.7    Liability

    14.7.1    No failure of a Party to exercise, and no delay by it in exercising, any right, power or remedy in connection with this Agreement (each a "**Right**") shall operate as a waiver thereof, nor shall any single or partial exercise of any Right preclude any other or further exercise of that Right or the exercise of any other Right. The Rights provided in this Agreement are cumulative and not exclusive of any other Rights (whether provided by law or otherwise). Any express waiver of any breach of this Agreement shall not be deemed to be a waiver of any subsequent breach.

    14.7.2    Without prejudice to any other rights or remedies which a Party may have under this Agreement, the Parties acknowledge and agree that damages may not be an adequate remedy for any breach of this Agreement and the seeking by the non-breaching Parties of the remedies of injunction, specific performance and other non-monetary remedies (in addition to damages) as permitted by law is appropriate for any threatened or actual breach of any provision of this Agreement.

    14.7.3    Any liability of a Party to any other Party under this Agreement may in whole or in part be released, compounded or compromised, or time or indulgence may be given in respect thereof, by that Party to whom the liability is owed, provided that the Party to whom the liability is owed also grants the same in respect of any similar or like

liability, or any liability that arises out of the same matter or event, of any other Party under this Agreement that is owed to that Party.

14.8    Governing law

The entry into and the variation, interpretation and implementation of this Agreement shall be governed by PRC law. Where PRC law does not provide for an interpretation of any provision or concept in this Agreement, such provision or concept shall be interpreted in accordance with internationally accepted legal principles.

14.9    Arbitration

Any dispute or difference arising out of or in connection with this Agreement shall be resolved in accordance with the provisions of the Arbitration Agreement.

14.10    Effectiveness

This Agreement is effective upon its signing by the Parties.

14.11    Counterparts

This Agreement may be entered into in any number of counterparts, all of which taken together shall constitute one and the same instrument. Any Party may enter into this Agreement by executing any counterpart.

14.12    Language

This Agreement is executed in Chinese and English. Both languages shall have the same meaning and be equally authentic.

14.13    Copies

There exist nine execution originals of this Agreement in Chinese and nine execution originals of this Agreement in English.

This Agreement is executed by the duly authorised representatives of the parties on the date stated on the first page of this Agreement.

Signed by:

_____ (Company Chop)
For and on behalf of
**Joy Dragon Consultants Co., Ltd.**

Name:
Title: Authorised Representative

Signed by:

_____ (Company Chop)
For and on behalf of
**Shanghai Aiwu Investment Management Co., Ltd.**

Name: Shi Yonglei
Title: Legal Representative

Signed by:

_____
For and on behalf of
**Wirecard Acquiring & Issuing GmbH**

Name:
Title: Authorised Representative

Signed by:

_____
For and on behalf of
**Wirecard Acquiring & Issuing GmbH**

Name:
Title: Authorised Representative

Signed by:

_____

Lin Yao

Signed by:

_____

Shi Yonglei

### Schedule 1
### Definitions

**1      Capitalised Terms**

| | |
|---|---|
| "**Accumulated Losses**" | means the accumulated losses of the Group as estimated in the Preliminary Completion Accounts, as set out in the Completion Accounts  and as set out in the Earn Out Accounts.  For these purposes, accumulated losses of the Group shall be the amount by which shareholders' equity falls below the total of the share capital and the capital reserve whereby any capital increase by the Investor is not taken into account in the calculation; |
| "**Agreed Terms**" | means, in relation to a document, the document in the terms agreed amongst the parties and signed for identification by them with any alterations as may be agreed in writing between or among the parties to that document from time to time for any reason including, without limitation, to take account of any changes between the date of this Agreement and Transfer Completion; |
| "**Aiwu Warranties**" | means the terms referred to in Clause 9.1.2 and a "**Aiwu Warranty**" means any of them; |
| "**Aiwu Warrantor**" | means the person set out in item 2 of Part 1 of Schedule 2; |
| "**Aiwu Guaranteed Obligation**" | has the meaning ascribed to it in Clause 10.2; |
| "**AllScore**" | means AllScore Payment Service Co., Ltd. (商银信支付服务有限责任公司) with its legal address at Suite 401-01, Building 28 (adjacent to two other buildings including Building 26), Ping'anli West Street, Xicheng District, Beijing, PRC; |
| "**AllScore HK**" | means Allscore Payment Service (Hong Kong) Co., Limited, with its registered office at Room 1508, 15/F, Office Tower Two, Grand Plaza, 625 Nathan Road, Kowloon, Hong Kong ; |
| "**Amended Business Licence**" | means the amended business licence of the Company to be issued by the SAMR, the Articles and the Joint Venture Contract, reflecting the Registered Capital as RMB (or, where the context requires, any subsequent re-issue of the same, whether in amended form or otherwise); |
| "**Applicable Laws**" | means all applicable laws, statutes, subsidiary legislation, regulations and rules promulgated by any governmental or regulatory body in the PRC, Hong Kong, Germany or elsewhere; |
| "**Applicable Rate**" | means the average rate of exchange over a period of four weeks ending on the date which is the second Business Day before the relevant payment date to a respective payment  for RMB and EUR as quoted by PBOC.; |
| "**Approval Authorities**" | means the PBOC, MIIT, SAMR, MOFCOM and all other governmental or trade agencies, courts or other regulatory bodies of the PRC or other jurisdiction whose licences, authorisations, registrations or other approvals are necessary |

Schedule 1 - Definition

|  | for undertaking the transactions contemplated by the Transfer Agreement and, as applicable, each other Transaction Document; |
|---|---|
| "**Arbitration Agreement**" | means the arbitration agreement entered into on the date of the Framework Agreement between the Parties and certain other Persons; |
| "**Articles**" | means the amended and restated articles of association of the Company entered into between the Initial Shareholders and the Investor on the date of this Agreement; |
| "**Audited Accounts**" | means the audited accounts relating to each Group Company and to the Group for the financial period ended on the Balance Sheet Date; |
| "**Balance Sheet Date**" | means 31 December 2018; |
| "**Board**" | means the board of directors of the Company; |
| "**Business Day**" | means a day on which banks are open for business in Beijing and Munich (excluding Saturdays, Sundays and public holidays); |
| "**Cash**" | means the aggregate amount of cash (including but without limitation all amounts entered into any cash book or the like (by whatever name called), Related Party Receivables and cash equivalents, but excluding cash in transit from clients or merchants of a Group Company and trapped cash held by the Group as at Transfer Completion as set out in the Completion Accounts agreed and determined in accordance with Clause 7 and Schedule 6 and containing only those line items specifically referenced in Schedule 6; |
| "**CJ EITA**" | means the equity interest transfer agreement entered into between Chen Jia and Joy Dragon on the date of execution of the Framework Agreement in relation to the transfer by Chen Jia of all of her ownership interest in the Registered Capital to Joy Dragon; |
| "**CJ Transfer**" | means the transfer by Chen Jia of all of her ownership interest in the Registered Capital to Joy Dragon in accordance with the CJ EITA; |
| "**Completion Accounts**" | means the audited consolidated financial statements of the Group showing the items and in the format set out in Schedule 6 as at the Transfer Completion Date, prepared and agreed in accordance with Clause 7 and; |
| "**Conditions Precedent**" | means the conditions specified in Schedule 3; |
| "**Debt**" | means (a) the aggregate amount of any borrowing or indebtedness in the nature of borrowing of the Group and the aggregate amount of the indebtedness of the Group for finance leases (or similar arrangements where the Group does not receive good title to goods until such goods have been paid for in full), (b) all obligations evidenced by notes, bonds, loan stock, debentures or similar instruments; (c) any amount raised under any other transaction (including any forward sale or purchase agreement, notes discounting and/or receivable factoring) having |

Schedule 1 - Definition

the commercial effect of a borrowing; (d) dividends payable; (e) any liabilities and provisions for income taxes (including deferred tax liabilities); (f) any liabilities and provisions relating to Transaction costs and/or bonuses; (g) any liabilities or provisions made, on an accruals basis to Transfer Completion, for dilapidations, unpaid termination fees or expenses related to business activities conducted prior to Transfer Completion; (h) any directors'/shareholders current account liabilities; (i) any pension-obligations or similar personnel obligations (j) any liabilities to shareholders or related parties of shareholders; (l) any negative amount of Trade Working Capital (m) any salaries and benefits payable to employees (n) any provisions for legal disputes; (o) any costs and expenses paid or agreed to be paid by the Company in relation to the negotiation, preparation, execution and performance of this Agreement and the Transaction, including, without limitation, any change of control or severance payments (such costs and expenses properly being for the account of Joy Dragon) and all costs relating to the any bonuses payable to employees (and associated Tax) in connection with the Transaction, whether or not such costs and expenses are still outstanding at Transfer Completion or have been previously settled; (p) RMB12,000,000, being the amount used for the Minority Buyout; each as at Transfer Completion (including in each case accrued interest and penalties thereon and including any break fees which would be incurred were such facilities to be terminated at Transfer Completion), as set out in the Transfer Completion Accounts agreed and determined in accordance with Clause 7 and Schedule 6 and containing only those line items specifically referenced in Schedule 6;

**"Disclosure Letter"**      means the letter of even date with this Agreement from the Company, Joy Dragon and the Warrantors to the Investor disclosing:

(i)    information constituting exceptions to the Warranties; and

(ii)   details of other matters referred to in this Agreement;

**"Earn Out Accounts"**     means the audited consolidated financial statements of the Group for the financial year ending 31 December 2020 prepared and agreed or determined in accordance with Clause 8;

**"Earn Out Consideration"**     means consideration up to the Maximum Earn Out Amount payable in accordance with Clause 8;

**"EBITDA"**      shall be the sustainable earnings before interest, tax, depreciations and amortizations of the Group as determined in the audited annual accounts of the Group (**"Earn-out Accounts"**), provided, however, that the Earn-out Accounts shall eliminate:

a)    any transactions which are initiated or arranged in whole or in part by the Purchaser or a Purchaser's Affiliate (e.g. recommendation or mediation of existing customers, development of new customers, new products or business fields;

b)    any extraordinary profit on the EBITDA outside the ordinary course of business;

c)    effects of any one-time and not recurring factors; or

Schedule 1 - Definition

|  | d) any earnings relating to previous accounting periods (e.g. earnings resulting from the sale of assets except for sales in the ordinary course of business); |
|---|---|
| "**EBITDA Statement**" | means a statement prepared on the basis of the Earn Out Accounts showing the EBITDA for the financial year ending 31 December 2020, subject to the adjustments and deductions as set out in Schedule 7 and agreed or determined in accordance with Clause 8; |
| "**EUR" or "Euro**" | means Euro, the lawful currency of the European countries which have joined the Euro Zone; |
| "**Encumbrance**" | means any mortgage, charge, debenture, pledge, lien, option, power of sale, right of pre-emption, security interest of any kind, licence or any other claim against a proprietary right; |
| "**Equity Interest**" | means the equity interest in the Registered Capital; |
| "**Framework Agreement**" | means the Framework Agreement entered into between, amongst others, the Parties on 18 November 2019; |
| "**Group Companies**" | means all companies and branches set out in Schedule 2 of the Subscription Agreement, a "**Group Company**" means any one of them, and "**Group**" means all Group Companies as a group; |
| "**Sellers**" | means Joy Dragon and Aiwu, and a "**Seller**" means any of them; |
| "**Holdback Amount**" | means an amount to be held back from the consideration and released to the Sellers in stages in accordance with Clause 7, in respect of Related Party Receivables, potential Tax Liabilities and potential PBOC Penalties, such amount to be agreed and determined based on the Completion Accounts and Schedule 6, and containing only the items set out in Schedule 6; |
| "**ICP Licence**" | has the meaning ascribed to it in the Subscription Agreement; |
| "**Intellectual Property**" | means trade marks, service marks, trade names, domain names, logos, get-up, patents, inventions, registered and unregistered design rights, copyrights, semi-conductor topography rights, database rights and all other similar rights in any part of the world (including Know-how) including, where such rights are obtained or enhanced by registration, any registration of such rights and applications and rights to apply for such registrations; |
| "**JD Warrantor**" | means the person set out in item 1 of Part 1 of Schedule 2; |
| "**Joy Dragon Guaranteed Obligation**" | has the meaning ascribed to it in Clause 10.1; |
| "**Know-how**" | means confidential and proprietary industrial and commercial information and techniques in any form including drawings, formulae, test results, reports, project reports and testing procedures, instruction and training manuals, tables of operating conditions, market forecasts, lists and particulars of customers, merchants and suppliers; |

Schedule 1 - Definition

| | |
|---|---|
| "**Longhe EITA**" | means the equity interest transfer agreement entered into between Longhe and Chen Jia on 24 September 2019 in relation to the transfer by Longhe of all of its ownership interest in the Registered Capital to Chen Jia; |
| "**Longhe Transfer**" | means the transfer by Longhe of all of its ownership interest in the Registered Capital to Chen Jia in accordance with the Longhe EITA; |
| "**Management Accounts**" | means the unaudited management accounts relating to each Group Company and to the Group for any period or drawn up as at any date since the Balance Sheet Date (the "**Relevant Management Accounts Date**"); |
| "**Management Accounts Date**" | means 31 July 2019; |
| "**Material Adverse Event**" | means any event, circumstance or change (i) which occurs after Transfer Completion, (ii) which has, taken alone or in the aggregate, a material adverse effect on the Company, the results of operation or the business or operations of the Group (taken as a whole ) and (iii) which are outside of the control of any of the Sellers, Lin Yao and the Warrantors other than any event, circumstance or change attributable to (a) the Investor's assumption of control of the Group and management of the Group in the ordinary course of business (b) changes to Applicable Laws or accounting practices or (c) changes in rates of Taxation or the imposition of new Taxation; |
| "**Maximum Earn Out**" | means RMB128,400,000 subject to the adjustments set out to Clause 8; |
| "**Minority Buyout**" | has the meaning given to it in the Framework Agreement; |
| "**MOFCOM**" | means the Ministry of Commerce of the PRC or its local bureau; |
| "**Net Debt**" | means Debt less Cash; |
| "**Operational Licences**" | has the meaning ascribed to it in the Subscription Agreement; |
| "**Parties**" | means the parties to this Agreement and a "**Party**" means any of them; |
| "**PBOC**" | means the People's Bank of China; |
| "**PBOC Penalty**" | means the estimated amount of penalty in respect of AllScore based on Yin Guan Fa Gao (2019) No.2 issued by PBOC, which is set out in the Preliminary Completion Accounts and the Holdback Statement; |
| "**Person**" | means any natural person, legal person or other organisations; |
| "**PRC**" | means the People's Republic of China, which, for the purposes of this Agreement, shall exclude the Hong Kong Special Administrative Region, the Macau Special Administrative Region and Taiwan; |

Schedule 1 - Definition

| | |
|---|---|
| "**PRC Law**" | means the laws, regulations, rules and regulatory documents of the PRC; |
| "**Preliminary Accumulated Losses**" | means the estimated Accumulated Losses as set out in the Preliminary Completion Accounts: |
| "**Preliminary Completion Accounts**" | means the latest available consolidated management accounts before expected completion date to be delivered on or before the 10th Business Day prior to the Completion Date, setting out the Preliminary Net Debt, the Preliminary Holdback Amount and the Preliminary Accumulated Losses, in the format set out in Schedule 6. |
| "**Preliminary Holdback Amount**" | means the estimated Holdback Amount as set out in the Preliminary Completion Accounts; |
| "**Preliminary Net Debt**" | means the estimated Net Debt as set out in the Preliminary Completion Accounts; |
| "**Registered Capital**" | means the registered capital of the Company, as specified in the Company's business licence from time to time; |
| "**Related Party Receivables**" | means the related party receivables of the Group due from [*list of parties to be inserted prior to signing*] less the related party liabilities of the Group due against [*list of parties to be inserted prior to signing*] as set out in the Preliminary Completion Accounts and the Holdback Statement; |
| "**Representative**" | means any person acting for or on behalf of the Recipient including any director, officer, employee, contractor or professional adviser of the Recipient; |
| "**RMB**" | means Renminbi, the lawful currency of the PRC; |
| "**SAFE**" | means the State Administration of Foreign Exchange of the PRC; |
| "**Sale Equity Interest**" | means the aggregate Equity Interest equal to RMB 15,586,374.1, as more particularly set out in Column C of Schedule 2; |
| "**SAMR**" | means the State Administration for Market Regulation of the PRC or its local bureau; |
| "**Shareholder**" | means any shareholder of the Company; |
| "**Subscription Agreement**" | means the Subscription Agreement entered into between the Parties and the Company on the date of the Framework Agreement; |
| "**Tax Liabilities**" | means the potential Tax Liabilities of the Group in respect of the financial years ended 31 December 2016, 2017 and 2018, the estimated amount of which is set out in the Preliminary Completion Accounts and the Holdback Statement; |
| "**Taxation**" | means all forms of taxation whether direct or indirect and whether levied by reference to income, profits, gains, net wealth, asset values, turnover, added value or other reference and statutory, state, provincial, local governmental or municipal |

Schedule 1 - Definition

|  | impositions, duties, contributions, rates and levies (including without limitation personal income tax for all employees, social security contributions and any other payroll taxes), whenever and wherever imposed (whether imposed by way of a withholding or deduction for or on account of tax or otherwise) and in respect of any person and all penalties, charges, costs and interest relating to it; and "**Tax**" shall be construed accordingly; |
|---|---|
| "**Transfer**" | has the meaning ascribed to it in Clause 2; |
| "**Transfer Completion**" | means completion of the Transfer in accordance with Clause 6; |
| "**Transfer Completion Date**" | means the date on which Transfer Completion takes place, or any other date as may be agreed by the Investor and the Sellers; |
| "**Transaction Documents**" | has the meaning ascribed to it under the Framework Agreement; and |
| "**Warranties**" | means the terms referred to in Clause 9.1.1 and a "**Warranty**" means any of them; |
| "**Warrantors**" | means the Aiwu Warrantor and the JD Warrantor and a "**Warrantor**" means any of them; |
| "**Withholding Amount**" | means the amounts reasonably calculated by the Investor as being payable as Tax by the Seller on disposable gains on indirect transfers pursuant to PRC Law PROVIDED THAT the Withholding Amount shall be deemed to be zero if the Withholding Tax Certificate has been duly issued and obtained; |
| "**Withholding Tax Certificate**" | means a certificate from the relevant PRC Tax authority confirming that all Taxes payable by the Seller in respect of the initial Purchase Price on disposal gains on indirect transfers pursuant to PRC Law have been duly paid in full; |

## 2    PRC Law

References to PRC law in this Agreement shall include any laws, regulations, rules, and regulatory documents publicly promulgated by the PRC (including central, provincial, municipal and other) authorities, and shall be construed as references to those provisions as respectively amended or varied from time to time.

## 3    PRC Government Authority

A reference to any PRC government authority or department includes such authority or department at central, provincial, municipal and other levels and its successor authority or department.

## 4    Accounts

Any reference to "**accounts**" of a company shall include the directors' and auditors' reports, relevant balance sheets, income statements and statements of profit distribution and appropriation and related notes together with all documents which are or would be required by law to be annexed to the accounts of the company concerned to be laid before that company in a shareholders' meeting and or in a meeting of the board of directors of the company in respect of the accounting reference period in question.

Schedule 1 - Definition

**5      Subsidiaries**

For the purposes of this Agreement, a company shall be deemed to be a subsidiary of another company, if that other company (a) holds more than 50 percent of the voting rights in it, or (b) has the right to appoint or remove more than 50% of its board of directors or the first mentioned company is a subsidiary of any company which is that other's subsidiary.

**Schedule 2**

**Part 1: Particulars of Warrantors**

| Full Name (in English and Chinese) | Nationality | Identity Card No. | Address |
|---|---|---|---|
| Lin, Yao (林耀) | PRC | 321026197211050034 | 7-3-3 Jingli Garden, Tianzhu Area, Shunyi District, Beijing, PRC |
| Shi, Yonglei (施永雷) | PRC | 320626197401145212 | Room 101, #9, Lane 9512, Humin Road, Xuhui District, Shanghai, PRC |

**Part 2: Particulars of the Sellers and their respective Equity Interests**

| (A) | (B) | (C) | | (D) | (E) |
|---|---|---|---|---|---|
| Name of relevant Seller | Address | Sale Equity Interest (in Registered Capital) | Proportion of Prepayment Amount | Proportion of Base Purchase Price | Proportion of Earn Out Consideration |
| Joy Dragon | | RMB 10,754,245.1 | 100% | EUR 42,771,447 | EUR 11,528,119 |
| Aiwu | | RMB 4,832,129 | | EUR 19,216,157 | EUR 5,179,300 |
| | <u>Total:</u> | RMB 15,586,374.1 | | EUR 61,987,604 | EUR 16,707,419 |

**Schedule 3**
**Conditions Precedents**

1. Approval having been issued by the PBOC in respect of the Investor becoming the ultimate controlling shareholder of the Company holding 80% ownership interests in the Registered Capital;

2. all other necessary approvals of, and registrations and filings with, the Approval Authorities (including without limitation, the MIIT, MOFCOM and SAMR) that are necessary in connection with the Transaction Documents having been obtained or effected, including without limitation, the approvals, registrations and filings set out in this Schedule 3, and all these approvals, registrations and filings remaining in full force and effect and with none of them conflicting with, altering or invalidating the terms or conditions of any of the Transaction Documents;

3. approval having been issued by the PBOC in respect of the persons nominated by the Investor as directors and senior management personnel of AllScore;

4. completion of the acquisition by the Company of all equity interest aggregating 1.74% in the registered capital of AllScore held by Yang, Chunshan (杨春山), Wang, Hui (王辉) and Dong, Junmin (董军民) (together, "**Individual Minority Shareholders**") as approved by the PBOC, upon which the Company shall become the sole shareholder of AllScore holding 100% ownership interests in its registered capital and there remain no outstanding claim or liability owing to any of the Individual Minority Shareholders by the Company or AllScore in connection with this acquisition;

5. a valid updated Business Licence having been issued by SAMR following an application to it for the registration of the Transfer, and a written receipt issued by SAMR in relation to a filing of the change of directors, general manager and supervisor in the Company;

6. in relation to the ownership interest Joy Dragon holds in the Registered Capital, registration with SAFE by the ultimate shareholders of Joy Dragon in accordance with Circular No.37 (or other similar regulation) in respect of a PRC Person holding, through an entity outside of the PRC, an ownership interests in the registered capital of a PRC incorporated company remaining in full force and effect and not altering the terms of any Transaction Document;

7. the receipt of the foreign exchange business registration certificate (外汇业务登记凭证) to open the special domestic account for asset realization (境内资产变现专户) of Aiwu to receive payment of its share of the Purchase Price;

8. completion of the registration with SAMR of the Transfer in accordance with this Agreement, the Amended and Restated Articles of Association (BJ Apple) No. 3, the Amended and Restated Articles of Association (AllScore) No. 2, the removal of three directors of the Company and three directors of AllScore and the appointment by the Investor of the corresponding number of directors in their place, the removal of the general manager and supervisors of each of the Company and AllScore and the appointment by the Investor of the general manager and supervisors in their place;

9. all representations and warranties given by each Warrantor and Seller in this Agreement remaining true, accurate and not misleading from the date of this Agreement up to and including the Transfer Completion Date, and none of the Warrantors and Sellers having breached any one or more of its obligations and undertakings under the Transaction Documents;

10. each of the Warrantors, Sellers, the Company and other parties to the Framework Agreement having duly executed the Transaction Documents;

Schedule 3 - Conditions Precedents

11. submission of a report to the public security bureau and SAMR (as applicable) relating to the loss of and replaced the business licences and branch chops of the Inner Mongolia and Shanxi branches of AllScore;

12. completion of the deregistration of the Hubei, Shaanxi, Hunan, Inner Mongolia and Shanxi branches of AllScore;

13. the replacement branch chop of the Hubei branch of AllScore having been obtained;

14. completion of the registration with the local SAMR of the change of the registered address of the Shenzhen branch of AllScore;

15. completion of the registration of a branch office of AllScore in Fuzhou with SAMR;

16. completion of the registration with SAMR of the revised business scope of the Shanghai branch of AllScore to rectify the inaccurate expiry date of the payment licence;

17. the Investor having received a certificate dated as of the Transfer Completion Date and signed by the legal representative of each Seller and the Company certifying, together with evidence of, the due fulfillment of the Conditions Precedent (other than those waived in accordance with this Agreement);

18. all monies payable by Joy Dragon and all Taxation liability, in relation to the CJ Transfer having been paid and discharged in full; and

19. all necessary written consent of and notices to third parties (including without limitation, banks) relating to the entry into, the performance of or the consummation of any matter contemplated under, any Transaction Document having been obtained or made (as applicable).

**Schedule 4**
**Transfer Completion Obligations**

On or prior to Transfer Completion, in accordance with Clause 5, the Sellers shall deliver or make available to the Investor:

1.  a certificate jointly signed by each Warrantor and Seller to the effect that all the representations and warranties given by each Warrantor and Seller in this Agreement remain true, accurate and not misleading from the date of this Agreement up to and including the Transfer Completion Date, and no undertaking given by any Warrantor or Seller has been breached;

2.  a certified copy of all relevant Board resolutions necessary for approving the Transfer,  and for the entry by the Company into and its performance of, each of the Transaction Documents to which the Company is a party, and for the appointment (taking effect on Subscription Completion) of four nominees of the Investor as directors of AllScore (in place of the outgoing directors not nominated by the Investor), each of these resolutions remaining in full force and effect and no resolution altering or rendering ineffective any terms or conditions of these Transaction Documents, the copy having been signed by the legal representative of the Company;

3.  a certified copy of a shareholders' resolution of AllScore approving the Amended and Restated Articles of Association (AllScore) No. 2 and each Transaction Document to which AllScore is a party, and  removing four directors (not nominated by the Investor) and appointing in their place, four nominees of the Investor as directors of AllScore (taking effect on Transfer Completion), and any other shareholder's resolution of AllScore necessary for its entry into, and performance of, each of the Transaction Documents to which it is a party, each of these resolutions remaining in full force and effect and no resolution altering or rendering ineffective any terms or conditions of these Transaction Documents, the copy having been signed by the legal representative of AllScore;

4.  a certified copy of the resolution of the board of directors of AllScore removing the general manager and other senior management personnel and appointing in their place, the nominees of the Investor (taking effect on Transfer Completion), this resolution remaining in full force and effect and no resolution altering or rendering ineffective any terms or conditions of these Transaction Documents, the copy having been signed by the legal representative of AllScore;

5.  all of the Transaction Documents, each duly executed by it;

6.  all relevant Board and shareholders' resolution (as applicable) necessary for the approval of the Amended and Restated Articles of Association No. 3, each of these resolutions remaining in full force and effect and no resolution altering or rendering ineffective any term or condition of the Amended and Restated Articles of Association No. 3; and

7.  the foreign exchange business registration certificate (外汇业务登记凭证) to open the special domestic account for asset realization (境内资产变现专户) of Aiwu to receive payment of its share of the Purchase Price;

8.  the Registration Notice of Creation of Equity Pledge (股权出质设立登记通知书) issued by SAMR in respect of the registration of each of the Joy Dragon Pledge No. 2 and Aiwu Pledge No. 2; and

9.  evidence of payment described in item 18 of Schedule 3.

**Schedule 5**
**Warranties**

For the purposes of this Schedule, capitalised terms used in the English version of this Agreement and terms in bold text in the Chinese version of this Agreement to the extent that they are not defined in this Agreement shall have the meanings ascribed to them in the Subscription Agreement.

**1      AUTHORITY AND CAPACITY**

1.1     Registration and existence

Each of Joy Dragon and the Group Companies is duly established with limited liability in accordance with all Applicable Laws and is validly existing since its establishment and in good standing under all Applicable Laws.

1.2     Rights, powers, authorisations and actions

Each of Joy Dragon and the JD Warrantor has the full and lawful capacity, rights, power and authority to execute and deliver this Agreement and all other Transaction Documents to which it is a party and to perform each of its obligations under them.

1.3     Binding Agreement

1.3.1    Each obligation under this Agreement and all other Transaction Documents to which it is a party is valid and binding on Joy Dragon and the JD Warrantor, and enforceable in accordance with its terms.

1.3.2    Each of the Joy Dragon and the JD Warrantor has obtained all approvals and other consents for the valid execution and delivery of, and the performance of its obligations under, this Agreement and all other Transaction Documents to which it is a party.

1.3.3    The execution and delivery of, and the performance by each of the Joy Dragon and the JD Warrantor of its obligations under, this Agreement and all other Transaction Documents to which it is a party will not result in a breach of (i) any provision of the constitutional documents of each of Joy Dragon and the Group Company, or (ii) any Applicable Laws, agreement, licence or other instrument or of any order, judgment, decree or rule of any court, governmental agency or regulatory body, or (iii) any Encumbrance under any contract, to which Joy Dragon, the JD Warrantor or a Group Company is a party or by which an Initial Shareholder or a Group Company is bound.

1.4     Ownership

Joy Dragon is the legal and beneficial owner of the Equity Interest set out against its name in Schedule 2 free and clear of all Encumbrances and it shall on Transfer Completion transfer that Equity Interest to the Purchaser free and clear of all Encumbrances together with all rights and advantages now or hereafter attaching thereto.

**2      CORPORATE INFORMATION**

2.1     General

All of the information set out in Schedules 2 and 6 of the Subscription Agreement is true and accurate in all respects and not misleading in any respect.

Schedule 5 – Warranties

2.2     Transaction Approval

Except as expressly provided in a Transaction Document, no licences, authorisations, registrations or other approvals (other than with SAMR) are necessary for undertaking each of the transactions contemplated by the Transaction Documents.

2.3     Capital

All of the equity interests (including, without limitation, the Equity Interest), registered capital and share capital of each Group Company are duly created, authorised, validly issued and fully paid, and in each case in accordance with all Applicable Laws, and held of record and legally and beneficially owned by Joy Dragon and Aiwu as set out in Part 2 of Schedule 2.

2.4     Pre-emption

No Person has any option, warrant, right, call, commitment, conversion right, right of exchange or other agreement or any right or privilege (whether by law, pre-emptive or contractual) capable of becoming an option, warrant, right, call, commitment, conversion right, right of exchange or other agreement for (a) the purchase from the Initial Shareholders of any of the Equity Interests; (b) the purchase from any Group Company of any of the equity interests in any other Group Company; (c) the purchase, subscription, allotment or issuance of any unissued shares or security of the Group Companies; or (d) the purchase or other acquisition from AllScore of any of the business, its undertakings, its property (including, without limitation, any equity or other ownership interest it holds) or its assets, and Joy Dragon is entitled to transfer to the Investor the full and lawful ownership of the Sale Equity Interest it holds on the terms of this Agreement without the consent of any party.

2.5     Encumbrance

There are no Encumbrances on the registered capital or share capital in any Group Company and there are no arrangements or obligations to create any Encumbrances.

2.6     Business Licence and Articles of Association

The business licence and articles of association of each Group Company set out completely the rights and restrictions attaching to the equity of each Group Company (other than rights and restrictions provided under PRC laws).

2.7     Existing business

Each Group Company does not and has not carried on any business or activity, other than:

2.7.1     within its scope of business as set out in of Schedule 2 of the Subscription Agreement and in accordance with Clause 5.2; and

2.7.2     in respect of which it is in compliance with paragraph 8 of this Schedule.

2.8     Subsidiaries and branches

No Group Company:

2.8.1     has any interest in, or has agreed to acquire, directly or indirectly, any registered capital, share capital or other right or interest of any other company or entity (wherever incorporated); or

2.8.2     has any branch, division, establishment or operations outside the jurisdiction in which it is incorporated other than the PRC and Hong Kong.

Schedule 5 – Warranties

2.9     Power of attorney

2.9.1     No Group Company has given any power of attorney or other authority (whether express, implied or ostensible) which is effective to any Person to enter into any contract, agreement or arrangement or make any commitment or payment or to do anything on its behalf.

2.9.2     None of the shareholders of the Group Company has given any power of attorney or any other authority (express, implied or ostensible) which is still outstanding or effective to any person in respect of the registered capital legally and beneficially owned by him and the voting rights attached to that registered capital.

2.10     Due authorisation

Each shareholder in each of the Group Companies has obtained the licences, consents and approvals (if any) necessary for its investment in the Group Companies and these licences, consents and approvals (if any) are in full force and effect and have been and are being complied with.

2.11     Books and Records; chops

2.11.1     Except as set out in the Disclosure Letter, there have not been any breaches by any Group Company of its constitutional documents or business licences which would have a material adverse effect on the business or any other aspect of the Group Companies.

2.11.2     The registers and minute books and SAMR and Hong Kong Company Registry records (where relevant) required to be maintained by each Group Company under the law of the jurisdiction of its incorporation:

(i)     are complete and correct;

(ii)     are up-to-date;

(iii)     are maintained in accordance with Applicable Law on a proper and consistent basis;

in each case in all material respects, and accurately and fairly reflect all meetings and other corporate actions of its shareholders and its directors and committees.

2.11.3     All registers, books and SAMR and Hong Kong Company Registry records referred to in paragraph 2.11.2, chops, seals and stamps of each Group Company and all other documents (including documents of title and copies of all subsisting agreements to which any Group Company is a party) which are the property of each Group Company or ought to be in its possession, are in the possession (or under the control) of the relevant Group Company, and no notice or allegation that any of these registers, books, documents, SAMR and Hong Kong Company Registry records or chops is incorrect or has to be rectified or replaced has been received.

2.11.4     All filings, publications, registrations and other formalities required by Applicable Law to be delivered or made by the Group Companies to company registries in each relevant jurisdiction, including SAMR and Hong Kong Company Registry, have been duly delivered or made on a timely basis.

2.12     The Directors

None of the directors of any Group Company:

Schedule 5 – Warranties

2.12.1   has been convicted of any criminal offence or been subject to any criminal proceedings (except convictions for, or proceedings relating to, minor motoring offences);

2.12.2   has been subject to any disqualification order;

2.12.3   has been censured by any recognised investment exchange (whether privately or publicly);

2.12.4   has been declared bankrupt or entered into any compromise or arrangement with his/her creditors; and

2.12.5   has been subject to any other legal or regulatory proceedings in relation to his/her role as a director in the past three years.

**3      ACCOUNTS**

3.1     Audited Accounts

3.1.1    The Audited Accounts have been prepared in accordance with applicable law and in accordance with International Accounting Standards and, subject to that, on a basis consistent with that adopted in preparing the audited accounts for the previous two financial periods and give a true and fair view of the assets, liabilities and state of affairs of the Company and AllScore at the Balance Sheet Date and of the profits or losses for the period concerned and as at that date:

(i)    reflected in full all actual liabilities;

(ii)   made proper provision for all contingent liabilities (or contingent liabilities were noted in accordance with good accountancy practice); and

(iii)  made adequate provision for all bad and doubtful debts in accordance with the policies of PBOC or provision reasonably regarded as adequate, whichever is the stricter.

3.1.2    The Audited Accounts give a true and fair view of the assets, liabilities and financial position of the Group at the Balance Sheet Date and of the profits or losses of the Group for the period concerned.

3.2     Management Accounts

3.2.1    The Management Accounts have been prepared in accordance with the accounting policies used in preparing the Audited Accounts applied on a consistent basis.

3.2.2    The Management Accounts give a fair view of, are not misleading and do not materially misstate the assets and liabilities of the Group Companies as at the Relevant Management Accounts Date nor the profits and losses of the Group Companies for the period ended on that date.

3.3     Non-Recurring Items etc.

The combined profits of the Group Companies for the three years ended on Balance Sheet Date as shown by the Audited Accounts and by the audited accounts of the Group Companies for previous periods delivered to the Investor (and the combined profits of the Group Companies for the twelve months ended on the Relevant Management Accounts Date as shown by the Management Accounts for the period between the Balance Sheet Date and the Relevant Management Accounts Date) and the trend of profits thereby shown have not (except as fairly disclosed in such accounts) been affected by changes or inconsistencies in accounting treatment, by any non-recurring items of income or expenditure, by transactions

Schedule 5 – Warranties

of an abnormal or unusual nature or entered into otherwise than on normal commercial terms or by any other factors rendering such profits for all or any of such periods exceptionally high or low.

3.4     Taxation

3.4.1     Full provision or reserve has been made in the Audited Accounts for all Taxation liable to be assessed on each Group Company or for which each is or may become accountable including without limitation in respect of:

(i)     profits, gains or income (as computed for Taxation purposes) arising or accruing or deemed to arise or accrue on or before the Balance Sheet Date (or, in relation to the Management Accounts, the Relevant Management Accounts Date);

(ii)     any transactions effected or deemed to be effected on or before the Balance Sheet Date (or, in relation to the Management Accounts, the Relevant Management Accounts Date) or provided for in the Audited Accounts or the Management Accounts; and

(iii)     distributions made or deemed to be made on or before the Balance Sheet Date (or, in relation to the Management Accounts, the Relevant Management Accounts Date) or provided for in the Audited Accounts or the Management Accounts.

3.4.2     Full provision for deferred taxation has been made in the Audited Accounts and the Management Accounts in accordance with PRC GAAP applicable as at the date of this Agreement.

3.4.3     AllScore HK has been resident for tax purposes in Hong Kong and each other Group Company has been resident for tax purposes in the PRC, and nowhere else at all times since its incorporation and will be so resident at the Subscription Completion Date.

3.4.4     Compliance

(i)     The Company has within the time limits prescribed by relevant PRC law paid all Tax, and there is no penalty, surcharge, late fee, fine or interest to be paid on any Tax.

(ii)     The Company has supplied all returns, notices or other information required to be supplied to any Taxation authority and all information was and remains complete and accurate in all material respects and all returns and notices were and remain complete and accurate in all material respects and were made on a proper basis.

(iii)     In respect of any payment, the Company has made all deductions and withholdings of Tax in accordance with PRC law. The Company has also accounted in full to the relevant PRC Taxation and fiscal authorities for any Tax so deducted or withheld.

3.4.5     The Company has no liability to Taxation in respect of which a Taxation Claim could be made and there are no circumstances likely to give rise to this liability.

3.4.6     The Company has no compensation liability in relation to tax payment or liability.

3.5     Book Debts

None of the debts receivable or due to any Group Company which are included in the Audited Accounts or which have subsequently arisen has not realised, in the ordinary course of

Schedule 5 – Warranties

collection, its nominal amount plus any accrued interest less any provisions for bad and doubtful debts included in the Audited Accounts.  No debt owing to any Group Company at the date of this Agreement will not, to the knowledge of Lin Yao and the Company, in the ordinary course of collection realise its nominal amount plus any accrued interest.  For the avoidance of doubt, a debt shall not be regarded as realizing its nominal amount to the extent that it is paid, received or otherwise recovered in circumstances in which the payment, receipt or recovery is or may be void, voidable or otherwise liable to be reclaimed or set aside.

3.6     Borrowings

3.6.1     No Group Company has outstanding any loan capital, any indebtedness or any money borrowed or raised, including without limitation money raised by acceptance or debt factoring and any liability (whether present or future) in respect of any guarantee or indemnity.

3.6.2     No Group Company has engaged in any financing of a type which would not be required to be shown or reflected in the Audited Accounts.

3.7     Guarantees

There is no outstanding guarantee, indemnity, suretyship or security given:

3.7.1     by any Group Company; or

3.7.2     for the benefit of any Group Company,

nor is any Group Company liable, by virtue of any act or omission as director, shadow director or "*de facto*" director or manager of another person, to pay all or part of the debts or liabilities of that other person.

3.8     Client money

3.8.1     There has been no non-compliance with Applicable Laws in relation to each aspect of the handling of client and merchant money.

3.8.2     Except as set out in the Disclosure Letter, no proceedings alleging fraud are currently in progress nor are there any police or other regulatory investigations into the possibility of fraud in relation to any of the payment services provided by any Group Company nor has the Company suffered any economic loss or made any compensation to any third party from fraud committed but in respect of which no proceedings have been initiated against the Company.

3.9     Accounting and other Records

The statutory books, books of account and other records of whatsoever kind of each Group Company are up-to-date and maintained in accordance with all applicable legal requirements on a proper and consistent basis and contain complete and accurate records of all matters required to be dealt with in such books and all such books and records and all other documents (including ownership certificates and copies of all subsisting agreements to which any Group Company is a party) which are the property of each Group Company or ought to be in its possession or are in its possession (or under its control) and no notice or allegation that any is incorrect or should be rectified has been received.  All accounts, documents and returns required by law to be delivered or made to any governmental authority have been duly and correctly delivered or made.

3.10    Changes since Balance Sheet Date

Since the Balance Sheet Date as regards each Group Company taken as a whole:

Schedule 5 – Warranties

3.10.1 there has been no material adverse change in its financial or trading position or prospects or turnover and no event, fact or matter has occurred or is likely to occur which will or is likely to give rise to any change of this kind;

3.10.2 the business of the Group has been carried on in the ordinary and usual course, without any interruption or alteration in its nature, scope or manner, and so as to maintain the same as a going concern;

3.10.3 there has been no adverse change in the method, manner or intensity of regulation of it by PBOC or any other governmental or trade agency or regulatory body;

3.10.4 the business of the Group has not been materially and adversely affected by the loss of any important customer or source of supply and there are no facts or circumstances which are likely to give rise to this result;

3.10.5 it has not entered into any transaction or assumed or incurred any liabilities (including contingent liabilities) or made any payment not provided for in the Audited Accounts otherwise than in the ordinary and usual course of carrying on its business;

3.10.6 its profits have not been affected by changes or inconsistencies in accounting treatment, by any non-recurring items of income or expenditure, by transactions of an abnormal or unusual nature or entered into otherwise than on normal commercial terms or by any other factors rendering the profits exceptionally high or low;

3.10.7 its business has not been materially and adversely affected by any increase in bad debts or by any abnormal factor not affecting similar businesses to a like extent and there are no facts which are likely to give rise to any of these effects;

3.10.8 no dividend or other distribution has been declared, made or paid to its members;

3.10.9 no Group Company has received a distribution from any company in contravention of any Applicable Law;

3.10.10 no share or loan capital or any other security giving rise to a right over the capital has been allotted or issued or agreed to be allotted or issued;

3.10.11 it has not redeemed, reduced or purchased or agreed to redeem, reduce or purchase any of its share capital: and

3.10.12 no insurance claims have been refused or settled below the amount claimed.

3.11 Control Issues

The external auditors of the Company have not raised any material control issues with respect to the way in which any of the Group Companies operate.

4 **LEGAL MATTERS**

4.1 Compliance with Laws

4.1.1 Each Group Company is conducting the business of the Group in compliance with Applicable Laws and regulations in each country in which the business of the Group is carried on in all material respects, including all existing published PRC and Hong Kong laws and regulations (as applicable) and no Group Company is in material breach of its constitutional documents or any laws and regulations.

4.1.2 The ownership structures of the Group Companies immediately prior to Subscription Completion and the revised ownership structures that will arise at Subscription Completion and the transactions giving rise to these ownership structures as outlined under this Agreement, are valid and binding and are in compliance with

Schedule 5 – Warranties

existing published Applicable Laws (including those in the PRC) and shall continue to be so following Subscription Completion.

4.1.3    There is no investigation disciplinary proceeding or enquiry by, or order, decree, decision or judgment of, any court, tribunal, arbitrator, governmental agency or regulatory body outstanding against any Group Company or any person for whose acts or defaults the Group Company may be vicariously liable.

4.1.4    No Group Company has received any written notice from any court, tribunal, arbitrator, governmental agency or regulatory body with respect to a violation and/or failure to comply with any Applicable Law, regulation, or requiring it to take or omit any action.

4.1.5    Each Group Company is in all material respects familiar with the provisions of the FCPA and its purposes and has taken no action and made no payment (including without limitation promises to take action or to make payments) in violation of, or that might cause the Company to be in violation of, the FCPA.

4.1.6    No Group Company has made, directly or indirectly, any payment, loan or gift of any money or anything of value to, or for the use of, any government official (including without limitation an official of a. government-owned or controlled entity), any political party or any officer, or any candidate for government office, or any other person whom it knows or has reason to know will give such payment, loan or gift directly or indirectly to any government official or political party or candidate for government office, and it has not taken any action or made any payment (including without limitation promises to take action or to make payments) for the purpose of inducing any of the aforementioned persons to do any act or make any decision in his or its official capacity (including without limitation a decision to fail to perform his or its official function) or use his or its influence with a government or instrumentality in order to affect any act or decision of such government or instrumentality in order to assist any Group Company in obtaining or retaining any business or to obtain an unfair competitive advantage or any benefit for any Group Company or its Affiliates or any other Person or which may cause any Group Company to be in material violation of the FCPA.

4.1.7    Each Group Company complies with anti-money laundering laws, rules and regulations of the PRC and Hong Kong (as applicable), and has established and maintains an anti-money laundering program in accordance with laws, rules and regulations of the PRC and Hong Kong (as applicable)and does not have a business relationship with any Persons subject to any sanctions list.

4.1.8    Each Group Company complies with laws, rules and regulations with respect to non-financial payment institutions issued by government authorities in the PRC and Hong Kong (as applicable), and has established and maintains effective management procedures to ensure the compliance with the laws, rules and regulations with respect to non-financial payment institutions (including, without limitation, to complete all filing requirements and to respond to PBOC's rectification requests).

4.1.9    Neither the Group Company nor any of its Affiliates, has taken or caused to be taken, or will take or cause to be taken, directly or indirectly, any action that would or could cause the Investor or any of its Affiliates to be in violation of any law, regulation, treaty or convention relating to anti-money laundering, anti-bribery, anti-corruption or similar matters.

4.1.10    Except as set out in the Disclosure Letter, no event has occurred and no circumstance exists that could reasonably be expected to constitute or result in (with

Schedule 5 – Warranties

or without notice or lapse of time or both) a violation of or failure to comply with any Applicable Laws by any Group Company (including, without limitation, PBOC rules and regulations).

4.2    Approval of Personnel

Each of the representatives and relevant working personnel of the Group Companies has been duly approved by all relevant authorities to the extent required by and in accordance with PRC law.  There is no investigation, enquiry or proceeding outstanding or anticipated which is likely to result in the suspension or cancellation of any of these approvals.  None of these approvals has been breached or is likely to be suspended or cancelled (whether as a result of the entry into or completion of this Agreement or the entry into or completion of the transactions contemplated by the other Transaction Documents or otherwise).

4.3    Litigation

4.3.1    Since the Balance Sheet Date no claim for damages or otherwise has been made against any Group Company.

4.3.2    No Group Company (or any person for whose acts or defaults a Group Company may be vicariously liable) is involved whether as claimant or defendant or other party in any claim, legal action, proceeding, suit, litigation, prosecution, investigation, enquiry or arbitration and no claim, legal action, proceeding, suit, litigation, prosecution, investigation, enquiry or arbitration is pending or threatened by or against any Group Company (or any person for whose acts or defaults a Group Company may be vicariously liable).

4.3.3    No claim, legal action, proceeding, suit, litigation, prosecution, investigation, enquiry, mediation or arbitration is pending against any Group Company (or any person for whose acts or defaults a Group Company may be vicariously liable).

4.3.4    There is no unfulfilled or unsatisfied judgment or order of any PRC court or awards of any arbitration tribunal outstanding against the Company.

4.3.5    No Group Company and none of the properties, assets or operations which it owns or in which it is interested, is subject to any continuing injunction, judgment or order of any court, arbitrator, governmental agency or regulatory body, nor in default under any order, licence, regulation or demand of any governmental agency or regulatory body or with respect to any order, suit, injunction or decree of any court.

4.3.6    There are no disciplinary proceedings or other circumstances likely to lead to any such claim or legal action, proceeding, suit, litigation, prosecution, investigation, enquiry or arbitration.

4.4    Insolvency

4.4.1    No order has been made, petition presented, resolution passed or meeting of creditors convened for the winding up or bankruptcy (or other process whereby the business is terminated and the assets of the company concerned are distributed amongst the creditors and/or shareholders or investors) of any Group Company and there are no cases or proceedings under any applicable insolvency, reorganisation, or similar laws in any jurisdiction concerning any Group Company and no events have occurred which, under PRC law or other applicable law, would justify any cases or proceedings.

4.4.2    No petition has been presented or other proceedings have been commenced for an order to be made by which during the period it is in force, the affairs, business and assets of the company concerned are managed by a person appointed for the

Schedule 5 – Warranties

purpose by a court, governmental agency or similar body in relation to any Group Company, nor has any order been made.

4.4.3   No liquidation committee or similar body or person has been appointed in any jurisdiction in respect of the whole or any part of the business or assets of any Group Company and no step has been taken for or with a view to the appointment of the body or person.

4.4.4   No Group Company is insolvent or unable to pay its debts as they fall due or is in liquidation under PRC law or Hong Kong law.

4.4.5   No ruling declaring the insolvency of any Group Company has been made and no public announcement in respect of the same has been pronounced by the PRC or Hong Kong court.

4.5   Inducements

None of the directors, officers, agents, employees or other persons acting on behalf of any Group Company has been party to:

4.5.1   the use of any of the assets of the Group Companies for unlawful contributions, gifts, entertainment or other unlawful expenses relating to political activity or to the making of any direct or indirect unlawful payment to government officials or employees from these assets;

4.5.2   the establishment or maintenance of any unlawful or unrecorded fund of monies or other assets;

4.5.3   the making of any false or fictitious entries in the books or records of any Group Company; or

4.5.4   the making of any unlawful or undisclosed payment.

4.6   No Fraud

None of the Group Companies and their respective legal representatives, directors and senior management has, committed any fraud upon any of the Group Companies, misappropriated any of the property or assets of any of the Group Companies, or falsified any of the records of any of the Group Companies.

**5      ANTI-COMPETITIVE AGREEMENTS AND PRACTICES**

No Group Company is a party to any agreement, arrangement or concerted practice or is carrying on any practice material to the business of the Group:

5.1   which in whole or in part may contravene may be invalidated by any anti-trust, fair trading, dumping, state aid, consumer protection or similar legislation in any jurisdiction;

5.2   in respect of which any filing, registration or notification is required or is advisable pursuant to the legislation referred to in paragraph 5.1 (whether or not the same has in fact been made).

**6      TRADING AND CONTRACTUAL ARRANGEMENTS**

6.1   Capital Commitments

No capital commitments not in the ordinary course of business have been entered into or proposed by any Group Company.

Schedule 5 – Warranties

6.2     Contracts

No Group Company is a party to or subject to any contract, transaction, arrangement, understanding or obligation which:

6.2.1     is not in the ordinary and usual course of business;

6.2.2     is not on an arm's length basis;

6.2.3     other than the lease agreements in respect of the Properties or commercial computer printer and other similar leases, is unlikely to have been fully performed, in accordance with its terms, more than 12 months after the date on which it was entered into or undertaken or is incapable of termination, in accordance with its terms, by the relevant Group Company, on 6 months' notice or less;

6.2.4     restricts its freedom to carry on its business in any part of the world in a manner as it thinks fit so as to have a material adverse effect on the Group;

6.2.5     cannot readily be fulfilled or performed without undue or unusual expenditure of money or effort;

6.2.6     is, or the performance of which is, in violation of the Applicable Laws; or

6.2.7     involves or is likely to involve the supply of goods and services, the aggregate sales value of which will be more than 5 per cent of turnover of the business of the Group Company concerned for the preceding financial year.

6.3     Joint Ventures etc.

No Group Company is, or has agreed to become, a member of any joint venture, consortium, partnership or other unincorporated association in which it is to participate with any other person in any business or investment.

6.4     Arrangements with Connected Persons

6.4.1     There is no indebtedness (actual or contingent) nor any indemnity, guarantee or security arrangement between any Group Company, any direct or indirect shareholder of the Company and any current or former employee, current or former director or any current or former consultant of any Group Company, or any person connected with any of these preceding persons.

6.4.2     Except for the employment contracts, no Group Company is or has been party to any contract, arrangement or understanding, whether oral or written, (i) with any current or former employee, current or former director or any current or former consultant of any Group Company or any person connected with any of these persons, or (ii) in which current or former employee, current or former director or any current or former consultant of any Group Company or any person connected with any of these persons is interested (whether directly or indirectly).

6.4.3     There are no existing contracts or arrangements between or involving any Group Company and any direct or indirect shareholder of the Company and/or any director of any Group Company, and/or any person connected with any of them.

6.5     Effect of the Subscription

Neither entering into, nor compliance with, nor completion of this Agreement nor entry into, compliance with, or completion of the transactions contemplated by any of the other Transaction Documents will, or is likely to, cause (i) any Group Company to lose the benefit of any right or privilege it presently enjoys, (ii) any person who normally does business with or gives credit to any Group Company not to continue to do so on the same basis, or (iii) any

Schedule 5 – Warranties

officer or senior employee of any Group Company to leave his employment, and the attitude or action of government authorities, customers, employees and other persons with regard to any Group Company will not be prejudicially affected.

6.6    Contracts

6.6.1    No Group Company is or has been party to any contract commitment or arrangement which:

(i)    is outside the ordinary and usual course of business;

(ii)    relates to the acquisition or leasing of any property by the Company other than by way of realisation of mortgage rights;

(iii)    is not wholly on an arm's length basis;

(iv)    is of a loss-making nature (that is, known to be likely to result in loss on completion of performance);

(v)    cannot readily be fulfilled or performed on time without undue or unusual expenditure of money or effort;

6.6.2    None of the Group Companies:

(i)    is or has been party to any agency, distributorship, marketing, branding, purchasing, or licensing agreement or arrangement or any agreement or arrangement which restricts its freedom to carry on its business in any part of the world in any matter whatsoever; or

(ii)    is, or has agreed to become, a member of any joint venture, consortium, partnership or other unincorporated association, body or undertaking in which it is to participate with any other person in any business or investment.

6.6.3    True and complete copies of all material contracts to which any of the Group Companies is a party have been set out in the Disclosure Letter and have been made available to the Investor.

6.7    Compliance with Agreements

All the contracts and all pledges, charges, mortgages and other security arrangements, leases, tenancies, licences, concessions and agreements of whatsoever nature to which any of the Group Companies is a party are valid, binding and enforceable obligations of the parties to them and their terms have been complied with by the relevant Group Company and by all the other relevant parties and there are no grounds for rescission, avoidance or repudiation of any of the contracts or the other leases, tenancies, licences, concessions or agreements and no related notice of termination or of intention to terminate has been received.

6.8    Guarantees

Save as disclosed in the Audited Accounts, there is not outstanding any guarantee, indemnity or comfort (whether or not legally binding) given by or for the benefit of any Group Company.

6.9    No loans

No loan and advance has granted by any Group Company and no security taken by, or given to, any Group Company in respect of any loan or advance.

Schedule 5 – Warranties

6.10    Others

6.10.1    All client and merchant deposits held by each Group Company have been accepted on the relevant standard terms and conditions used by the relevant Group Company in the ordinary and usual course of its business.

6.10.2    The standard terms and conditions utilised by each Group Company in the course of its business, and their use, comply with all applicable PRC, Hong Kong and other laws and regulations.

6.10.3    All outstanding foreign exchange transactions entered into by each Group Company comply with PRC law.

6.11    Finders etc.

The Group Companies have not employed, retained or otherwise contracted with any broker or finder or incurred any liability for any brokerage fees or commissions or finders' fees in connection with the transactions contemplated by the Transaction Documents, and no person is entitled to receive from any Group Company any brokerage fees or commissions or finders' fees.

**7    EMPLOYEES**

7.1    Employees and Terms of Employment

7.1.1    All agreements or arrangements relating to the employment of the employees of each Group Company have been entered into on an arms' length basis between the relevant parties and the terms are fair and reasonable compared with the prevailing market practice in the PRC.

7.1.2    There are no terms of employment for employees at any Group Company or consultancy agreements with any Group Company or terms of appointment for directors of any Group Company which would have the effect of entitling the said employee, consultant or director to treat the Subscription or the performance of any of the transactions contemplated by the Transaction Documents as amounting to a breach of the contract or entitling the employee to any payment or benefit whatsoever or entitling the employee to treat himself/herself as redundant or dismissed or released from any obligation.

7.1.3    None of the terms of the employment contracts and the confidentiality and non-compete agreements entered into by any Group Company with its employees and the entering into of these agreements violates any Applicable Laws. There is no outstanding no liabilities owing by any Group Company in relation to any of these terms.

7.1.4    There is no share incentive or share option arrangements for or affecting any employees or former employees or other former workers of the Group Companies together with details of current awards allocated and options granted and the total potential liability of each Group Company in respect of these awards and options

7.1.5    The agreements, policies and arrangements relating to the employment or appointment of all employees, consultants and directors of each Group Company as disclosed in the Disclosure Letter contain all material terms of employment or appointment of these employees, consultants and directors and do not violate any Applicable Laws.

Schedule 5 – Warranties

7.1.6     There is no agreement or arrangement in place between any Group Company and any trade union or other organisation representing all, or any group of, employees of any Group Company.

7.2     Payments on Termination

Except as disclosed in the Audited Accounts:

7.2.1     no liability has been or may be incurred by any Group Company for breach of any contract of employment or consultancy with any employee or consultant including without limitation redundancy payments, protective awards, compensation for wrongful dismissal or unfair dismissal or for failure to comply with any order for the reinstatement or re-engagement of any employee; and

7.2.2     no Group Company has made or agreed to make any payment or provided or agreed to provide any benefit to any employee or former employee of any Group Company or any dependant of any employee or former employee or to any consultant or former consultant in connection with the actual or proposed termination or suspension of employment or variation of any contract of employment of any employee or former employee or consultancy agreement of any consultant or former consultant, nor is it liable to make any payment or to provide any benefit.

7.3     Industrial Disputes

7.3.1     No Group Company is involved in, and there are no circumstances likely to give rise to, any industrial dispute or any or former employee dispute or negotiation regarding a claim of material importance with any employee of a Group Company or any trade unions.

7.3.2     There are no outstanding trade union fees liable to be paid by any Group Company.

7.4     Incentive Schemes

There are no share incentive, share option, profit sharing, bonus or other incentive arrangements for or affecting any employees or other workers or former employees or other former workers of any of the Group Companies.

7.5     Social Security Funds

7.5.1     No liability has been or may be incurred by any Group Company for breach of any obligation for contribution to the pension fund, unemployment insurance, occupational injury insurance, maternity insurance, the collective housing fund, the housing fund, the welfare fund, the trade union fund, the employee education fund and any other social security funds so provided under PRC law or the competent authorities from time to time to which the Company is obliged to make contributions for its employees (together, the "**Social Security Funds**").

7.5.2     Other than under the Social Security Funds, there are no pension, provident, superannuating or retirement benefit funds, schemes or arrangements under which any Group Company is obliged, either morally or contractually, to provide to any of its employees or officers or former employees or officers or any spouse or other dependant of any of the same retirement benefits of any kind (which expression shall include benefits payable upon retirement, leaving service, death, disablement and any other benefits which are commonly provided for under provident or retirement schemes) and in relation to which there are insufficient or inadequate funds set aside or held to provide or pay the benefits promised under any scheme or arrangement and any taxes and expenses of the scheme or arrangement, or to

Schedule 5 – Warranties

which any required or recommended contributions or premiums have not been paid, or from which any assets have been withdrawn (except to provide or pay benefits).

7.6    Compliance

Each Group Company has in all material respects complied with its obligations to its employees and former employees, whether under the terms of their employment or under Applicable Laws.

## 8    TAXATION

8.1    Transactions since the Balance Sheet Date

Since the Balance Sheet Date, no Group Company has been involved in any transaction outside the ordinary and usual course of business which has given or may give rise to a liability to Taxation on any Group Company (or would have given or might give rise to such a liability but for the availability of any relief, allowance, deduction or credit).

8.2    Compliance

8.2.1    None of the Group Companies has committed any material breach of applicable Taxation laws.

8.2.2    Each Group Company has within the lime limits prescribed by relevant PRC and Hong Kong law duly paid all Tax, made all registrations, returns, given all notices, supplied all other information required to be supplied to any Taxation authority and all information was and remains complete and accurate in all material respects and all registrations, returns and notices were and remain complete and accurate in all material respects and were made within the requisite periods and on a proper basis within the approved business scope of each Group Company and no Group Company is subject of a back duty, additional Tax or other Tax investigation and there are no facts which are likely to cause an investigation to be initiated and no notices of any dispute regarding Tax recoverable from any Group Company or regarding the availability of any relief from Tax to any Group Company have been served or made.  Each Group Company is not, and has not at any time since the Balance Sheet Dale been, liable to pay any penalty or interest on any unpaid Tax.

8.2.3    Each Group Company has made all deductions and withholdings in respect or on account of Tax which it is required or entitled by any relevant legislation to make from any payments made by it.  Each Group Company has accounted in full to the relevant PRC and Hong Kong taxation and fiscal authorities for any Tax so deducted or withheld.

8.2.4    Each Group Company is in possession of sufficient information to enable it to compute its liability to Taxation insofar as it depends on any transaction occurring on or before Subscription Completion.

8.2.5    No relief (whether by way of deduction, reduction, set-off, exemption, preferential treatment, postponement, roll-over, hold-over, repayment or allowance or otherwise) from, against or in respect of any Taxation has been claimed and/or given to any Group Company which could or might be effectively withdrawn, postponed, restricted, clawed back or otherwise lost as a result of any act, omission, event or circumstance arising or occurring at or at any time after Subscription Completion.

8.2.6    Each Group Company that enjoyed or enjoys tax exemptions and preferential tax treatments has fulfilled all the requirements for it to enjoy exemptions and treatments in accordance with the Applicable Laws of the PRC in all material respects, and

Schedule 5 – Warranties

enjoys exemptions and treatments granted by the relevant Tax Authorities and these exemptions and treatments are not subject to any challenge by the Tax Authorities. There is no circumstance that will cause or result in the foregoing exemptions and treatments to be revoked or become unavailable.

8.2.7   No Group Company has taken any action which has had, or will have, the result of altering, prejudicing or in any way disturbing any arrangement or agreement which it has previously had with any Tax Authority.

8.3   Stamp duty

All documents in the possession or under the control of and used or relied on by each Group Company and which attract stamp duty in the PRC or elsewhere have been properly stamped.

8.4   Employees

All amounts payable to any Tax Authority in respect of any employee (including any Taxation deductible from any amounts paid to any employee) due or payable by any Group Company have been duly paid and each Group Company has made all deductions and retentions as should have been made under applicable law and/or applicable regulations.

8.5   Effect of Transaction

Neither the execution nor the performance of this Agreement nor the execution of, nor the performance of the transactions contemplated by, any other Transaction Document:

8.5.1   will result in the Investor being required under PRC law to make any withholding in respect of any payment;

8.5.2   will result in any losses of any Group Company or any other allowance, deduction or credit available for relief for Taxation purposes against the profits, gains or income (or deemed profits, gains or income) of the Company ceasing to be so available or being reduced; or

8.5.3   will render any Group Company liable to any, or any additional, Taxation.

8.6   Deductions

All remuneration, compensation payments, payments on retirement or removal from an office or employment and other sums paid or payable to employees or officers or former employees or officers of each Group Company and all interest, annuities, royalties, rent and other annual payments paid or payable by each Group Company (whether before or after the date hereof) pursuant to any obligation in existence at the date hereof are and will (on the basis of the Taxation laws and regulations in force at the date hereof) be deductible for profits tax purposes either in computing the profits of any Group Company or as a charge on the income of any Group Company.

8.7   Indemnification

No Group Company is a party to any agreement under which it is liable to indemnify any person with respect to Taxes or otherwise share liability to Taxes with any person.

8.8   Avoidance

No Group Company has at any time, in breach of PRC and other applicable laws, entered into, engaged in or been a party to or otherwise been involved in any transaction, scheme or arrangement for the avoidance of, or reduction in liability to, Taxes.

Schedule 5 – Warranties

**9        ASSETS**

9.1      The Properties

9.1.1      True and accurate details of all premises, buildings, land or other property rights, occupied or otherwise used by the Group Companies are set out in the Disclosure Letter ("**Properties**" or each a "**Property**").

9.1.2      In relation to each Property, the Group Company named in the Disclosure Letter is the lessee or licensee as applicable of the Property.

9.1.3      The Group Company named in the Disclosure Letter is in possession of the whole of each Property and no person other than a Group Company is in, or otherwise entitled to, occupation or use.

9.1.4      Each Property has the benefit of rights and easements as are necessary for the existing use of the Property.

9.1.5      None of the Group Companies owns any premises, buildings, land or other property rights.

9.1.6      To the knowledge, information and belief of the management personnel of Company, there is no outstanding notice or dispute involving the relevant Group Company and any third party as to the use of any Property which would, if implemented or enforced, have a material adverse effect on the business of the Group carried out at the Properties.

9.2      Leases

9.2.1      The interest of the Group Companies in all Properties is leasehold.

9.2.2      The Properties are validly and lawfully leased to the Group Companies under lawful lease contracts.

9.2.3      There is no subsisting breach and no non-observance of any covenant, condition or agreement contained in the lease under which the Group Company holds its interest in the Property, on the part of the relevant landlord or the Group Company which would materially adversely affect the business of the Group carried out at the Property.

9.2.4      The Group Companies have the lawful right to use the Properties for their entire contractual term in accordance with the relevant lease contracts, subject to termination clauses of the relevant lease contracts. Other than the rights under the relevant lease agreements, there is no right for the landlord to terminate the lease before the expiry of the contractual term, other than by breach of the lease by the lessee. There exists no fact which will give rise to any right of termination by the lessor of each of the lease agreements relating to the Properties.

9.2.5      No right can be asserted by any third party over the Properties which will have a material adverse effect on the ability of the Group Companies to use these properties in the ordinary course of their business and in the manner and to the fullest extent as currently used or intended to be used or which will result in the revision or renegotiation of the terms of any lease relating to the Properties.

9.3      No Dispute

There are no outstanding actions, disputes, claims or demands between the Group Companies and the respective landlord or any third party in relation to any of the Properties

Schedule 5 – Warranties

9.4     Ownership of Assets

All assets included in the Audited Accounts or acquired by any of the Group Companies since the Audited Accounts Date, other than any assets disposed of or realised in the ordinary and usual course of business:

9.4.1   are legally and beneficially owned by the Group Companies;

9.4.2   are, where capable of possession, in the possession or under the control of the relevant Group Company;

9.4.3   none of these assets is the subject of an Encumbrance or the subject of any factoring arrangement, conditional sale or credit agreement.

9.5     Aging

The Disclosure Letter contains the aging report of the Group, as of 31 December 2018, which shows the aging of all receivables for the Group as of that date. The information contained in the aging report for the Group is true, accurate and not misleading in all material respects.

9.6     Sufficiency of Assets

The Properly, rights and assets owned, held or leased by each Group Company comprise all the properly, rights and assets necessary or convenient for the carrying on of the business of each Group Company fully and effectively in and to the extent to which it is presently conducted, and none of these property, rights and assets will be adversely affected by the transaction contemplated by this Agreement and by any other Transaction Document.

9.7     Insurance

9.7.1   All the assets of each Group Company which are capable of being insured have at all material times been and are insured to their full replacement value against fire and other risks normally insured against by companies carrying on similar businesses or owning assets of a similar nature and each Group Company has at all material times been and is adequately covered against accident, physical loss or damage, third party liability and other risks normally covered by insurance by these companies.

9.7.2   In respect of all the insurances, all the policies are in full force and effect and no act, omission, misrepresentation or non-disclosure by or on behalf of any Group Company has occurred which makes any of these policies voidable, nor have any circumstances arisen which would render any of these policies void or unenforceable for illegality or otherwise, nor has there been any breach of the terms, conditions and warranties of any of the policies that would entitle insurers to decline to pay all or any part of any claim made under the policies.

9.8     No Undisclosed Liabilities

There are no material liabilities, whether actual or contingent, of the Group Companies other than (i) liabilities disclosed or provided for in the Audited Accounts; (ii) liabilities incurred or likely to be incurred in the ordinary and usual course of business since the Balance Sheet Date, none of which is material; or (iii) items which in accordance with the principles of determination of relevant liabilities under the applicable International Accounting Standards or PRC accounting standards are not required to be classified as liabilities; and (iv) liabilities disclosed elsewhere in this Agreement.

Schedule 5 – Warranties

**10      INTELLECTUAL PROPERTY, INFORMATION TECHNOLOGY AND DATA PRIVACY**

10.1    Definitions

For the purposes of this paragraph 10:

"**Business**" means the business activities conducted by the Group.

"**Business Information**" means all information (whether or not confidential and whether written, oral, in electronic form or any other media) that is used in or in any way relates to all or any part of the Business, any products sold or services rendered by the Business, the operations, management, administration or financial affairs of the Business (including business plans and forecasts), the sale or marketing of any of the products sold or services rendered by the Business.

"**Business IP**" means all rights and interest held by any Group Company or Group Companies in Intellectual Property which has in the last two years been used or is intended to be used in or in connection with the business of any Group Company or Group Companies as it is presently conducted;

"**Business IT**" means all Information Technology which is owned by any Group Company and/or which has in the last two years been used or is now intended to be used in connection with the business of any Group Company;

"**Information Technology**" means servers, computer systems, communication systems and facilities, software and hardware;

"**Owned Business IP**" means Business IP which is owned by any Group Company;

"**Licensed Business IP**" means Business IP other than Owned Business IP.

10.2    Ownership etc.

10.2.1    All Owned Business IP is legally and beneficially owned by a Group Company.

10.2.2    All Owned Business IP is not being infringed by any person as a result of which the business of the Group will be materially and adversely affected.

10.2.3    None of the Owned Business IP is subject to any Encumbrance or any licence or authority in favour of another; and

10.2.4    Schedule 7 of the Subscription Agreement lists the complete, accurate and current details of all domain names and trade marks used by the Group.

10.2.5    No infringement claims have been made against any Group Company and, no intellectual property applications are pending which if pursued or granted might be material to the truth and accuracy of any of the above in this paragraph 10.2.

10.3    Registered Intellectual Property

Schedule 7 of the Subscription Agreement lists complete, accurate and current details of all Owned Business IP that is registered or the subject of applications for registration and all renewal fees which are due and steps which are required for their maintenance and protection have been paid and taken.

10.4    Unregistered Trade Marks

Other than the trade marks listed in Part I of Schedule 7 of the Subscription Agreement, there are no other unregistered trade marks forming part of the Business IP which are material to the Group.

Schedule 5 – Warranties

10.5     Validity

The Owned Business IP is valid and enforceable.

10.6     Infringement of Third Party Rights in Intellectual Property

The material processes employed and the products and services dealt in by each Group Company both now and at any time within the last six years do not and did not use, embody or infringe any rights or interests of third parties in Intellectual Property and no claims of infringement of any rights or interests have been made by any third party against any Group Company.

10.7     Licences

Other than the basic operating system, office software, system utility software and other non-bespoke ordinary Internet and commercial software, the Group Companies have no Licensed Business IP.

10.8     No assertion of moral rights

No moral rights have been asserted which would affect the use of any of the Business IP.

10.9     Patents

None of the Group Companies has registered or applied to register any patent or invention.

10.10    Sufficiency of Business IP

The Owned Business IP and the Licensed Business IP comprise all the rights and interests in Intellectual Property necessary for the carrying on of the business of each Group Company in the manner in, and to the extent to, which it is presently conducted.

10.11    Information Technology

10.11.1    Each of the Business IT is owned by or licensed to the relevant Group Company.

10.11.2    The present capacity and performance of the Business IT is sufficient to satisfy the current and reasonably projected business requirements (including requirements as to data volumes) of the Group Companies.

10.11.3    All material services relating to, and material licences of, Business IT are, and have been throughout the last two years, provided under written contracts with the relevant Group Company. These contracts are:

(i)      in full force and effect, no notice having been given by either side to terminate them;

(ii)     no circumstances exist or have existed which would entitle a party to terminate them, vary them and/or make a claim for money or a money equivalent in respect of them; and

(iii)    the obligations of all parties have been fully complied with, and no disputes have arisen or are foreseeable in respect of those contracts.

10.11.4    There are, and in the past two years there have been, no performance reductions or breakdowns of, or logical or physical intrusions to, any Information Technology or losses of data which have had (or are having) a material adverse effect on the business of the Group or the use of the Business IT by the business of the Group and the Seller is not aware of any fact or matter which may give rise to any material adverse effect of this kind.

Schedule 5 – Warranties

10.11.5   The Group Companies have not disclosed, and are not aware of any disclosure by any third party of, the source code of software owned by the Group Companies to any third party other than under a binding agreement with a reputable escrow agent on the agent's standard terms. The release of any source code has not been triggered and the Seller is not aware of any fact or matter which might, now or in the future, trigger release of that source code.

10.12   Information and Content

10.12.1   To the knowledge, information and belief of the Warrantors, all information used by the Group in relation to the Business and all Content used in relation to the Portals is owned by or is the subject of a valid grant of rights to the Group and is not subject to any restriction which materially and adversely affects the Group's ability to use it for the purposes of the Business.

10.12.2   The Sellers have not disclosed nor to the Seller's knowledge, nor are any of them obliged to disclose any information of a confidential nature to any person other than its employees.

10.12.3   To the knowledge, information and belief of the Warrantors, none of the Content used in the Portals contains any bugs or viruses, logic bombs or other contaminants (including "worms" or "Trojan horses") which may materially affect the Business.

10.13   User Information

The Group have taken all steps that would be reasonably prudent in the circumstances to protect identity and personal information of any users of any website of the Group.

10.14   Compliance with telecoms-related laws

10.14.1   For each of the Portals, the Group has validly obtained the necessary Approvals for in the PRC.

10.14.2   Without prejudice to the generality of paragraph 10.14.1, the Content complies with and the Group Companies have complied with all their respective obligations in all material respects under the Internet Information Services Measures promulgated by the PRC State Council (Guowuling No. 292).

10.15   Domain Names

10.15.1   All domain names used by the relevant Group Company are validly owned and duly registered by it. All annual domain name registration fees have been fully and regularly paid.

10.15.2   There is no circumstance which will render the Group Companies not being entitled to use or continue to use these domain names.

10.16   Compliance with Data Privacy

10.16.1   No Group Company has disclosed, or is obliged to disclose, any of the Business Information to any third party, other than those of its officers or employees who are bound by obligations of confidence. Save for the employees engaged in the Business, no third party has had access to any of the Business Information. No Group Company is restricted in its ability to use, or to disclose any of the Business Information.

10.16.2   Each Group Company has taken all reasonable measures to maintain in confidence the Business Information and Business Know-how.

Schedule 5 – Warranties

10.16.3   Each Group Company has at all times complied with all applicable data privacy laws and regulations.

10.16.4   No Group Company has been or is in breach of any data security breach reporting or notification requirement under any law, regulation or mandatory code or is the subject of any investigation enforcement action by any regulator in respect of its handling of any personal data which relates to the Business.

10.16.5   Each Group Company has implemented appropriate procedures in accordance with best industry practice for ensuring the security of the Computer Systems, the Leased Properties and the Real Property and the confidentiality and integrity of all data stored in them.

10.16.6   The Seller is not aware of any current or past data security breach in respect of the data which it holds and which relates to the Business and the Seller is not, or has not been, the subject of a complaint by any customer and/or individual in respect of any loss of, or unauthorised access to, data which relates to the Business.

## 11    LICENCES AND PERMITS

11.1    All licences, consents, authorisations, confirmations, certificates registrations, filings and approvals ("**Licences**") necessary or desirable for each Group Company with respect to the carrying on of the business of the Group as now carried on have been obtained, effected or completed, are in full force and effect, and will be in full force and effect at Subscription Completion, and have been and are being complied with.

11.2    All Licenses are exclusively owned, used, operated by the applicable Group Company under its direct control and in its possession and have not been lent, borrowed or misused by any other Person in breach of any Applicable Laws.

11.3    Without prejudice to the generality of paragraph 11.1, the Operational Licences comprise all material Licences necessary and desirable for carrying on, in full and in compliance with all relevant laws and regulations, the business of each of AllScore and its subsidiaries.

11.4    There is no investigation, enquiry or proceeding outstanding or anticipated which is very likely to result in the suspension, cancellation, modification or revocation of any of these Licences or other matters referred to in paragraphs 11.1 or 11.2, and there is no circumstance that will lead to any material alteration in the terms of any these Licences or prevent its renewal or re-issue by the Approval Authority that originally granted it.

11.5    None of these Licences other matters referred to in paragraphs 11.1 or 11.2 has been breached or is likely to be suspended, cancelled, refused, modified or revoked (whether as a result of the entry into or completion of any of the transactions contemplated by this Agreement or any other Transaction Document or otherwise).

**Schedule 6**

**Part 1: Completion Accounts format**

**Part 2: Holdback Statement format**

**Schedule 7**
**EBITDA Statement**

# EXHIBIT 24



**公司註冊處**
**Companies Registry**

# 更改公司秘書及董事通知書(委任／停任)
## Notice of Change of Company Secretary and Director (Appointment／Cessation)

表格
**Form ND2A**

公司編號 **Company Number**

| 2840241 |
| --- |

註 Note

**1  公司名稱 Company Name**

| JOY DRAGON CONSULTANTS LIMITED |
| --- |
| 欣龍顧問有限公司 |

**2  公司秘書／董事的停任 Cessation to Act as Company Secretary／Director**

*(如超過一名公司秘書／董事停任，請用續頁 A 填報 Use Continuation Sheet A if more than one company secretary／director ceased to act)*

**A. 現時在公司註冊處登記的詳情 Particulars Currently Registered with the Companies Registry**

請在適用的空格內加上 ✓ 號 Please tick the relevant box(es)

❼

身分
Capacity

| ✓ | 公司秘書 Company Secretary | | 董事 Director | | 候補董事 Alternate Director |
| --- | --- | --- | --- | --- | --- |

代替 Alternate to

公司秘書／董事的詳情（自然人）**Particulars of Company Secretary／Director (Natural Person)**

中文姓名
**Name in Chinese**

| NIL |
| --- |

英文姓名
**Name in English**    姓氏 Surname

名字 Other Names

❽

身分證明
**Identification**

| | | | ( ) | |
| --- | --- | --- | --- | --- |

香港身分證號碼
Hong Kong Identity Card Number

護照號碼
Passport Number

## 或 OR

❾

公司秘書／董事的詳情（法人團體）**Particulars of Company Secretary／Director (Body Corporate)**

中文及英文名稱 **Chinese and English Names**

| GRL19 NOMINEE LIMITED |
| --- |

**B. 停任詳情 Details of Cessation**

停任原因
**Reason for Cessation**

| ✓ | 辭職／其他 Resignation／Others | | 去世 Deceased |
| --- | --- | --- | --- |

❶

停任日期
**Date of Cessation**

| 19 JUL 2019 |
| --- |

日 DD        月 MM        年 YYYY

❶

上述董事或候補董事在停任日期後，是否仍然擔任這公司的候補董事或董事職位？
**Will this director or alternate director continue to hold office as alternate director or director in this company after the date of cessation?**

☐ 是 Yes

☐ 否 No

❹

提交人資料 **Presentor's Reference**

姓名 Name:  SMART TEAM INTERNATIONAL BUSINESS LIMITED

地址 Address:  FLAT/RM A 12/F KIU FU COMMERCIAL BLDG, 300 LOCKHART ROAD, WAN CHAI, HONG KONG.

電話 Tel:  31158545        傳真 Fax:  2521 1478

電郵 Email:

檔號 Reference:

請勿

Acknowledgement
Companies Registry
H.K.

19/07/2019 10:38:25
Submission No/Seq No: 232535737/10
2840241
ND2A

指明編號 1/2014 (2014 年 3 月) Specification No. 1/2014 (March 2014)

表格 **ND2A**
Form

公司編號 Company Number

2840241

## 3 委任公司秘書／董事（自然人）Appointment of Company Secretary／Director (Natural Person)

*(如委任超過一名自然人為公司秘書／董事，請用續頁 B 填報 Use Continuation Sheet B if more than 1 natural person is appointed as company secretary／director)*

請在適用的空格內加上 ✓ 號 Please tick the relevant box(es)

| 身分<br>Capacity | ☐ 公司秘書<br>Company<br>Secretary | ☑ 董事<br>Director | ☐ 候補董事<br>Alternate<br>Director | 代替 Alternate to |
|---|---|---|---|---|

| 中文姓名<br>Name in Chinese | | 林耀 |
|---|---|---|
| 英文姓名<br>Name in English | 姓氏<br>Surname | LIN |
| | 名字<br>Other Names | YAO |
| 前用姓名<br>Previous Names | 中文<br>Chinese | NIL |
| | 英文<br>English | NIL |
| 別名<br>Alias | 中文<br>Chinese | NIL |
| | 英文<br>English | NIL |

| 地址<br>Address | 7-3-3, LIJING GARDEN, |
|---|---|
| | TIANZHU DIQU, SHUNYI DISTRICT, |
| | BEIJING CITY, |
| 國家／地區<br>Country／Region | CHINA. |

| 電郵地址<br>Email Address | NIL |
|---|---|

身分證明 Identification                 Chinese ID No.: 321026197211050034

| (a) 香港身分證號碼<br>Hong Kong Identity Card Number | | | | | | | ( ) |
|---|---|---|---|---|---|---|---|

| (b) 護照<br>Passport | 簽發國家<br>Issuing Country | NIL |
|---|---|---|
| | 號碼<br>Number | NIL |

| 委任日期 Date of Appointment | 19 JUL 2019 |
|---|---|
| | 日 DD        月 MM        年 YYYY |

**上述董事或候補董事在獲得這次委任時，是否已經是這公司的現任候補董事或董事？**
**Is this director or alternate director already an existing alternate director or director in this company at the time of this appointment?**

☐ 是 Yes
☑ 否 No

| 提示<br>Advisory Note | 所有公司董事均應閱讀公司註冊處編製的《董事責任指引》，並熟悉該指引所概述的董事一般責任。<br>All directors of the company are advised to read 'A Guide on Directors' Duties' published by the Companies Registry and acquaint themselves with the general duties of directors outlined in the Guide. |
|---|---|

**出任董事職位同意書 Consent to Act as Director** *請刪去不適用者 Delete whichever does not apply*

本人同意擔任公司的董事／候補董事*，並確認本人已年滿 18 歲。
I consent to act as director／alternate director* of this company and confirm that I have attained the age of 18 years.

簽署 Signed        :

表格 Form **ND2A**

公司編號 Company Number

2840241

### 4 委任公司秘書／董事 (法人團體) Appointment of Company Secretary／Director (Body Corporate)

(如委任超過一個法人團體為公司秘書／董事，請用續頁 C 填報 Use Continuation Sheet C if more than 1 body corporate is appointed as company secretary／director)

請在適用的空格內加上 ✓ 號 Please tick the relevant box(es)

**1** 身分 Capacity
[✓] 公司秘書 Company Secretary
[ ] 董事 Director
[ ] 候補董事 Alternate Director

代替 Alternate to

**1** 中文名稱 Name in Chinese : 駿滙國際商務有限公司

**1** 英文名稱 Name in English : SMART TEAM INTERNATIONAL BUSINESS LIMITED

**2** 地址 Address :
FLAT/RM A 12/F KIU FU COMMERCIAL BLDG,
300LOCKHART ROAD,
WANCHAI,

國家／地區 Country／Region : HONG KONG.

**2** 電郵地址 Email Address : NIL

**2** 公司編號 Company Number : 1652620
(只適用於在香港註冊的法人團體)
(Only applicable to body corporate registered in Hong Kong)

**2** 委任日期 Date of Appointment :

| 日 DD | 月 MM | 年 YYYY |
|---|---|---|
| 19 | JUL | 2019 |

**2** 上述董事或候補董事在獲得這次委任時，是否已經是這公司的現任候補董事或董事？
Is this director or alternate director already an existing alternate director or director in this company at the time of this appointment？
[ ] 是 Yes
[ ] 否 No

**2** 提示 Advisory Note : 所有公司董事均應閱讀公司註冊處編製的《董事責任指引》，並熟悉該指引所概述的董事一般責任。
All directors of the company are advised to read 'A Guide on Directors' Duties' published by the Companies Registry and acquaint themselves with the general duties of directors outlined in the Guide.

**2** 出任董事職位同意書 Consent to Act as Director

本人謹代表上述公司確認，上述公司同意擔任公司的董事／候補董事＊。
I, acting on behalf of the above named company, confirm that the above company consents to act as director／alternate director＊ of this company.

簽署 Signed : _____

董事(法人團體)的董事／公司秘書／獲授權人士＊
Director／Company Secretary／Authorized Person of the Director (Body Corporate)＊

本通知書包括下列續頁 This Notice includes the following Continuation Sheet(s)

| 續頁 Continuation Sheet(s) | A | B | C |
|---|---|---|---|
| 頁數 Number of pages | 2 | 0 | 0 |

**2**

### 5 確認 (適用的話) Confirmation (If applicable)

名列本通知書內的每一名獲委任為公司秘書的自然人通常居於香港。
Each natural person appointed as company secretary and named in this Notice ordinarily resides in Hong Kong.

**6** 簽署 Signed : LIN YAO 林耀

姓名 Name : LIN YAO 林耀

日期 Date :

| 日 DD | 月 MM | 年 YYYY |
|---|---|---|
| 19 | JUL | 2019 |

董事 Director／公司秘書 ~~Company Secretary~~ ＊

＊請刪去不適用者 Delete whichever does not apply

第三頁 Page 3

指明編號 1/2014 (2014 年 3 月) Specification No. 1/2014 (March 2014)

表格
Form **ND2A**

<table>
<tr><td>續頁 A   Continuation Sheet A</td></tr>
<tr><td>公司編號 Company Number</td></tr>
<tr><td>2840241</td></tr>
</table>

公司秘書／董事的停任 (第 2 項)
**Cessation to Act as Company Secretary／Director (Section 2)**

**A.** 現時在公司註冊處登記的詳情 Particulars Currently Registered with the Companies Registry

*請在適用的空格內加上 ✓ 號 Please tick the relevant box(es)*

**7** 身分
Capacity

☐ 公司秘書
Company
Secretary

☑ 董事
Director

☐ 候補董事
Alternate
Director

代替 Alternate to

公司秘書／董事的詳情 (自然人) Particulars of Company Secretary／Director (Natural Person)

中文姓名
**Name in Chinese**

NIL

英文姓名
**Name in English**   姓氏 Surname

名字 Other Names

**8** 身分證明
**Identification**

( )

香港身分證號碼
Hong Kong Identity Card Number

護照號碼
Passport Number

## 或 OR

**9** 公司秘書／董事的詳情 (法人團體) Particulars of Company Secretary／Director (Body Corporate)

中文及英文名稱 Chinese and English Names

GRL19 NOMINEE LIMITED

**B.** 停任詳情 Details of Cessation

停任原因
**Reason for Cessation**

☑ 辭職／其他
Resignation／Others

☐ 去世
Deceased

**1** 停任日期
**Date of Cessation**

19 JUL 2019

日 DD     月 MM     年 YYYY

**1** 上述董事或候補董事在停任日期後，是否仍然擔任這公司的候補董事或董事職位？
Will this director or alternate director continue to hold office as alternate director or director in this
company after the date of cessation?

☐ 是 Yes

☑ 否 No

指明編號 1/2014 (2014 年 3 月) Specification No. 1/2014 (March 2014)

表格 **Form ND2A**

續頁 A **Continuation Sheet A**

公司編號 **Company Number**

2840241

## 公司秘書／董事的停任 (第 2 項)
## Cessation to Act as Company Secretary／Director (Section 2)

### A. 現時在公司註冊處登記的詳情 Particulars Currently Registered with the Companies Registry

請在適用的空格內加上 ✓ 號 Please tick the relevant box(es)

**7** 身分
Capacity

☐ 公司秘書
Company Secretary

☑ 董事
Director

☐ 候補董事
Alternate Director

代替 Alternate to

#### 公司秘書／董事的詳情 (自然人) Particulars of Company Secretary／Director (Natural Person)

中文姓名
**Name in Chinese** — 劉芝茵

英文姓名
**Name in English** — 姓氏 Surname — NIL

名字 Other Names — NIL

**8** 身分證明
**Identification**

香港身分證號碼
Hong Kong Identity Card Number — ( )

NIL
護照號碼
Passport Number

## 或 OR

**9** 公司秘書／董事的詳情 (法人團體) Particulars of Company Secretary／Director (Body Corporate)

中文及英文名稱 Chinese and English Names

NIL

### B. 停任詳情 Details of Cessation

停任原因
**Reason for Cessation**

☑ 辭職／其他
Resignation／Others

☐ 去世
Deceased

**1** 停任日期
**Date of Cessation**

19 JUL 2019

日 DD    月 MM    年 YYYY

**1** 上述董事或候補董事在停任日期後，是否仍然擔任這公司的候補董事或董事職位？
**Will this director or alternate director continue to hold office as alternate director or director in this company after the date of cessation?**

☐ 是 Yes

☑ 否 No

指明編號 1/2014 (2014 年 3 月) Specification No. 1/2014 (March 2014)



公 司 註 冊 處
**Companies Registry**

# 註冊辦事處地址更改通知書
## Notice of Change of Address of Registered Office

表格
**Form NR1**

公司編號 **Company Number**

2840241

註 Note

**1   公司名稱 Company Name**

JOY DRAGON CONSULTANTS LIMITED
欣龍顧問有限公司

**2   更改詳情 Details of Change**

*只需申報有更改的項目* **Please complete item(s) with change(s) only**

**(a) 新註冊辦事處地址 New Address of Registered Office**

*(本區不接納非香港地址、「轉交」地址或郵政信箱號碼)*
*Non-Hong Kong addresses, 'care of' addresses or post office box numbers are not acceptable)*

FLAT/RM A 12/F, KIU FU COMMERCIAL BLDG,

300LOCKHART ROAD,

WAN CHAI,

地區 Region | HONG KONG

生效日期 **Effective Date**

19 JUL 2019

日 DD | 月 MM | 年 YYYY

**(b) 新電郵地址 New Email Address**

NIL

生效日期 **Effective Date**

日 DD | 月 MM | 年 YYYY

簽署 Signed :

姓名 Name : LIN YAO 林耀

日期 Date : 19 JUL 2019

董事 Director／公司秘書 ~~Company Secretary~~ *

日 DD ／ 月 MM ／ 年 YYYY

*請刪去不適用者 Delete whichever does not apply

**提交人資料 Presentor's Reference**

姓名 Name: SMART TEAM INTERNATIONAL BUSINESS LIMITED

地址 Address: FLAT/RM A 12/F, KIU FU COMMERCIAL BLDG, 300 LOCKHART ROAD, WAN CHAI, HONG KONG.

電話 Tel: 31158545    傳真 Fax: 2521 1478

電郵 Email:

檔號 Reference:

請勿

Acknowledgement
Companies Registry
H.K.

19/07/2019 10:38:25
Submission No/Seq No:  232535737/9
CR No:                          2840241
St. Form.                         NR1

指明編號 1/2014 (2014 年 3 月) Specification No. 1/2014 (March 2014)

# EXHIBIT 25

# Wirecard to acquire China's Allscore Payment Services

#35

05 November 2019

Wirecard will gradually acquire all shares in the Bejing-based AllScore Payment Services. AllScore Payment Services is currently controlled in its majority by its founder and CEO Mr. Yao Lin and Shanghai Aiwu Investment Management Co. Ltd.. The framework agreement was signed in Beijing today. After the closing, which is subject to customary and regulatory closing conditions, Wirecard will hold 80 percent of all shares in AllScore. A call option enables Wirecard to acquire the remaining 20 percent of shares after two years.

This step underlines Wirecard's strategy to expand its global technology platform by way of cross-border licenses. In the current industry-wide effort to enter China, Wirecard is among the first movers in its peer group.

AllScore Payment Services, founded in 2007, is a local Payment Service Provider owning an attractive license portfolio and employing a dedicated team of more than 120 people. The license portfolio enables Wirecard to offer internationally oriented Chinese merchants local acquiring services, cross-border acquiring including settlement in their local currency and innovative digital value added services. Additionally, the international merchants of Wirecard gain access to Chinese consumers and are enabled to accept widely-used digital mobile payments methods and receive settlements in their respective local currency. The license portfolio also provides Wirecard with the capability to issue payment cards to consumers and companies in China.

Markus Braun, CEO at Wirecard: "We are excited to share the news of Wirecard entering China. The Chinese market represents a tremendous opportunity for Wirecard. The licenses are a perfect match to the global platform strategy of Wirecard."

Yao Lin, CEO, Chairman and Founder of AllScore Payment Service Co., Ltd.: "We welcome Wirecard to China and are proud that they have selected us to enter the market, joining in on the efforts of the Chinese Government to open the financial sector and improve the regulatory environment for market access to foreign investors. Wirecard's demonstrated history in expanding a global, digital business and their professional approach to execution, combined with our local knowledge and licenses make us an ideal combination to serve Chinese merchants, as well as international clients doing business in China."

The consideration in connection with this transaction comprises cash payments, including a capital increase of AllScore Payment Services, of up to EUR 72.4 million until closing. Subject to customary closing date account adjustments the minimum payment will amount to EUR 38.6 million. Furthermore, an earn-out payment of up to EUR 16.7 million has been agreed to, subject to EBITDA targets in the fiscal year 2020. Wirecard holds a call option to acquire the remaining 20 percent of shares after two years for up to EUR 20.2 million, subject to post-closing EBITDA targets.

For fiscal 2020, Wirecard projects a low single-digit EBITDA contribution in EUR after integration costs. The integrated company will generate more than EUR 35 million of EBITDA in 2021 and an EBITDA in excess of EUR 50 million in 2022.

## Related Companies

Wirecard >

## Lead Channel

Payments >

## Channels

Retail Banking >

## Keywords

Shangyinxin Payment Service Co., Ltd. 8: The debt exemption agreement between Shangyinxin Payment Service Co., Ltd. and Beijing Zhong Han Hai Lian Asset Management Co., Ltd.

The above-mentioned specific agreements and this agreement together constitute an integral part of the relevant matters related to this reorganization of all parties, and both of them and this agreement will become effective after the central bank approves the reorganization matters.

(No text below)

(This page is the signing page of the "Restructuring Agreement of Shangyinxin Payment Service Co., Ltd.")
Party A: Shanghai Century Family Financial Information Service Co., Ltd.
Party B: Beijing Apple Information Consulting Co., Ltd.
The creditor: Beijing Soufun Technology Development Co., Ltd.; Yao Lin
Target company: Shangyinxin Payment Service Co., Ltd.
1

# EXHIBIT 26

**Prenuptial Agreement**

**Party 1: Yao Lin (Male)**
ID Number:321026197211050034
Address: Lijing Huayuan 7-3-3, TianZhu, Shunyi District, Beijing

**Party 2: Jia Chen (Female)**
ID Number: 450305197602041023
Address: Lijing Huayuan 7-3-3, TianZhu, Shunyin District Beijing

The man and the woman were married on April 20, 1999, and had three sons after the marriage. After separating for nearly a year due to the man's long-term cheating, the parties registered for divorce at the Civil Affairs Bureau on September 12, 2019. Now, because Party 1 (Yao Lin) is willing to return to her family and promise to break off the lover relationship with the third party, the parties agree to remarry and reach a prenuptial agreement as follows:

1. If Party 1 (Yao Lin) cheats again and the two parties divorce again as a result, the custody of the three children will belong to Party 2 (Jia Chen), Party 2 (Jia Chen) has the right to change the children's surnames, and with Party 2's (Jia Chen) consent, Party 1 (Yao Lin) can visit the children no less than four times a month, each time no less than four hours. Party 1 (Yao Lin) shall pay Party 2 (Jia Chen) 30 million RMB as compensation for his breach of promise.

2. In order to protect the rights and interests of Party 2 (Jia Chen) and the children, the part of the agreement previously signed between the parties regarding the distribution of property remains valid and no transfer of ownership occurs as a result of the remarriage.
The property and vehicles already in the name of Party 2 (Jia Chen) belong to Party 2 (Jia Chen) and are her personal property. 27487 Lafigo Bay View Drive and 31663 Broad Beach Road in Malibu, U.S.A. have been transferred to Party 2 (Jia Chen) and are the property of Party 2 (Jia Chen), who is paying the mortgage.
The property and vehicles already in the name of Party 1 (Yao Lin) belong to Party 1 (Yao Lin), and the companies in the name of Party 1 (Yao Lin) or under his effective control belong to Party 1 (Yao Lin). The proceeds from the sale of the company shall be divided equally between Party 1 (Yao Lin) and the three children, and shall be held in trust by Party 2 (Jia Chen) until the children reach the age of twenty-one.

3. The cash, stocks, funds and earnings in the parties' joint bank accounts and financial accounts in the United States shall belong to Party 2 (Jia Chen) and shall be the personal property of Party 2 (Jia Chen). Party 1 (Yao Lin) shall cooperate with Party 2 (Jia Chen) to close the above accounts or change them to the sole name of the female party as soon as possible.

Party 1 (Yao Lin) shall pay Party 2 (Jia Chen) and the children $150,000 per month for their living expenses.

5. Each party shall be responsible for all debts and credits incurred prior to the re-marriage, and each party shall be responsible for all debts and credits incurred after the re-marriage.

Party 1 (Yao Lin) shall unconditionally cooperate and support the ongoing legal proceedings in relation to 27487 Lafigo Bay View in the name of Party 2 (Jia Chen). Because Party 2 (Jia Chen) has suffered great physical and psychological harm in the fire and has lost all of her jewelry, clothing, belongings and collections in the United States, and has been left alone to protect and care for her children during and after the fire, all legal proceeds from the lawsuit shall belong to Party 2 (Jia Chen) personally and the costs of the lawsuit shall be paid by Party 2 (Jia Chen).

Other income or debts, if not otherwise agreed, shall be the sole property of each party. The property in each party's name after the re-marriage shall belong to each party.

8. This agreement is effective from the date of signature.

Party 1: Yao Lin
12/24/2019

Party 2: Jia Chen
12/24/2019

# EXHIBIT 27

MARRIAGE CERTIFICATE
(Seal) Special seal for Marriage Certificate Administration of the
Ministry of Civil Affairs of the People's Republic of China

Both sides applied for marriage. Upon due examination it is ascertained to be in conformity with the Marriage Law of
the People's Republic of China. They are allowed to register and are given this certificate.
Beijing Shunyi District People's Government (special seal for marriage registration)
Registrar:

Bearer of Certificate: Chen Jia
Date of Issue: December 30, 2019
# J110113-2019-006610
Remark:

Name: Chen Jia
Sex: female
Date of Birth: February 4, 1976
Nationality: Chinese
ID Card No.: 450305760204102
Name: Lin Yao
Sex: male
Date of Birth: November 5, 1972
Nationality: Chinese
ID Card No.: 321026721105003





持 证 人
陈佳

登记日期
2019 年 12 月 10 日

结婚证字号
J110113-2019-009610

备注

姓名 陈佳          性别 女
国籍 中国          出生日期 1976年02月01日
身份证件号 110101197602010023

姓名 尹璀          性别 男
国籍 中国          出生日期 1972年11月05日
身份证件号 121026197211050031

# EXHIBIT 28



**Make Sense of it All**

Choose an FT plan that suits you best. Pay annually and save 20%.

See our plans

**Inside Wirecard**

## Wirecard collapses into insolvency

Auditor EY says it found 'clear indications of elaborate and sophisticated fraud' at German payments company

**Dan McCrum** in London, **Olaf Storbeck** in Frankfurt, **Stefania Palma** in Singapore and **John Reed** in Bangkok JUNE 25 2020



### Receive free Wirecard AG updates

We'll send you a *myFT Daily Digest* email rounding up the latest Wirecard AG news every morning.

Enter your email address

Sign up

Wirecard filed for insolvency after the once high-flying payments group revealed a multiyear fraud that led to the arrest of its former chief executive.

In a remarkable collapse of a company once regarded as a European tech champion, Wirecard said in a statement on Thursday morning that it faced "impending insolvency and over-indebtedness".

The first failure of a member of Germany's prestigious Dax index is expected to inflict big losses on creditors and reputational damage on regulators led by BaFin and Wirecard's longstanding auditors EY.

EY on Thursday afternoon said there were "clear indications that this was an elaborate and sophisticated fraud, involving multiple parties around the world in different institutions, with a deliberate aim of deception", adding that "even the most robust and extended audit procedures may not uncover a collusive fraud".

Wirecard's admission a week ago that €1.9bn of cash was missing was the catalyst for the company's unravelling. Founder and former chief executive Markus Braun was arrested on Monday on suspicion of false accounting and market manipulation before being released on bail.



## This is a disaster for Germany as a financial hub. Heads will have to roll

**Fabio De Masi, German lawmaker**

As the price of Wirecard's shares and bonds plunged in recent days, the company has been locked in urgent negotiations with banks owed €2bn. The company has a further €1.4bn of debt issued in September last year.

Restructuring specialists from Houlihan Lokey, appointed by Wirecard last week, have pored over the company's books to work out if the group had a path to survival.

However, the genuine parts of its business turned out to be too small to sustain the cost base and debt of a company that spent the past 18 months fighting whistleblower allegations of accounting fraud.

Mr Braun resigned last week but said Wirecard had "an excellent business model, outstanding technology and sufficient resources for a great future". He has always denied any wrongdoing.

Wirecard said the insolvency filing only affects the group's holding company, which employs 200 of the group's 5,700 staff. The payment groups'

operating businesses are continuing, Wirecard said, but added it was "currently evaluating whether insolvency applications have to be filed for subsidiaries".

Much of Wirecard's business relied on licences that allow it to connect customers with the international payments networks operated by Visa and Mastercard.

Visa said it was "closely monitoring" developments. Mastercard said: "Our priority is ensuring people are able to continue to use their cards. We will continue to work with all parties and stand ready to take any necessary action."

In a statement Wirecard said its management board had "come to the conclusion that a positive going concern forecast cannot be made in the short time available". Under German law, a court will now be asked to appoint a receiver who will oversee the future and likely dismantling of the company.

People close to the situation noted that directors would be exposed to personal liability if they continued to let the company trade when it might be insolvent. In addition to the arrest of Mr Braun, Munich prosecutors have already said they are investigating the rest of the former management board.

The collapse has prompted soul-searching in Germany about the state of regulation in the country.

"This is a disaster for Germany as a financial hub," said Fabio De Masi a lawmaker in Berlin with leftwing Die Linke party, adding that "heads will have to roll" at financial regulators as a consequence.

Jan Pieter Krahnen, professor of finance at Frankfurt University, said: "The Wirecard case is highlighting that Germany's capital markets supervisors have not kept pace with the times and lack the necessary technical and analytical skills," adding that supervisors made "technical mistakes" such as imposing a two-month short-selling ban on Wirecard's shares last year rather than focusing on the alleged fraud.

As different parts of the world tried to assess their exposure to the collapsed payments group, Benjamin Diokno, governor of the Philippines central bank, told the Financial Times his country had suffered "no harm" despite local banks' supposed involvement with Wirecard, which they have denied.

However, Mr Diokno added that earlier action by German authorities "would have been helpful" in preventing the alleged fraud. "So maybe this is the fault on the part of the Germans, but also there are some rogue personalities in the two banks in the Philippines," said Mr Diokno.

In the UK, the Financial Conduct Authority said it had put restrictions on a local Wirecard subsidiary, warning it not to dispose of any assets without seeking permission from the regulator.

Wirecard's creditors had been waiting for an assessment of the company's odds from FTI Consulting, which was expected at the end of this week. "Wirecard's move caught the banks on the hop," said one person briefed on the lenders' internal discussions.

Wirecard has drawn about 90 per cent of a €2bn credit line with banks, including Commerzbank, LBBW, ING and ABN Amro. The four have the largest exposure with €200m.

Wirecard shares hit a peak of €191 in the summer of 2018, valuing the group at more than €24bn, and traded as high as €104 last week. On Thursday the price fell to €3.

The price of its €500m bond due in 2024 fell to a record low of 12 cents on the euro.

At the heart of the apparent fraud were suspect arrangements in which payments processing was said to be outsourced to partners in the Philippines, Dubai and Singapore. These partners were supposedly the source of the €1.9bn in non-existent cash, and the "lion's share" of the €1bn in operating profit Wirecard reported between 2016 and 2018, according to

a special audit by KPMG.

*Additional reporting by Tabby Kinder, Nikou Asgari, Nicholas Megaw and
Stephen Morris in London and Laura Noonan in New York*

Copyright The Financial Times Limited 2023. All rights reserved.

# EXHIBIT 29

#42

## Fwd: Our M&A Project

From:  yale lam (lamyale@yahoo.com)

To:  jiachenly@yahoo.com

Date:  Wednesday, August 9, 2023 at 12:16 AM PDT


Sent from my iPhone

Begin forwarded message:

> **From:** yale lam <lamyale@yahoo.com>
> **Date:** July 6, 2023 at 12:09:47 PM PDT
> **To:** CJ <jiachenly@yahoo.com>
> **Subject: Fwd: Our M&A Project**


Sent from my iPhone

Begin forwarded message:

> **From:** yale lam <lamyale@yahoo.com>
> **Date:** December 17, 2020 at 4:07:46 PM EST
> **To:** christoph.kuester@wirecard.com
> **Cc:** yalelam@hotmail.com, lars.dannenberg@wirecard.com, georg.vonwaldenfels@wirecard.com, leihua@fang.com
> **Subject: Re: Our M&A Project**


Dear Christoph,

Did you receive my forwarded mail? Please use this address as contact email. Thanks

主题: RE: Our M&A Project
日期: 2020-12-16 11:55
发件人: lyfullcorp.com
收件人: "Kuester, Christoph" <christoph.kuester@wirecard.com>
抄送: "Dannenberg, Lars" <lars.dannenberg@wirecard.com>, "von Waldenfels, Georg"
<georg.vonwaldenfels@wirecard.com>
回复至: <yalelam@hotmail.com>, <leihua@fang.com>

Dear Christoph,

Yahoo Mail - Fwd: Our M&A Project

Case 1:23-ap-01036-MB    Doc 28-2    Filed 05/15/25    Entered 05/15/25 22:53:40    Desc
Exhibit Declaration of Yao Lin Declaration of Jia Chen Exhibits 1 through 31    Page 195 of 251

3:17 AM

Sorry for late response because there are technical problems for me to access the company
email address in the US, please use lamyale@yahoo.com as contact address in the future.
WD's scandal caused lots of chaos. As you know, one of the reason PBOC imposed the fine on
Allscore is that they thought we would receive a big amount of transaction fee which could
and should afford the fine. Meanwhile PBOC was concerned that if Allscore was involved in
WD's accused criminal activities, so they suspended Allscore's operations till today. In
the past over half year, Allscore has no income and is in the status of insolvency.
In order to keep Allscore alive, Apple signed a term sheet with Fang.com, which is a
leading real estate e-commerce company in China.Apple intended to transfer 80% equity to
Fang.com with one dollar, Fang.com will become the major shareholder of Allscore and is
responsible for Allscore's management and operations. Because the potential transaction
need the approval from PBOC, right now we are in a challenging process with PBOC, because
Allscore lost credits in PBOC and they are reluctant to renew our payment license which
will happen in 2022. Hopefully Fang.com's strong industry background could convince PBOC.
The motivation for Fang.com's reorganization with Allscore is to make Allscore resume
operations and keep license so that they can save the debt to Allscore, so they are open
to talk to any potential buyer. I also cc this mail to Frank LEI, COO of Fang.com.
Hopefully the reorganization with Fang.com can get approval from PBOC or we find strong
buyer soon, otherwise Allscore would file insolvency in three months.

Bests

Yao

发自我的iPhone

在 2020年12月15日，下午6:57，ly@allscore.com 写道：

-------- 原始信件 --------
主题: RE: Our M&A Project
日期: 2020-11-12 17:14
发件人: "Kuester, Christoph" <christoph.kuester@wirecard.com>
收件人: "ly@allscore.com" <ly@allscore.com>
抄送: "Dannenberg, Lars" <lars.dannenberg@wirecard.com>, "von Waldenfels, Georg"
<georg.vonwaldenfels@wirecard.com>

Dear Mr. Lin,

I hope you are doing fine and are staying fine and healthy.

I was wondering whether you had a chance to give the below outline a thought and would like to discuss.

Best regards,

Christoph

FROM: Kuester, Christoph
SENT: Donnerstag, 22. Oktober 2020 16:00
TO: ly@allscore.com
CC: Dannenberg, Lars <lars.dannenberg@wirecard.com>; von Waldenfels, Georg
<georg.vonwaldenfels@wirecard.com>

SUBJECT: Our M&A Project

Dear Mr. Lin,

I hope this email finds you and healthy. Unfortunately I was not able to reach you via, hence please excuse my direct approach via email.

As you have most probably come to know, Wirecard in Germany had to file for insolvency in the mid of June and is now being dissolved. Lars and Matthias, whom you dealt before with have already left the company so that I will be your point of contact with my colleague Lars Dannenberg (here in cc). Naturally you may always also approach Georg here in cc as well.

Intention of my contact is to discuss a possibility to dissolve our M&A transaction so to enable you to operate separated from WD given (a) the fine that I understand has been imposed in China and (b) the insolvency in Germany. To give you a bit of a background information why we think that this could be beneficial for each of us (rather then terminating the agreements) is that we were approached by potential buyers that would like to take over Allscore. When we told them that they would have to step into the contract between us, all of them refused as these were the terms agreed between us.

Accordingly I thinkt the only solution (as WD will not be granted PBOC approval to take over the company due to the insolvency in Germany) to dissolve our transaction and put you directly in touch with potentially interested parties in the Asian region that have expressed interest.

Technically our proposal would include a dissolution agreement as well as an Purchase Agreement for you to buy back our stack already held at a discounted price to be agreed upon.

I hope that the above helps to establish a good contact in order to find a proper solution for Allscore to continue operations. Please feel free to reach out any time suitable.

Sincerely yours,

Christoph

DR. CHRISTOPH KÜSTER

WIRECARD AG
Einsteinring 35 | 85609 Aschheim | Deutschland

P: +49 (0)89 4424 - 191877 | M: +49 (0)151 14708033 | F: +49 (0)89 4424 - 1611

www.wirecard.com [1]

Amtsgericht München HRB Nummer: 169 227 | USt-ID: DE 201 591 202

VERTRAULICHE INFORMATIONEN! Diese E-Mail enthält vertrauliche Informationen und ist nur für den berechtigten Empfänger bestimmt. Wenn diese E-Mail nicht für Sie bestimmt ist, bitten wir Sie, diese E-Mail an uns zurückzusenden und anschließend auf Ihrem Computer und Mail-Server zu löschen. Solche E-Mails und Anlagen dürfen Sie weder nutzen noch verarbeiten noch Dritten zugänglich machen, gleich in welcher Form. Wir danken für Ihre Kooperation.

CONFIDENTIAL! This email contains confidential information and is intended for the authorized recipient only. If you are not an authorized recipient, please return the email to us and then delete it from your computer and mail server. You may neither use nor edit any such emails including attachments, nor make them accessible to third parties in any manner whatsoever. Thank you for your cooperation.

Yahoo Mail - Fwd: Opti Mai  Project

Case 1:23-ap-01036-MB   Doc 28-2   Filed 05/15/25   Entered 05/15/25 22:53:40   Desc
Exhibit Declaration of Yao Lin Declaration of Jia Chen Exhibits 1 through 31   Page 197 of 251

3:17 AM

Links:
------
[1] https://www.wirecard.com/

# EXHIBIT 30

# Precise Escrow

960 East Las Tunas Drive, Suite B
San Gabriel, CA 91776
Tel: (626) 292-2088 • F: (626) 292-2099
precisee@pacbell.net

# 50

Jia Chen

Date: March 23, 2021
Escrow Nb.: **20-08117JH**

31663 Broad Beach Road
Malibu, CA 90265

RE: Property Address: **31663 Broad Beach Road, Malibu, CA 90265**

Dear **Mrs. Jia Chen**

We are pleased to inform you that the above referenced escrow was closed on **March 1, 2021** and we enclose the following for your records:

Final Settlement/Closing Costs Statement.

**Loan Information:**

First Deed of Trust in favor of: **East West Bank**. (Lender will notify you regarding payments.)

Any documents to which you are entitled will be forwarded to you directly from the appropriate governing party.

We hope this transaction has been handled to your satisfaction, and that we may serve you again in the future.

**Precise Escrow**

## BORROWER STATEMENT
### Final

ile No.: 20-08117JH
fficer/Escrow Officer:

| | |
|---|---|
| Printed Date/Time: | 03/23/2021 - 9:40:03AM |
| | Page    1  of 1 |
| Closing Date: | 03/01/2021 |
| Disbursement Date: | 03/01/2021 |
| Loan Number: | 09205586 |

orrower:    Jia Chen

roperty: 31663 Broad Beach Road, Malibu, CA 90265

| DESCRIPTION | | DEBITS | CREDITS |
|---|---|---|---|
| 'OTAL CONSIDERATION | | | |
| Additional Deposit | | | 755.18 |
| **TITLE CHARGES** | | | |
| ender/Mortgagee Premium for 1,500,000.00: WFG National Title Company of California | | 1,000.00 | |
| Mortgage Recording Fee: Los Angeles County Registrar-Recorder/County Clerk | | 94.00 | |
| Sub Escrow Fee: WFG National Title Company of California | | 75.00 | |
| Recording Service Fee: WFG National Title Company of California | | 15.00 | |
| Wire/Express: WFG National Title Company of California | | 45.00 | |
| SB2 Surcharge: Los Angeles County Registar-Recorder/County Clerk | | 225.00 | |
| **ESCROW CHARGES TO: Precise Escrow** | | | |
| settlement Agent Fee | | 1,000.00 | |
| Document Preparation Fee | | 100.00 | |
| Messenger Fee | | 20.00 | |
| Wire Fee | | 20.00 | |
| **LENDER CHARGES** | | | |
| New Deed of Trust to East West Bank: | | | 1,500,000.00 |
| Appraisal: ValuTrust Solutions POC $1,150.00 | | | |
| Credit Report: CoreLogic Credco LLC | | 25.52 | |
| Flood Certification: ServiceLink National Flood | | 9.50 | |
| Fax Service: Lereta, LLC | | 80.00 | |
| Processing Fee: East West Bank | | 1,200.00 | |
| Flood Monitoring Life of loan: LPS National ServiceLink | | 4.00 | |
| Undisbursed Amount: East West Bank | | 31,469.05 | |
| **LOAN PAYOFF: East West Bank** | | | |
| Principal Balance | 1,420,068.49 | | |
| nterest Per Diem From  2/01/2021 To  3/02/2021, 30 Days, @ 192.0100 | 5,960.98 | | |
| Reconveyance Fee | 45.00 | | |
| Unpaid NSF Charges | 18.00 | | |
| Recording Fee | 93.00 | | |
| Total Loan Payoff | | 1,426,185.47 | |
| **TAXES:** | | | |
| Property Tax - 2nd half 20-21 to: Los Angeles County Tax Collector #4470-019-017 | | 18,577.44 | |
| Property Tax - Delinquent to: Los Angeles County Tax Collector #4470-019-017 | | 20,435.20 | |
| **ADDITIONAL DISBURSEMENTS:** | | | |
| Mobile Notary Service: Audrey Kwan | | 175.00 | |
| **SUBTOTALS** | | 1,500,755.18 | 1,500,755.18 |
| **TOTALS** | | 1,500,755.18 | 1,500,755.18 |

# ▓▓ EAST WEST BANK

## ANNUAL PERCENTAGE YIELD AND ACCOUNT TERMS DISCLOSURE

### FOR

## East West Value Checking

| DATE: 05/12/2021 | ACCOUNT # ▓▓▓ 1747 | | |
|---|---|---|---|
| **INTEREST RATE AND ANNUAL PERCENTAGE YIELD WILL BE DETERMINED BY YOUR DAILY BALANCE** | **DAILY BALANCE** | **INTEREST RATE** | **ANNUAL PERCENTAGE YIELD** |
| | NA | NA | NA |

| | |
|---|---|
| **RATE INFORMATION** | Non-Interest Bearing |
| **MINIMUM OPENING BALANCE** | $100.00 |
| **ACCOUNT MAINTENANCE FEE** | $5.00 each statement cycle - WAIVED if your account meets either one of the below stated minimum balance requirements |
| **MNIIMUM AVERAGE MONTHLY BALANCE REQUIRED TO AVOID ACCOUNT MAINTENANCE FEE** | 1.  $1,500.00 average monthly balance in your account each statement cycle<br>OR<br>2.  $5,000.00 average combined balance *<br><br>* Average combined balance is based on the aggregate total of the prior month-end average balances maintained in the consumer deposit accounts you own at East West Bank. Additional fees may apply.<br><br>Note: For our accountholders who are 62 years of age or over, East West Bank will automatically convert this account to our **East West Senior Checking**, which does NOT assess a monthly account maintenance fee. All other terms and conditions will remain the same.<br><br>(Other fees may apply.  Please refer to the *East West Bank Fee Schedule* for additional fee information.) |
| **INTEREST COMPUTATION METHOD** | Not Applicable |
| **INTEREST COMPOUNDING METHOD** | Not Applicable |
| **INTEREST ACCRUAL** | Not Applicable |
| **INTEREST PAYMENT FREQUENCY** | Not Applicable |
| **CHECK TRUNCATION** | With check truncation, your canceled checks are not returned with your account statement.  Your account statement will include the following information with respect to each check paid against your account during the statement cycle: (i) the item number, (ii) the amount of the check, and (iii) the date of payment.<br><br>By opening this account you understand and agree to this procedure and authorize us to destroy the original items and checks' item, agree to a truncation imaged document or copy thereof to serve as an original item for any and all purposes, including charging your account or determining the validity of any signatures or otherwise.<br><br>Upon request by you, we will provide you, without charge, with legible copies of **two** checks from your account statement.  Additional imaged copies of cancelled checks are subject to service charges. (please refer to the *east west bank fee schedule for additional fee information.*)<br><br>You can request these copies by telephoning us at (888) 895-5650.  To produce a copy, we will need your account number, check number, exact amount of check and the date the check was paid.  You agree that if we provide your requested copies within **five (5)** business days that we will have provided the copies within a reasonable time.  If we need more time, we will inform you when the copy will be available. |
| **PREAUTHORIZED TELEPHONIC AND ELECTRONIC FUNDS TRANSFER LIMITS** | Unlimited |
| **CHECK WRITING** | Unlimited |
| **LIMITS ON THE NUMBER OF DEPOSITS AND TELLER WITHDRAWALS** | Unlimited |
| **AGE REQUIREMENT** | 18 years or older |
| **SAVINGS ACCOUNT LOANS** | Not Allowed |
| **ATM ACCESS** | Yes |
| **TRANSACTION FEE AT EAST WEST ATMs** | No Charge |
| **NETWORK ATM WITHDRAWAL FEE** | No fee for the first two withdrawals per month.  $1.00 for each withdrawal thereafter. (3rd party ATM usage fees may be charged to your account at the request of the third-party operating the non East West ATM.) |

APYI - CHEU 5-13

# LENDER'S ESCROW INSTRUCTIONS

**Borrower:** JIA CHEN
31663 BROAD BEACH ROAD
MALIBU, CA 90265

**Lender:** EAST WEST BANK
9300 FLAIR DRIVE, 5TH FLOOR
EL MONTE, CA 91731

ALL DOCUMENTS, funds and statements are to be mailed to **East West Bank at 9300 Flair Drive 5th Floor, El Monte, CA 91731.** Failure to return the documents to this address will result in a delayed funding of this loan. You may contact HELOC@EASTWESTBANK.COM or Natalie.Chavez@EastWestBank.com with telephone# 626-371-8843 for inquiries on your funding.

**LOAN NUMBER: 09205586**

**ESCROW NUMBER: 20-08117JH**

**ESCROW OFFICER: JAMES HE / 626-292-2088**

**TITLE INSURER: WFG NATIONAL TITLE**

**TITLE CONTACT INFORMATION: MARK MENDOZA / 818-476-4083**

**TITLE ORDER NUMBER: 20-352793**

**PROPERTY ADDRESS: 31663 BROAD BEACH ROAD, MALIBU, CA 90265**

**TITLE VESTED IN: JIA CHEN, A MARRIED WOMAN AS HER SOLE AND SEPARATE PROPERTY**

**LIEN POSITION: 1ST**

In connection with the above referenced order we are enclosing the following:

- Deed of Trust dated **02/10/2021**, securing a NOTE in the amount of **$1,500,000.00** with all applicable attachments/Riders.

The above shall be referred to herein as, the "Recordable Documents".

*NOTE:
Customer Information Profile may be completed and signed by a Notary, Settlement Agent or Escrow Officer. Signature Card must be signed by the Borrower as this form is use to verify their signatures when advancing funds from their line of credit.

**CONDITIONS PRECEDENT TO RECORDATION OF RECORDABLE DOCUMENTS AND DISBURSEMENT OF LOAN PROCEEDS IF APPLICABLE:** You are authorized to record the Recordable Documents and disburse the Loan Proceeds which the Bank shall deposit with you if applicable when, and only when all of the following conditions have been met:

(1)     Hazard insurance premium paid at closing or proof of payment must be provided.
(2)     All property taxes must be current or brought current at the time of loan disbursement.
(3)     You have verified that the Recordable Documents are in recordable form.
(4)     You have confirmed that the proper legal description has been properly attached to the legal description showing on the Preliminary Report as stated on the title order number above.
(5)     You have caused the Title Insurer to be unconditionally and irrevocably committed to issue in favor of Bank an **ALTA EXTENDED LOAN POLICY (6-17-06)** of title insurance with endorsements 8.1-06, 39-06, 22.1-06, 6-06 with a    liability equal to the Loan Amount, insuring the priority of the lien of the Deed of Trust.
(6)     You have strictly complied with these Instructions.

**POST CLOSING INSTRUCTIONS:**

(1)     No later than five (5) days after the recording date, please deliver to Bank at HELOC@EastWestBank.com, a file stamped, conformed copy of each of the recorded documents.
(2)     No later than 24 hours of recording the final HUD-1 Settlement State
(3)     No later than thirty (30) days after the recording date, deliver to Bank original and one copy of the Title Insurance Policy with all the required endorsements to Bank at the address given above subject to the following:

Items   **1C,5-7,REQ1**   are to be removed
Items   **1A-B,1D-G,2-4**   will remain on the prelim
Items   _____   will be amended

All your fees, costs, and pay off demands are to be collected from loan proceeds with no charges to the Bank. East West Bank will retain the **Loan Origination Fee.** Remit balance of loan funds, if any, to borrower.

THESE INSTRUCTIONS are effective until the "time limit date" of **03/18/2021**, unless revoked by written demand and authorization satisfactory to you. If no demand for cancellation is made, you will proceed to close this escrow when the principals have complied with the escrow instructions.

**ACCEPTED AND ACKNOWLEDGED:**

We acknowledge receipt of the documents described above and we agree to strictly comply with the foregoing instructions.

_____
Escrow Officer (Printed Name / Signature)

_____
Title Officer (Printed Name / Signature)

# EXHIBIT 31

1   O'MELVENY & MYERS LLP
    Stephen H. Warren (State Bar No. 136895)
2   Marc Feinstein (State Bar No. 158901)
    Karen Rinehart (State Bar No. 185996)
3   Jordan A. Weber (State Bar No. 326711)
    400 South Hope Street
4   Los Angeles, California  90071-2899
    Telephone:    (213) 430-6000
5   Facsimile:    (213) 430-6407
    swarren@omm.com
6   mfeinstein@omm.com
    jweber@omm.com
7
    Attorneys for Plaintiff
8   Beijing SouFun Science and Technology
    Development Co., Ltd.
9

10                      **UNITED STATES BANKRUPTCY COURT**
                          **CENTRAL DISTRICT OF CALIFORNIA**
11                        **SAN FERNANDO VALLEY DIVISION**

12

13  In re:                                   Bankruptcy No. **1−23−bk−10733−MB**

14  **YAO LIN,**                             Chapter 7

15              Debtor.                       Hon. Martin R. Barash

16  ─────────────────────────

17  **BEIJING SOUFUN SCIENCE AND**           Adversary Proceeding No. _____
    **TECHNOLOGY DEVELOPMENT CO.,**
18  **LTD.,**
                                             **COMPLAINT OBJECTING TO THE**
19              Plaintiff,                   **DISCHARGE OF CERTAIN DEBTS**
                                             **UNDER 11 U.S.C. § 523 AND SEEKING**
20  v.                                       **TO DENY DEBTOR'S DISCHARGE**
                                             **UNDER 11 U.S.C. § 727**
21  **YAO LIN,**

22              Defendant.

23  ─────────────────────────

24

25

26

27

28
    ─────────────────────────────────────────────────────────
    COMPLAINT OF BEIJING SOUFUN SCIENCE AND TECHNOLOGY DEVELOPMENT CO., LTD.,
    OBJECTING TO DISCHARGE AND SEEKING TO DENY DEBTOR YAO LIN'S DISCHARGE

1.     Plaintiff Beijing SouFun Science and Technology Development Co., Ltd.
("**Plaintiff**" or "**SouFun**") complains of defendant Yao Lin (the "**Debtor**," "**Lin**," or
"**Defendant**"), and alleges as follows:

**PARTIES, JURISDICTION AND VENUE**

2.     Plaintiff is a corporation, organized and existing under the laws of the People's
Republic of China with its principal place of business in Beijing.

3.     Lin is the debtor in the above-captioned chapter 7 bankruptcy case, having filed a
voluntary petition under chapter 7 of title 11 of the United States Code (the "**Bankruptcy Code**"),
on May 29, 2023 (the "**Petition Date**"). Lin is an individual residing in the County of Los
Angeles, State of California, and a contingent beneficiary and backup trustee to the Shinewoods
Trust.

4.     This Court has jurisdiction over the subject matter of and parties to this adversary
proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

5.     This action arises under the Bankruptcy Code, and arises in and relates to the
chapter 7 bankruptcy case of the Debtor.

6.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (I), (J), and (O).

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409, as Debtor's underlying
bankruptcy case is pending before the Court.

8.     The first date set for the meeting of creditors under Bankruptcy Code section
341(a) was July 10, 2023.

**FACTUAL ALLEGATIONS**

   ***A.  Plaintiff Obtains a Foreign Arbitration Award Against Defendant and Reduces the
Final Award to Judgment in the United States.***

9.     On September 16, 2015, Plaintiff entered into an Agreement on Settlement of
Outstanding Amount and the Termination of Nominee Holding the Final Award (the
"**Termination Agreement**") with Allscore Payment Services Co., Ltd. ("**Allscore**"); Beijing
Zhonghan Hailian Assets Management Co., Ltd. ("**Hailian**"); and Nanning Xuyin Business Co.,

1

COMPLAINT OF BEIJING SOUFUN SCIENCE AND TECHNOLOGY DEVELOPMENT CO., LTD.,
OBJECTING TO DISCHARGE AND SEEKING TO DENY DEBTOR YAO LIN'S DISCHARGE

1 Ltd. ("**Xuyin**").  Under the Termination Agreement, Allscore and Hailian are jointly and severally

2 liable for payment of an outstanding principal amount and liquidated damages amount owed to

3 Plaintiff in connection with a prior 2014 contractual agreement.

4       10.    Additionally, on September 16, 2015, Plaintiff entered into a Guarantee Contract

5 (the "**Guarantee Contract**") with Lin, Beijing Longhe Trading Co. Ltd. ("**Longhe**") and Xuyin.

6 Under the Guarantee Contract, Lin and Longhe are jointly and severally liable for all obligations

7 borne by Allscore and Hailian under the Termination Agreement.

8       11.    After Allscore failed to make payments in accordance with the Termination

9 Agreement—and Lin, Hailian, and Longhe failed to satisfy those payments in accordance with

10 their guarantor obligations under the Termination Agreement and Guarantee Contract—Plaintiff

11 submitted a breach of contract claim for arbitration before the China International Economic and

12 Trade Arbitration Commission ("**CIETAC**") on or around January 23, 2018.

13       12.    On September 6, 2019, the arbitration tribunal issued a final award ("**Final**

14 **Award**") in favor of Plaintiff and against Lin.

15       13.    On March 23, 2023, the United States District Court for the Central District of

16 California (the "**District Court**") granted Plaintiff's Petition for Confirmation, Recognition, and

17 Enforcement of Foreign Arbitration Award (the "**Enforcement Petition**"), and entered judgment

18 on April 12, 2023 for $21,165,155.97, plus pre-judgment interest (the "**Domestic Judgment**").

19    **B.  Defendant Fraudulently Transfers Assets to His Wife Jia Chen.**

20       14.    Upon information and belief, Lin transferred substantially all of his assets to his

21 wife, Jia Chen ("**Chen**"), who then subsequently transferred Lin's assets to a revocable living

22 trust, the Shinewoods Trust.  These transferred assets include, but are not limited to, several multi-

23 million dollar real property assets located in Malibu, California.

24       15.    Upon information and belief, Chen, who at all relevant times has been and

25 continues to be the wife of Lin, is an individual residing in Malibu, California and is a trustee of

26 the Shinewoods Trust.  At the July 10, 2023 meeting of creditors, Lin testified that he is a

27 beneficiary of the Shinewoods Trust and a backup trustee.

28

COMPLAINT OF BEIJING SOUFUN SCIENCE AND TECHNOLOGY DEVELOPMENT CO., LTD.,
OBJECTING TO DISCHARGE AND SEEKING TO DENY DEBTOR YAO LIN'S DISCHARGE

16.     The real properties transferred from Lin to Chen include, without limitation, the assets set forth in the fraudulent transfer complaint attached as <u>Exhibit A</u> hereto.

17.     Lin engaged in multiple transfers of assets with actual intent to hinder, delay, and/or defraud Plaintiff and its attempts to exercise its right to collect from Lin the amounts owed under the Final Award.

18.     Upon information and belief, Lin transferred valuable assets, including the real property assets located in Malibu, to Chen through multiple transactions and failed to receive a reasonably equivalent value in exchange for the transfers made or obligations incurred.  Chen paid no consideration for the transfers of the 31663 Broad Beach Road or 27487 Latigo Bay View properties set forth in <u>Exhibit A</u> hereto.

19.     Lin engaged in, or purported to engage in, transfers and assumed obligations involving Lin's assets where Lin retained possession or control of the property after the transfer. These transfers and obligations include, but are not limited to, transfers to trusts as to which Lin is serving, or has served, as trustee or beneficiary, including the Shinewoods Trust.

20.     Upon information and belief, Lin engaged in, or purported to engage in, transfers and assumed obligations involving Lin's assets where the transfer or conveyance was concealed.

21.     Upon information and belief, Lin engaged in, or purported to engage in, transfers and assumed obligations involving Lin's assets at a time when Lin had been sued or threatened with suit.

22.     Upon information and belief, Lin engaged in, or purported to engage in, transfers and assumed obligations where the alleged transfers and assumed rights encompassed substantially all of Lin's assets.

23.     Upon information and belief, Lin engaged in transfers to remove and conceal assets that would otherwise be available to satisfy the Domestic Judgment.

24.     Upon information and belief, Lin engaged in transfers and assumed obligations that made him insolvent, or caused him to become insolvent shortly after the transfers were made.

COMPLAINT OF BEIJING SOUFUN SCIENCE AND TECHNOLOGY DEVELOPMENT CO., LTD.,
OBJECTING TO DISCHARGE AND SEEKING TO DENY DEBTOR YAO LIN'S DISCHARGE

25.     Upon information and belief, Lin engaged in transfers involving his assets shortly before a substantial debt was incurred.

26.     As a result of these fraudulent transfers, Plaintiff has been damaged by being deprived of having Lin's assets available to satisfy the Domestic Judgment.

27.     Lin's actions have been, and continue to be, malicious, oppressive, and willful, and engaged in with conscious disregard for Plaintiff's rights.

### C. Plaintiff Files Fraudulent Transfer Action Against Lin

28.     On September 16, 2022, Plaintiff filed an action against Lin, Chen, and the Shinewoods Trust in Los Angeles Superior Court (Case No. 22STCV30434) to recover the fraudulent transfers.  Attached as <u>Exhibit A</u> is a copy of Plaintiff's fraudulent transfer complaint.

29.     Plaintiff's fraudulent transfer action was stayed by the commencement of the Debtor's chapter 7 bankruptcy case.

### D. Lin Fraudulently Transfers Approximately $800,000 From His Bank Accounts Immediately Prior to or After Filing For Bankruptcy.

30.     Upon information and belief, on or about May 26, 2023, Lin had approximately $800,000 in multiple bank and brokerage accounts with East West Bank, located in Encino, California ("**East West Accounts**").  Upon information and belief, Lin was the account holder and signer of the East West Accounts.

31.     On May 29, 2023, Lin filed his bankruptcy petition and failed to disclose any of these East West Accounts.

32.     Upon information and belief, shortly before or immediately after Lin filed for bankruptcy, Lin transferred, or otherwise caused to be transferred, all of the money in the East West Accounts.

33.     Upon information and belief, Lin emptied East West Accounts in an attempt to place assets beyond the reach of Plaintiff.

34.     Upon information and belief, Lin was insolvent at the time of any transfers out of the East West Accounts or would become insolvent as a result of the transfers.

COMPLAINT OF BEIJING SOUFUN SCIENCE AND TECHNOLOGY DEVELOPMENT CO., LTD.,
OBJECTING TO DISCHARGE AND SEEKING TO DENY DEBTOR YAO LIN'S DISCHARGE

35. Upon information and belief, Lin engaged in the transfers to remove and conceal assets that would otherwise be available to satisfy the Domestic Judgment.

36. As a result of the fraudulent transfers, Plaintiff has been damaged by being deprived of Lin's assets that could have been used to satisfy the Domestic Judgment.

37. Lin's actions have been, and continue to be, malicious, oppressive, and willful, and engaged in with conscious disregard for Plaintiff's rights.

### E. Lin Makes Fraudulent Statements and Omissions in Communications With Plaintiff, the Court, and Other Creditors Immediately After Filing Bankruptcy.

38. After the Petition Date, on the schedules of assets filed under penalty of perjury with this Court in connection with his chapter 7 bankruptcy case, Lin did not list the East West Accounts or any of the assets transferred to Chen and then to the Shinewood Trust.

39. Lin, under oath, at the meeting of creditors held pursuant to section 341 of the Bankruptcy Code, admitted to having accounts at East West Bank, but denied having any funds in those accounts or having recently transferred any funds out of those accounts.

40. Upon information and belief, Lin knowingly made false and misleading statements under oath regarding his assets and recent transfers of assets.

## CLAIMS FOR RELIEF

### First Claim for Relief

### (Exception to Discharge Pursuant to Section 523(a)(2)(A) of the Bankruptcy Code)

41. Plaintiff repeats and incorporates by reference each and every allegation of Paragraphs 1 through 40 as though fully set forth in this claim for relief.

42. The transfers of property described above in Paragraphs 14–27 were actually fraudulent as to Plaintiff as they were made to hinder Plaintiff's collection of its debt owed by Defendant.

43. The transfers of property described above in Paragraphs 30–37 were actually fraudulent as to Plaintiff as they were made to hinder Plaintiff's collection of its debt owed by Defendant.

COMPLAINT OF BEIJING SOUFUN SCIENCE AND TECHNOLOGY DEVELOPMENT CO., LTD., OBJECTING TO DISCHARGE AND SEEKING TO DENY DEBTOR YAO LIN'S DISCHARGE

44.     As a proximate cause of the aforementioned fraudulent transfers, Plaintiff was damaged in an amount believed to be no less than the value of the assets that were fraudulently transferred, the exact amount of which will be proven at the time of trial.  Damages also include attorneys' fees and costs.

45.     The Debtor's actual fraud in connection with these fraudulent transfers is an exception to discharge to the extent of those transfers under section 523(a)(2)(A) of the Bankruptcy Code.

**Second Claim for Relief**

**(Exception to Discharge Pursuant to Section 523(a)(6) of the Bankruptcy Code)**

46.     Plaintiff repeats and incorporates by reference each and every allegation of Paragraphs 1 through 45 as though fully set forth in this claim for relief.

47.     In making the fraudulent transfers of property described above in Paragraphs 14–27, Defendant willfully and maliciously injured Plaintiff and/or the property of Plaintiff.

48.     In making the fraudulent transfers of property described above in Paragraphs 30–37, Defendant willfully and maliciously injured Plaintiff and/or the property of Plaintiff.

49.     The Debtor's willful and malicious conduct caused Plaintiff injury in connection with the fraudulent transfers, and such conduct creates an exception to discharge to the extent of those transfers under section 523(a)(6) of the Bankruptcy Code.

**Third Claim for Relief**

**(Denial of Discharge Pursuant to Section 727(a)(2) of the Bankruptcy Code)**

50.     Plaintiff repeats and incorporates by reference each and every allegation of Paragraphs 1 through 49 as though fully set forth in this claim for relief.

51.     In or in connection with this bankruptcy case, the Debtor, with intent to hinder, delay, or defraud Defendant and/or other creditors, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed (a) the Debtor's property, within one year before the Petition Date; and/or (b) property of the estate, after the Petition Date.

COMPLAINT OF BEIJING SOUFUN SCIENCE AND TECHNOLOGY DEVELOPMENT CO., LTD., OBJECTING TO DISCHARGE AND SEEKING TO DENY DEBTOR YAO LIN'S DISCHARGE

52.     By reason of the foregoing, Defendant's discharge should be denied pursuant to section 727(a)(2) of the Bankruptcy Code, including without limitation any discharge of the Domestic Judgement.

**Fourth Claim for Relief**

**(Denial of Discharge Pursuant to Section 727(a)(4)(A) of the Bankruptcy Code)**

53.     Plaintiff repeats and incorporates by reference each and every allegation of Paragraphs 1 through 52 as though fully set forth in this claim for relief.

54.     In this bankruptcy case, the Debtor submitted his sworn statement in which the Debtor knowingly and fraudulently made a false oath.

55.     Among other things, the Debtor failed to disclose all of his bank accounts, including the East-West Accounts.  The Debtor also failed to identify assets transferred out of his name but in which he still enjoyed beneficial control.  Upon information and belief, the Debtor knowingly and fraudulently omitted these material facts from his petition in this chapter 7 case.

56.     By reason of the foregoing, Defendant's discharge should be denied pursuant to section 727(a)(4)(A) of the Bankruptcy Code, including without limitation any discharge of the Domestic Judgment.

**Fifth Claim for Relief**

**(Denial of Discharge Pursuant to Section 727(a)(5) of the Bankruptcy Code)**

57.     Plaintiff repeats and incorporates by reference each and every allegation of Paragraphs 1 through 56 as though fully set forth in this claim for relief.

58.     The Debtor has failed to explain satisfactorily a material loss of assets or deficiency of assets to meet the Debtor's liabilities, including without limitation (a) the transfers of a substantial majority of Defendant's assets during or soon after the entry of the Final Award by CIETAC or (b) the dissipation of amounts held in the East-West Accounts immediately prior to or after the Petition Date.

COMPLAINT OF BEIJING SOUFUN SCIENCE AND TECHNOLOGY DEVELOPMENT CO., LTD.,
OBJECTING TO DISCHARGE AND SEEKING TO DENY DEBTOR YAO LIN'S DISCHARGE

1        59.    By reason of the foregoing, Defendant's discharge should be denied pursuant to

2  section 727(a)(5) of the Bankruptcy Code, including without limitation any discharge of the

3  Domestic Judgement.

4        WHEREFORE, Plaintiff demands judgment against Defendant as follows:

5  A.    That all debts and obligations owed to Plaintiff by Defendant, including the

6        Domestic Judgment, be declared nondischargeable in this and any subsequent

7        bankruptcy filing by Defendant;

8  B.    That Defendant's discharge be denied for the reasons set forth herein;

9  C.    For recovery of damages in an amount to be established at trial representing

10       monetary and other damages arising from Defendant's conduct described above,

11       plus all interest, costs and attorneys' fees allowable by law; and

12  D.    For such other and further relief as the Court deems appropriate.

13

14  DATED: September 7, 2023        O'MELVENY & MYERS LLP

15                     /s/ Karen Rinehart

16                     Stephen H. Warren
                        Marc Feinstein

17                     Karen Rinehart
                        Jordan A. Weber

18                     *Attorneys for Plaintiff*

19

20

21

22

23

24

25

26

27

28

COMPLAINT OF BEIJING SOUFUN SCIENCE AND TECHNOLOGY DEVELOPMENT CO., LTD.,
OBJECTING TO DISCHARGE AND SEEKING TO DENY DEBTOR YAO LIN'S DISCHARGE

# EXHIBIT A

Electronically FILED by Superior Court of California, County of Los Angeles on 09/16/2022 04:25 PM Sherri R. Carter, Executive Officer/Clerk of Court, by N. Alvarez, Deputy Clerk
Case 1:23-ap-01083-MB    Doc 2-2    Filed 09/07/25    Entered 09/07/25 22:53:50    Desc
Exhibit Declaration of Yao Lin - Mediation Documents - Exhibits 48 through 31    Page 214 of 251

MARC FEINSTEIN (S.B. #158901)
mfeinstein@omm.com
SHERIN PARIKH (S.B. #301890)
sparikh@omm.com
KAITIE FARRELL (S.B. #341259)
kfarrell@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street
18ᵗʰ Floor
Los Angeles, California 90071-2899
Telephone:    +1 213 430 6000

RONALD SLATES (S.B. #43712)
rslates2@rslateslaw.com
RONALD P. SLATES, P.C.
500 South Grand Avenue
Suite 2010
Los Angeles, California
Telephone:    +1 213 624 1515

J. STEVEN BINGMAN (S.B. #156847)
jsbingman@aol.com
LAW OFFICES OF J. STEVEN
BINGMAN
6528 Greenleaf Avenue
Suite 103
Whittier, California
Telephone:    +1 213 489 8123

Attorneys for Plaintiff
Beijing SouFun Science and Technology
Development Co., Ltd.

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

Beijing SouFun Science and Technology
Development Co., Ltd., a People's Republic of
China corporation,

                    Plaintiff,

          v.

Yao Lin, an individual; Jia Chen, an individual;
Yao Lin, as Trustee of the Shinewoods Trust;
Jia Chen, as Trustee of the Shinewoods Trust;
and Does 1 through 100, inclusive,

                    Defendants.

Case No.    22STCV30434

UNLIMITED JURISDICTION

**COMPLAINT FOR:**
**1. VOIDABLE TRANSACTION, CAL.
CIV. CODE § 3439.04(a)(1)**
**2. VOIDABLE TRANSACTION, CAL.
CIV. CODE § 3439.04(a)(2)**
**3. VOIDABLE TRANSACTION, CAL.
CIV. CODE § 3439.05**
**4. COMMON LAW FRAUDULENT
CONVEYANCE**
**5. CONSPIRACY TO COMMIT
FRAUDULENT CONVEYANCE**
**6. AIDING AND ABETTING
FRAUDULENT CONVEYANCE**

1

**INTRODUCTION**

2      1.      This suit arises from Defendant Yao Lin's concerted and unlawful attempts to

3   avoid paying debts owed to Plaintiff Beijing SouFun Science and Technology Development Co.,

4   Ltd. pursuant to a final arbitration award.

5      2.      On September 6, 2019, Plaintiff obtained a final arbitration award (the "Final

6   Award") issued by an arbitration panel in accordance with the China International Economic and

7   Trade Arbitration Commission ("CIETAC") against Defendant Yao Lin ("Lin") for an amount

8   more than 140,597,571.30 (currently $20,286,786.13).  However, after these debts were incurred

9   and during the pendency of the arbitration, Lin transferred substantially all of his assets to his

10  wife, Jia Chen ("Chen"), who then subsequently transferred several multi-million dollar real

11  property assets to a revocable living trust, the Shinewoods Trust.

12     3.      Lin has transferred these assets in an attempt to hinder, delay or avoid his debts to

13  Plaintiff.  Each of these purported transfers was invalid and orchestrated to defraud Plaintiff as

14  Lin's creditor.

15

**THE PARTIES**

16     4.      Plaintiff is a corporation, organized and existing under the laws of the People's

17  Republic of China with its principal place of business in Beijing.

18     5.      Plaintiff is informed and believes, and on that basis alleges, that Defendant Yao

19  Lin is an individual residing in Malibu, California and, upon information and belief, is a trustee of

20  the Shinewoods Trust.

21     6.      Plaintiff is informed and believes, and on that basis alleges, that Defendant Jia

22  Chen, who at all relevant times has been and continues to be the wife of Lin, is an individual

23  residing in Malibu, California.  Plaintiff is informed and believes, and on that basis alleges, that

24  several multi-million dollar real property assets that were transferred by Lin and/or Chen during

25  the pendency of the arbitration or thereafter were acquired during their marriage and are

26  considered community property.  Upon information and belief, Chen is a trustee of the

27  Shinewoods Trust.

28     7.      Defendant Does 1 through 100, inclusive, are sued herein under fictitious names.

- 2 -

COMPLAINT

1    Plaintiff is ignorant of the true names and capacities of defendants sued herein as Does 1 through

2    100 and therefore sues these defendants by those fictitious names.  Plaintiff will amend this

3    Complaint to include their true names and capacities when ascertained.  Plaintiff is informed and

4    believes, and on that basis alleges, that each of the fictitiously named defendants received a

5    fraudulently transferred asset of Lin and/or fraudulently transferred an asset or ownership of an

6    asset once belonging to Lin to another named defendant or a Doe defendant.

7        8.        Unless otherwise specified: (a) all defendants, named or fictitious, are herein

8    collectively referred to as the "Defendants" and (b) all Doe defendants are herein collectively

9    referred to as "Does."

10                            **VENUE AND JURISDICTION**

11        9.        Venue is proper in the Superior Court of California, County of Los Angeles under

12    California Code of Civil Procedure § 395.  Upon information and belief, Defendants Yao Lin and

13    Jia Chen reside in the County of Los Angeles, State of California.

14        10.        The Los Angeles Superior Court has jurisdiction over this action pursuant to the

15    Uniform Voidable Transfers Act ("UVTA"), California Civil Code §§ 3439 *et seq*.  This Court

16    also has jurisdiction to grant relief on Plaintiff's common law claims for fraudulent conveyance,

17    conspiracy to commit fraudulent conveyance, and aiding and abetting fraudulent conveyance.

18                            **GENERAL ALLEGATIONS**

19    **I.    FOREIGN ARBITRATION AWARD AGAINST DEFENDANT YAO LIN**

20        11.        On September 16, 2015, Plaintiff entered into an Agreement on Settlement of

21    Outstanding Amount and the Termination of Nominee Holding the Final Award (the

22    "Termination Agreement") with Allscore Payment Services Co., Ltd. ("Allscore"); Beijing

23    Zhonghan Hailian Assets Management Co., Ltd. ("Hailian"); and Nanning Xuyin Business Co.,

24    Ltd. ("Xuyin").  Under the Termination Agreement, Allscore and Hailian are jointly and severally

25    liable for payment of an outstanding principal amount and liquidated damages amount owed to

26    Plaintiff in connection with a prior 2014 contractual agreement.

27        12.        Additionally, on September 16, 2015, Plaintiff entered into a Guarantee Contract

28    (the "Guarantee Contract") with Lin, Beijing Longhe Trading Co. Ltd. ("Longhe") and Xuyin.

COMPLAINT

1  Under the Guarantee Contract, Lin and Longhe are jointly and severally liable for all obligations

2  borne by Allscore and Hailian under the Termination Agreement.

3        13.     After Allscore failed to make payments in accordance with the Termination

4  Agreement—and Lin, Hailian, and Longhe failed to satisfy those payments in accordance with

5  their guarantor obligations under the Termination Agreement and Guarantee Contract—Plaintiff

6  submitted a breach of contract claim for arbitration before CIETAC.

7        14.     On November 30, 2018 and May 21, 2019, an arbitration tribunal heard the case in

8  accordance with the applicable CIETAC Arbitration Rules.

9        15.     On September 6, 2019, the arbitration tribunal issued a final award (the "Final

10  Award"), ordering: (i) Allscore to pay Plaintiff principal of the outstanding amount of RMB

11  55,427,195.39 (currently $7,997,575.27); (ii) Allscore to pay Plaintiff liquidated damages in the

12  amount of RMB 66,784,745.30 (currently $9,636,353.12); (iii) Allscore to pay Plaintiff interest

13  calculated at the lending rate of the People's Bank of China, currently 4.3%, on RMB

14  82,418,872.85 for the period from September 8, 2017 to the date of actual repayment (currently

15  $2,556,822.40) and interest calculated at the lending rate of the People's Bank of China, currently

16  4.3%, on RMB 148,794.45 for the period from September 19, 2017 to the date of actual

17  repayment (currently $4,615.95); (iv) Allscore to pay Plaintiff RMB 400,000 (currently

18  $57,715.90) to compensate Plaintiff for attorney fees paid; (v) Lin, Hailian, and Longhe jointly

19  and severally liable for the monetary obligations of Allscore under items (i) – (iv); and (vi) Lin,

20  Allscore, Hailian, and Longhe jointly liable for arbitration fees of RMB 934,328.50 (currently

21  $134,814.01).  The total amount owed under the Final Award is over RMB 140,597,571.30

22  (currently $20,286,786.13).

23        16.     On August 19, 2022, Plaintiff filed a Petition for Confirmation, Recognition, and

24  Enforcement of Foreign Arbitration Award with the United States District Court, Central District

25  of California, Western Division, Case No. 2:22-cv-05898.  This action is currently pending before

26  the court.

27  **II.    FRAUDULENT TRANSFERS**

28        17.     Plaintiff is informed and believes, and on that basis alleges, that Lin has

1    transferred assets to Chen, the Shinewoods Trust, and/or Does, and as a result, Lin has

2    insufficient assets to pay his debts owed to Plaintiff under the Final Award.

3    18.    Plaintiff is informed and believes, and on that basis alleges, that Lin put assets that

4    were in his name into the name of Chen, who then transferred those assets to the Shinewoods

5    Trust.

6    19.    The assets fraudulently transferred include, but are not limited to:

7    (a)    Real property located at or near 31663 Broad Beach Road, Malibu,

8    California 90265, and legally described as: *"Those portions of Lots 4, 5,*

9    *and 7 of Tract No. 20658, in the City of Malibu, county of Los Angeles,*

10    *State of California, as per map recorded in Book 579, Pages 9 and 10 of*

11    *maps, in the Office of the County Recorder of said County; described as*

12    *follows: Beginning at the Northeast corner of said Lot 4 thence along the*

13    *Easterly line of said Lot 4 South 10° 05' 30" West 82.00 feet to the Easterly*

14    *prolongation of the Northerly line of Lot 5; thence along said prolongation*

15    *and along said Northerly line North 82° 02' 55" West 76.00 feet to a line*

16    *parallel with the Easterly line o [sic] said Lot 5 that passes through point*

17    *in the Southerly line of said lot 5 distant North 79° 54' 30' West 76.00 feet*

18    *from the Southeast corner of said Lot 4; thence along said parallel line,*

19    *South 10° 05' 30" West 100.00 feet to the Southerly line of said lot 5;*

20    *thence along said southerly line, North 79° 54' 30" West 10.00 feet to a*

21    *point in said Southerly line distant South 79° 64' 30" East 69.00 feet from*

22    *the Southwest comer of said Lot 5; thence parallel with the Easterly line of*

23    *said Lot 5, North 10° 06' 30" East 99.60 feet to the Northerly line of said*

24    *Lot 5; thence Northwesterly, in a direct line South 70° 43' 58" West 39.00*

25    *feet from the most Northerly corner of said Lot 7; thence along said*

26    *Northwesterly line, North 70° 43' 68" East 39.00 feet to said most*

27    *Northerly comer; thence along the Northeasterly line of Lots 7 and 4,*

28    *South 66° 28' 30" East 107.11 feet to the point of beginning.  Except*

- 5 -

COMPLAINT

1    *therefrom all oil, gas, minerals and other hydrocarbon, below a depth of*

2    *600 feet, without the right of surface entry, as reserved in Instrument of*

3    *record."*  Upon information and belief, on or around March 18, 2019, Lin

4    transferred this property by Grant Deed, with no consideration paid, to

5    Chen, individually, as her sole and separate property.  A true and correct

6    copy of this Grant Deed is attached hereto as **Exhibit 1**.  On or around

7    November 4, 2021, Chen transferred this property by Grant Deed to Jia

8    Chen as the trustee of the Shinewoods Trust.  A true and correct copy of

9    this Grant Deed is attached hereto as **Exhibit 2**.

10    (b)    Real property located at or near 27487 Latigo Bay View Drive, Malibu,

11    California 90265, and legally described as: "*Parcel 1: Lot 10, of Tract No.*

12    *46851, in the City of Malibu, County of Los Angeles, State of California, as*

13    *per map recorded in Book 1171 Pages 62 to 73, inclusive of Maps, in the*

14    *Office of the County Recorder of said County.  Excepting therefrom all*

15    *minerals, oil, petroleum, asphaltum, gas, coal and other thereof, but*

16    *without surface right of entry, as reserved by Marblehead Land Company,*

17    *in deed recorded March 4, 1947 as Instrument No. 1036 in Book 24232,*

18    *Page 380, of Official Records.  Parcel 2: An easement for road purposes*

19    *and ingress and egress over those certain strips of land designated as*

20    *'Private Driveway and Fire Lane' and 'Private Streets', as designated and*

21    *delineated on the map of said Tract No. 46851.*"  Upon information and

22    belief, on or around March 18, 2019, Lin transferred this property by Grant

23    Deed, with no consideration paid, to Chen, individually, as her sole and

24    separate property.  A true and correct copy of this Grant Deed is attached

25    hereto as **Exhibit 3**.  On or around December 16, 2021, Chen transferred

26    this property by Grant deed to Jia Chen as the trustee of the Shinewoods

27    Trust.  A true and correct copy of this Grant Deed is attached hereto as

28    **Exhibit 4**.

COMPLAINT

20.     Plaintiff is informed and believes, and on that basis alleges, that Lin is in the process of considering transferring the same and other valuable assets to family members or friends for a low value in an attempt to keep his assets out of Plaintiff's reach.  Upon information and belief, these assets include, but are not limited to:

(a)     Real property located at or near 31663 Broad Beach Road, Malibu, California 90265, and legally described as above.

(b)     Real property located at or near 27487 Latigo Bay View Drive, Malibu, California 90265, and legally described as above.

(d)     Real property located at or near 435 Woodbluff Road, Calabasas, California 91302, and legally described as: "*Lot 2 of Tract No. 45168, in the County of Los Angeles, State of California, as per Map recorded in Book 1166, Pages 97 to 99 inclusive of Maps, in the Office of the County Recorder of said County.*"

(e)     Real property located at or near 2100 East Guinness Court, Bloomington, Indiana 47408, and legally described as: "*The North Half of the Southwest Quarter of Section Number Three (3), Township Number Nine (9) North, Range One (1) West. Containing Eighty (80) acres, more or less.  ALSO, a part of the Southwest Quarter of the Northwest Quarter of Section Three (3), Township Number Nine (9) North, Range One (1) West, described as follows, to-wit: COMMENCING at the Northwest corner of said quarter quarter; thence East Nine Hundred Eighty-three and one-half (983.5) feet; thence South Fifty (50) feet; thence South Twelve (12) degrees and Forty-two (42) minutes West, Thirteen Hundred One and Seven-tenths (1301.7) feet; thence West to the Southwest corner of said quarter quarter; thence North to the Northwest corner of said quarter quarter, the place of beginning, containing Twenty-five (25) acres, more or less.  ALSO, a part of the Southeast Quarter of the Southwest Quarter of Section 3, Township 9 North, Range 1 West, Monroe County, Indiana, being more particularly*

- 7 -

1        *described as follows: COMMENCING at the Southwest corner of said*

2        *quarter quarter marked by a railroad spike, thence NORTH 00 degrees 15*

3        *minutes 24 seconds WEST (assumed basis of bearings) along the West line*

4        *of said quarter quarter, 1078.49 feet to the point of beginning marked by a*

5        *5/8-inch rebar with yellow cap; thence continuing NORTH 00 degrees 15*

6        *minutes 24 seconds WEST along said West line, 228.09 feet to the*

7        *Northwest corner of said quarter quarter; thence SOUTH 88 degrees 25*

8        *minutes 22 seconds EAST along the North line of said quarter quarter,*

9        *1314.57 feet to the Northeast corner of said quarter quarter; thence*

10       *SOUTH 00 degrees 15 minutes 24 seconds EAST along the East line of*

11       *said quarter quarter, 670.55 feet to a 5/8-inch rebar with yellow cap,*

12       *thence NORTH 59 degrees 28 minutes 13 seconds WEST, a distance of*

13       *321.26 feet to a 5/8-inch rebar with yellow cap; thence NORTH 66 degrees*

14       *16 minutes 34 seconds WEST, a distance of 271.28 feet [sic] to a 5/8-inch*

15       *rebar with yellow cap; thence NORTH 75 degrees 22 minutes 56 seconds*

16       *WEST, a distance of 236.75 feet to a 5/8-inch rebar with yellow cap;*

17       *thence SOUTH 62 degrees 48 minutes 27 seconds WEST, a distance of*

18       *90.00 feet to a 5/8- inch rebar with yellow cap; thence NORTH 43 degrees*

19       *56 minutes 00 seconds WEST, a distance of 115.00 feet to a 5/8-inch rebar*

20       *with yellow cap; thence NORTH 75 degrees 22 minutes 56 seconds WEST,*

21       *a distance of 415.49 feet to the point of beginning, containing 12.319*

22       *acres, more or less. ALSO KNOW AS TRACT 3 in the plat of Moseman*

23       *Type "E" Administrative Subdivision recorded June 22, 2005 as Instrument*

24       *2005011748."*

25       21.    Plaintiff is informed and believes, and on that basis alleges, that Lin is in the

26      process of encumbering his assets.

27                       **FIRST CAUSE OF ACTION**

28                       **VOIDABLE TRANSACTION**

(UNIFORM VOIDABLE TRANSACTIONS ACT, CAL. CIV. CODE § 3439.04(a)(1))

(Against All Defendants)

22.    Plaintiff realleges and incorporates by reference paragraphs 1 through 21 of this Complaint, as if fully set forth herein.

23.    Upon information and belief, Defendants engaged in multiple transfers of assets, with actual intent to hinder, delay, and/or defraud Plaintiff and its attempts to exercise its right to collect from Lin the amounts owed under the Final Award.  Each of the Defendants agreed and conspired with the others, and provided assistance with knowledge of the wrongdoing and otherwise aided and abetted one another, to achieve this unlawful goal.

24.    Upon information and belief, Defendants transferred Lin's valuable real property assets through multiple transactions and failed to receive a reasonably equivalent value in exchange for the transfers made or obligations incurred.  Chen paid no consideration for the transfers of the 31663 Broad Beach Road or 27487 Latigo Bay View properties.

25.    Upon information and belief, at the time the transfers were made or obligations incurred, Defendants were engaged, or about to engage, in a business or transaction, and Lin's remaining assets were unreasonably small in relation to those business or transactions.

26.    Upon information and belief, at the time the transfers were made or obligations incurred, Lin intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as the debts became due.  Lin knew that the liability he could face from the Final Award would be more than the value of his assets.

27.    Upon information and belief, Defendants engaged in, or purported to engage in, transfers and assumed obligations involving Lin's assets where the transfer and obligations involved insiders or close affiliates.  The transferee of the real properties was Lin's wife, Chen.

28.    Upon information and belief, Defendants engaged in, or purported to engage in, transfers and assumed obligations involving Lin's assets where Defendants retained possession or control of the property after the transfer.  These transfers and obligations include, but are not limited to, Defendants serving, or having served, as trustees, or being, or having been, beneficiaries to the Shinewoods Trust.

- 9 -

COMPLAINT

29.     Upon information and belief, Defendants engaged in, or purported to engage in, transfers and assumed obligations involving Lin's assets where the transfer or conveyance was concealed.

30.     Upon information and belief, Defendants engaged in, or purported to engage in, transfers and assumed obligations involving Lin's assets at a time when Lin had been sued or threatened with suit.  Transfers occurred after Plaintiff commenced an arbitration against Lin for breach of contract where Lin served as a joint and several guarantor.

31.     Upon information and belief, Defendants engaged in, or purported to engage in, transfers and assumed obligations where the alleged transfers and assumed rights encompassed substantially all of Lin's assets.

32.     Upon information and belief, Defendants engaged in transfers and assumed property rights that helped remove and conceal Lin's assets.

33.     Upon information and belief, Defendants engaged in transfers and assumed obligations that made Lin insolvent, or caused him to become insolvent shortly after the transfers were made.

34.     Upon information and belief, Defendants engaged in transfers involving Lin's assets shortly before a substantial debt was incurred.  Each of the Defendants absconded with the assets and/or aided and abetted and conspired with the other Defendants to do so.

35.     Plaintiff is entitled, but not limited, to (a) damages against each Defendant in an amount to be determined at trial, plus applicable interest, (b) avoidance of the transfers made or obligations incurred to the extent necessary to satisfy the Final Award, (c) an attachment of the assets transferred, (d) an injunction against further disposition by Defendants or a transferee, or both, of any asset transferred or other property of the transferee, and/or (e) the appointment of a receiver over the fraudulently transferred assets.

36.     Defendants' actions have been, and continue to be, malicious, oppressive, and willful, and engaged in with conscious disregard for Plaintiff's rights, thus justifying an award of exemplary and punitive damages.

## SECOND CAUSE OF ACTION

- 10 -

**VOIDABLE TRANSACTION**

(UNIFORM VOIDABLE TRANSFER ACT, CAL. CIV. CODE § 3439.04(a)(2))

(Against All Defendants)

37.     Plaintiff realleges and incorporates by reference paragraphs 1 through 21 of this Complaint, as if fully set forth herein.

38.     Upon information and belief, Defendants exchanged Lin's valuable real property assets through multiple transactions and failed to receive a reasonably equivalent value in exchange for the transfers made or obligations incurred.  Chen paid no consideration for the transfers of the 31663 Broad Beach Road or 27487 Latigo Bay View properties.

39.     Upon information and belief, at the time the transfers were made or obligations incurred, Defendants were engaged or about to engage in a business or transaction, and Lin's remaining assets were unreasonably small in relation to those business or transactions.

40.     Upon information and belief, at the time the transfers were made or obligations incurred, Lin intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as the debts became due.

41.     Plaintiff is entitled, but not limited, to (a) damages against each Defendant in an amount to be determined at trial, plus applicable interest, (b) avoidance of the transfers made or obligations incurred to the extent necessary to satisfy the Final Award, (c) an attachment to the assets transferred, (d) an injunction against further disposition by Defendants or a transferee, or both, of any asset transferred or other property of the transferee, and/or (e) the appointment of a receiver over the fraudulently transferred assets.

**THIRD CAUSE OF ACTION**

**VOIDABLE TRANSACTION**

(UNIFORM VOIDABLE TRANSFER ACT, CAL. CIV. CODE § 3439.05)

(Against All Defendants)

42.     Plaintiff realleges and incorporates by reference paragraphs 1 through 21 of this Complaint, as if fully set forth herein.

43.     Upon information and belief, Defendants exchanged Lin's valuable real property

- 11 -

1    assets through multiple transactions and failed to receive a reasonably equivalent value in

2    exchange for the transfers made or obligations incurred, and Lin was insolvent at the time of the

3    transfers or became insolvent as a result of the transfers made or obligations incurred.

4        44.      Plaintiff is entitled, but not limited, to (a) damages against each Defendant in an

5    amount to be determined at trial, plus applicable interest, (b) avoidance of the transfers made or

6    obligations incurred to the extent necessary to satisfy the Final Award, (c) an attachment to the

7    assets transferred, (d) an injunction against further disposition by Defendants or a transferee, or

8    both, of any asset transferred or other property of the transferee, and/or (e) the appointment of a

9    receiver over the fraudulent transferred Lin's assets.

10                    **FOURTH CAUSE OF ACTION**

11            **COMMON LAW FRAUDULENT CONVEYANCE**

12                      (Against All Defendants)

13        45.      Plaintiff realleges and incorporates by reference paragraphs 1 through 21 of this

14    Complaint, as if fully set forth herein.

15        46.      Upon information and belief, Defendants engaged in multiple transfers involving

16    Yao Lin's assets in order to deprive Plaintiff of its right as a creditor to recover the amounts owed

17    under the Final Award.

18        47.      Upon information and belief, Defendants exchanged Lin's valuable real property

19    assets through multiple transactions and failed to receive a reasonably equivalent value in

20    exchange for the transfers made or obligations incurred, and Lin was insolvent at the time of the

21    transfers or became insolvent as a result of the transfers made or obligations incurred.

22        48.      As a direct and proximate result of Defendants' actions, Plaintiff has been

23    damaged in an amount to be proven at trial, but in no event less than the total amounts owed

24    under the Final Award.

25        49.      Defendants' actions have been, and continue to be, malicious, oppressive, and

26    willful, and engaged in with conscious disregard for Plaintiff's rights, thus justifying an award of

27    exemplary and punitive damages.

28                    **FIFTH CAUSE OF ACTION**

**CONSPIRACY TO COMMIT FRAUDULENT CONVEYANCE**

(Against All Defendants)

50.     Plaintiff realleges and incorporates by reference paragraphs 1 through 21 of this Complaint, as if fully set forth herein.

51.     Defendants formed a group and agreed to a common plan or design to, and did in fact, intentionally hinder, delay, and defraud Plaintiff and its right to collect under the Final Award by engaging in a series of transfers and conveyances with the intent of misrepresenting and concealing the true ownership of Lin's assets.  Defendants knowingly participated in the foregoing fraudulent transfers.

52.     As a direct and proximate result of Defendants' actions, Plaintiff has been damaged in an amount to be proven at trial, but in no event not less than the total amounts owed under the Final Award.

53.     Defendants' actions have been, and continue to be, malicious, oppressive, and willful, and engaged in with conscious disregard for Plaintiff's rights, thus justifying an award of exemplary and punitive damages.

**SIXTH CAUSE OF ACTION**

**AIDING AND ABETTING FRAUDULENT CONVEYANCE**

(Against All Defendants)

54.     Plaintiff realleges and incorporates by reference paragraphs 1 through 21 of this Complaint, as if fully set forth herein.

55.     Defendants aided and abetted Lin in hindering, delaying, and defrauding Plaintiff from the proper exercise of its rights as a creditor.  They knowingly participated in the foregoing fraudulent transfers.

56.     As a direct and proximate result of Defendants' actions, Plaintiff has been damaged in an amount to be proven at trial, but in no event less than the total amounts owed under the Final Award.

57.     Defendants' actions have been, and continue to be, malicious, oppressive, and willful, and engaged in with conscious disregard for Plaintiff's rights, thus justifying an award of

- 13 -

1    exemplary and punitive damages.

2    **PRAYER FOR RELIEF**

3    WHEREFORE, Plaintiff prays for relief as follows:

4    (i)     For compensatory damages not less than the total amounts owed under the

5    Final Award;

6    (ii)    For punitive damages;

7    (iii)   For avoidance of unlawful transfers and injunction against further unlawful

8    transfers;

9    (iv)    For an accounting;

10   (v)     For disgorgement of unjust enrichment and a constructive trust;

11   (vi)    For involuntary dissolution;

12   (vii)   For appointment of a receiver over Defendants' assets;

13   (viii)  For pre- and post-judgment interest;

14   (ix)    For attorneys' fees and costs of suit; and

15   (x)     For all such other and further relief as this Court may deem just and proper.

16   Dated:  September 16, 2022                    O'MELVENY & MYERS LLP

17

18                                                 By:      */s/ Marc Feinstein*

19                                                        Marc Feinstein
                                                   Attorneys for Plaintiff
20                                                 Beijing SouFun Science and Technology
                                                   Development Co., Ltd.

21

22

23

24

25

26

27

28

# EXHIBIT 1

 

**This page is part of your document - DO NOT DISCARD**



# 20190238746



**Pages:
0005**

**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**03/18/19 AT 08:00AM**

| | |
|---|---|
| FEES: | 31.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 75.00 |
| PAID: | 106.00 |



**L E A D S H E E T**



**201903180290018**

**00016375340**



**009695517**

**SEQ:
01**

**SECURE - 8:00AM**



**THIS FORM IS NOT TO BE DUPLICATED**



E535543

RECORDING REQUESTED BY
*Stewart Title*
AND WHEN RECORDED MAIL TO:

JIA CHEN
*5579 Angelus Ave*
*San Gabriel, CA. 91776*

---

THIS SPACE FOR RECORDER'S USE ONLY:

---

AP#: 4470-019-017        **GRANT DEED**

---

THE UNDERSIGNED GRANTOR(S) DECLARE(S)

**DOCUMENTARY TRANSFER TAX is $0.00**    'This is a bonafide gift and the grantor received nothing in return, R & T 11911 '

[X] computed on full value of property conveyed, or
[ ] computed on full value less value of liens or encumbrances remaining at time of sale.
[ ] Unincorporated area    [ ] City of AND

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

**YAO LIN AND JIA CHEN, HUSBAND AND WIFE AS COMMUNITY PROPERTY WITH RIGHT OF SURVIVORSHIP**

hereby GRANT(s) to:

**JIA CHEN, A MARRIED WOMAN AS HER SOLE AND SEPARATE PROPERTY**

the real property in the County of LOS ANGELES, State of California, described as:

LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND MADE A PART HEREOF

**Also Known as:** 31663 BROAD BEACH ROAD, MALIBU, CA 90265
"This conveyance establishes sole and separate property of a spouse, R & T 11911."

**ACCOMMODATION**
This Document delivered to Recorder
as an accommodation only at the
express request of the parties hereto.
It has not been examined as to
its effect or validity.

DATED: January 7, 2019        **Signature Page attached hereto and made a part hereof**

MAIL TAX STATEMENTS TO PARTY SHOWN BELOW; IF NO PARTY SHOWN, MAIL AS SHOWN ABOVE:

AP#: 4470-019-017

## SIGNATURE PAGE

**Title of Document:  GRANT DEED**

**Date of Document:** January 7, 2019

YAO LIN

JIA CHEN

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA                    People's Republic of China)
COUNTY OF _____               Municipality of Beijing         ) SS:
On     JAN 29 2019                      Embassy of the United     )
before me,     Morgan Kuehne            States of America             )
A Notary Public personally appeared    Consular Associate
     Yao Lin

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

~~I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.~~

WITNESS my hand and official seal.

Signature _____                    (Seal)

# EXHIBIT "A"

## LEGAL DESCRIPTION

The land referred to herein is situated in the State of California, County of Los Angeles, City of Malibu and described as follows:

Those portions of Lots 4, 5 and 7 of Tract No. 20658, in the City of Malibu, County of Los Angeles, State of California, as per map recorded in Book 579, Pages 9 and 10 of maps, in the Office of the County Recorder of said County, described as follows:

Beginning at the Northeast corner of said Lot 4; thence along the Easterly line of said Lot 4, South 10° 05' 30" West 82.00 feet to the Easterly prolongation of the Northerly line of Lot 5; thence along said prolongation and along said Northerly line North 82° 02' 55' West 76.00 feet to a line parallel with the Easterly line of said Lot 5 that passes through point in the Southerly line of said lot 5 distant North 79° 54' 30' West 76.00 feet from the Southeast, corner of said Lot 4; thence along said parallel line, South 10° 05'30" West 100.00 feet to the Southerly line of said lot 5; thence along said southerly line, North 79° 54' 30" West 10.00 feet to a point in said Southerly line distant South 79° 54' 30" East 69.00 feet from the Southwest corner of said Lot 5; thence parallel with the Easterly line of said lot 5, North 10° 05' 30" East 99.50 feet to the Northerly line of said Lot 5; thence Northwesterly, in a direct line South 70° 43' 58" West 39.00 feet from the most Northerly corner of said Lot 7; thence along said Northwesterly line, North 70° 43' 58" East 39.00 feet to said most Northerly corner; thence along the Northeasterly line of Lots 7 and 4, South 66° 28' 30" East 107.11 feet to the point of beginning.

Except therefrom all oil, gas, minerals and other hydrocarbon, below a depth of 500 feet, without the right of surface entry, as reserved in instrument of record.

APN: 4470-019-017

# California All-Purpose Certificate of Acknowledgment

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

**State of California**

**County of Los Angeles** } s.s

On_ March 11, 2019 _before me,_ Brenda Machuca V., NOTARY PUBLIC,

personally appeared _____ JIA CHEN _____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Signature of Notary Public

BRENDA MACHUCA V.
Notary Public - California
Los Angeles County
Commission # 2194619
My Comm. Expires Apr 29, 2021

Seal

------------------OPTIONAL INFORMATION------------------
Although the information in this section is not required by law, it could prevent fraudulent removal and reattachment of this acknowledgment to an unauthorized document and may prove useful to persons on the attached document.

Description of Attached Document

The preceding Certificate of Acknowledgment is attached to a

document titled/for the purpose of GRANT Deed.

AP# : 4470-019-017

Containing 3 pages, and dated Jan. 7, 2019

# EXHIBIT 2




**This page is part of your document - DO NOT DISCARD**



# 20211655794



**Pages:**
**0004**

**Recorded/Filed in Official Records**
**Recorder's Office, Los Angeles County,**
**California**

**11/04/21 AT 03:23PM**

| | |
|---|---|
| FEES: | 28.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| | |
| PAID: | 28.00 |



**L E A D S H E E T**



202111042840082

00021380661



012801768

**SEQ:**
**01**

DAR - Mail (Intake)



**THIS FORM IS NOT TO BE DUPLICATED**



E188245

PREPARED AND RECORDING REQUESTED BY:

SEDRIC E. COLLINS
*Attorney at Law*
Legacy One Law Firm
12400 Wilshire Blvd Suite 400
Los Angeles, California 90025
323 405-7017

WHEN RECORDED, MAIL TO
AND MAIL TAX STATEMENTS TO:

Jia Chen, as Trustee
31663 Broad Beach Rd.
Malibu, CA 90265

**21380661**

Batch Number: 12801768

*THIS SPACE FOR RECORDER'S USE ONLY*

**APN:** 4470-019-017

# GRANT DEED TO A REVOCABLE TRUST

The undersigned Grantor declares that this conveyance transfers Grantor's interest to
Grantor's revocable living trust for zero ("0") consideration
This conveyance transfers an interest into or out of a Living Trust, R & T §11930.
**Documentary Transfer Tax is $0.00**

Exempt from fee per Gov. Code §27388.1(a)(2); document transfers real property that is a residential dwelling to an owner-occupier.

☒    City of Malibu

☐    Unincorporated Area of _____

JIA CHEN, a married woman, as her sole and separate property, the GRANTOR,

HEREBY GRANTS TO

JIA CHEN, as Trustee of THE SHINEWOODS TRUST, DATED OCTOBER 8, 2021, U/A dated October 8, 2021, the GRANTEE,

All of THAT PROPERTY situated in the County of Los Angeles, State of California, more commonly known as 31663 Broad Beach Rd., Malibu, CA 90265; which property is bounded and described as set forth in Exhibit "A" (attached hereto and incorporated herein by reference).

SUBJECT TO the Restrictions, Conditions, Covenants, Rights, Rights of Way, and Easements now of record, if any.

The then-acting Trustee has the power and authority to encumber or otherwise to manage and dispose of the hereinabove described real property; including, but not limited to, the power to convey.

Executed on October 8, 2021, in Los Angeles County, California.

_____
**JIA CHEN**

Please send tax statement to the address as directed above

## EXHIBIT "A"

### LEGAL DESCRIPTION

The land referred to herein is situated in the State of California, County of Los Angeles, City of Malibu and described as follows:

Those portions of Lots 4, 5 and 7 of Tract No. 20858, in the City of Malibu, County of Los Angeles, State of California, as per map recorded in Book 578, Pages 9 and 10 of maps, in the Office of the County Recorder of said County; described as follows:

Beginning at the Northeast corner of said Lot 4; thence along the Easterly line of said Lot 4, South 10° 05' 30" West 82.00 feet to the Easterly prolongation of the Northerly line of Lot 5; thence along said prolongation and along said Northerly line North 62° 02' 55" West 76.00 feet to a line parallel with the Easterly line o said Lot 5 that passes through point in the Southerly line of said lot 5 distant North 79° 54' 30' West 76.00 feet from the Southeast, corner of said Lot 4; thence along said parallel line, South 10° 05'30" West 100.00 feet to the Southerly line of said lot 5; thence along said southerly line, North 79° 54' 30" West 10.00 feet to a point in said Southerly line distant South 79° 54' 30" East 69.00 feet from the Southwest corner of said Lot 5; thence parallel with the Easterly line of said lot 6, North 10° 05' 30" East 99.50 feet to the Northerly line of said Lot 5; thence Northwesterly, in a direct line South 70° 43' 56" West 39.00 feet from the most Northerly corner of said Lot 7; thence along said Northwesterly line, North 70° 43' 56" East 39.00 feet to said most Northerly corner; thence along the Northeasterly line of Lots 7 and 4, South 66° 28' 30" East 107.11 feet to the point of beginning.

Except therefrom all oil, gas, minerals and other hydrocarbon, below a depth of 500 feet, without the right of surface entry, as reserved in instrument of record.

APN: 4470-019-017

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF LOS ANGELES

*B.G. Williams*

On October 8, 2021, before me, ~~BERNICE WILLIAMS,~~ a Notary Public, personally appeared JIA CHEN, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public Signature

B. G. WILLIAMS
COMM. #2242424
Notary Public - California
Los Angeles County
My Comm. Expires May 30, 2022

Notary Public Seal

# EXHIBIT 3

 

**This page is part of your document - DO NOT DISCARD**



# 20190238747



**Pages:**
**0005**

**Recorded/Filed in Official Records**
**Recorder's Office, Los Angeles County,**
**California**

**03/18/19 AT 08:00AM**

| | |
|---|---|
| FEES: | 31.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 75.00 |
| PAID: | 106.00 |



**L E A D S H E E T**



201903180290018

00016375341



009695517

**SEQ:**
**02**

**SECURE - 8:00AM**



**THIS FORM IS NOT TO BE DUPLICATED**

E08_190318_6 55



E535543

RECORDING REQUESTED BY:

*Stewart Title*

AND WHEN RECORDED MAIL TO:

JIA CHEN
*5579 Angelus Ave*
*San Gabriel, CA. 91776*

THIS SPACE FOR RECORDER'S USE ONLY:

## GRANT DEED

AP#: 4460-035-010

THE UNDERSIGNED GRANTOR(S) DECLARE(S)

### DOCUMENTARY TRANSFER TAX is $ 0.00

[X] computed on full value of property conveyed, or
[ ] computed on full value less value of liens or encumbrances remaining at time of sale.
[ ] Unincorporated area   [ ] City of **AND**

"This is a bonafide gift and the grantor received nothing in return. R & T 11911"

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

**YAO LIN AND JIA CHEN, HUSBAND AND WIFE AS COMMUNITY PROPERTY WITH RIGHT OF SURVIVORSHIP**

hereby GRANT(s) to:

**JIA CHEN, A MARRIED WOMAN AS HER SOLE AND SEPARATE PROPERTY**

the real property in the County of LOS ANGELES, State of California, described as:

LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND MADE A PART HEREOF

**Also Known as:** 27487 LATIGO BAY VIEW DRIVE, MALIBU, CA 90265
"This conveyance establishes sole and separate property of a spouse, R & T 11911."

**ACCOMMODATION**
This Document delivered to Recorder
as an accommodation only at the
express request of the parties hereto,
It has not been examined as to
its effect or validity.

DATED: January 7, 2019

Signature Page attached hereto
and made a part hereof

MAIL TAX STATEMENTS TO PARTY SHOWN BELOW; IF NO PARTY SHOWN, MAIL AS SHOWN ABOVE:

AP#: 4460-035-010

## SIGNATURE PAGE

**Title of Document:** GRANT DEED

**Date of Document:** January 7, 2019

YAO LIN

JIA CHEN

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF ~~~~~~~~
On JAN 29 2019
before me, ~~Morgan Kuchne~~
A Notary Public personally appeared ~~Consular Associate~~

People's Republic of China)
Municipality of Beijing   ) SS:
Embassy of the United     )
States of America         )

Yao Lin

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

~~I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.~~

WITNESS my hand and official seal.

Signature _____

(Seal)

## LEGAL DESCRIPTION
## EXHIBIT "A"

The land referred to herein is situated in the State of California, County of Los Angeles, City of Malibu and described as follows:

Parcel 1:
Lot 10, of Tract No. 46851, in the City of Malibu, County of Los Angeles, State of California, as per map recorded in Book 1171 Pages 62 to 73, inclusive of Maps, in the Office of the County Recorder of said County.

Excepting therefrom all minerals, oil, petroleum, asphaltum, gas, coal and other thereof, but without surface right of entry, as reserved by Marblehead Land Company, in deed recorded March 4, 1947 as Instrument No. 1036 in Book 24232, Page 380, of Official Records.

Parcel 2:
An easement for road purposes and ingress and egress over those certain strips of land designated as "Private Driveway and Fire Lane" and "Private Streets", as designated and delineated on the map of said Tract No. 46851.

APN: 4460-035-010

# California All-Purpose Certificate of Acknowledgment

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

**State of California**

**County of Los Angeles**  } s.s

On __March 11, 2019__ before me, __Brenda Machuca V.__, NOTARY PUBLIC,

personally appeared _____ JIA CHEN _____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Signature of Notary Public

BRENDA MACHUCA V.
Notary Public - California
Los Angeles County
Commission # 2194619
My Comm. Expires Apr 29, 2021

Seal

--------OPTIONAL INFORMATION--------

Although the information in this section is not required by law, it could prevent fraudulent removal and reattachment of this acknowledgment to an unauthorized document and may prove useful to persons on the attached document.

Description of Attached Document

The preceding Certificate of Acknowledgment is attached to a

document titled/for the purpose of __Grant Deed.__

AP#: 4460-035-010

Containing __3__ pages, and dated __Jan. 7, 2019__

# EXHIBIT 4

 

**This page is part of your document - DO NOT DISCARD**



# 20211870687



**Pages:
0004**

**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**12/16/21 AT 01:09PM**

| | |
|---|---|
| FEES: | 28.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 75.00 |
| PAID: | 103.00 |



**L E A D S H E E T**



**202112162910028**

**00021636871**


**012959982**

**SEQ:
01**

**DAR - Mail (Intake)**



**THIS FORM IS NOT TO BE DUPLICATED**



E123753

PREPARED AND RECORDING REQUESTED BY:

SEDRIC E. COLLINS
*Attorney at Law*
Legacy One Law Firm
12400 Wilshire Blvd Suite 400
Los Angeles, California 90025
323 405-7017

WHEN RECORDED, MAIL TO
AND MAIL TAX STATEMENTS TO:

Jia Chen, as Trustee
31663 Broad Beach Rd.
Malibu, CA 90265



21636871

Batch Number: 12959982

*THIS SPACE FOR RECORDER'S USE ONLY*

**APN:** 4460-035-010

# GRANT DEED TO A REVOCABLE TRUST

The undersigned Grantor declares that this conveyance transfers Grantor's interest to
Grantor's revocable living trust for zero ("0") consideration
This conveyance transfers an interest into or out of a Living Trust, R & T §11930.

**Documentary Transfer Tax is $0.00**

☒    City of Malibu

☐    Unincorporated Area of _____

JIA CHEN, a married woman, as her sole and separate property, the GRANTOR,

HEREBY GRANTS TO

JIA CHEN, as Trustee of THE SHINEWOODS TRUST, DATED OCTOBER 8, 2021, U/A dated October 8, 2021, the GRANTEE,

All of THAT PROPERTY situated in the County of Los Angeles, State of California, more commonly known as 27487 Latigo Bay View Drive, Malibu, CA 90265; which property is bounded and described as set forth in Exhibit "A" (attached hereto and incorporated herein by reference).

SUBJECT TO the Restrictions, Conditions, Covenants, Rights, Rights of Way, and Easements now of record, if any.

The then-acting Trustee has the power and authority to encumber or otherwise to manage and dispose of the hereinabove described real property; including, but not limited to, the power to convey.

Executed on 11/17/2021 , 2021, in Los Angeles County, California.

_____
**JIA CHEN**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF LOS ANGELES

On _November 17_____, 2021, before me, _Nathan Schields_____, a Notary Public, personally appeared JIA CHEN, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public Signature

NATHAN SCHIELDS
Comm. #2312231
Notary Public · California
Ventura County
Comm. Expires Nov 10, 2023

Notary Public Seal

## LEGAL DESCRIPTION
## EXHIBIT "A"

The land referred to herein is situated in the State of California, County of Los Angeles, City of Malibu and described as follows:

Parcel 1:
Lot 10, of Tract No. 46851, in the City of Malibu, County of Los Angeles, State of California, as per map recorded in Book 1171 Pages 62 to 73, inclusive of Maps, in the Office of the County Recorder of said County.

Excepting therefrom all minerals, oil, petroleum, asphaltum, gas, coal and other thereof, but without surface right of entry, as reserved by Marblehead Land Company, in deed recorded March 4, 1947 as Instrument No. 1036 in Book 24232, Page 380, of Official Records.

Parcel 2:
An easement for road purposes and ingress and egress over those certain strips of land designated as "Private Driveway and Fire Lane" and "Private Streets", as designated and delineated on the map of said Tract No. 46851.

APN: 4460-035-010

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>BEIJING SOUFUN SCIENCE AND<br>TECHNOLOGY DEVELOPMENT CO., LTD. | DEFENDANTS<br>YAO LIN |
|---|---|

| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>O'MELVENY & MYERS LLP<br>400 South Hope Street, Los Angeles, California 90071<br>(213) 430-6000 | ATTORNEYS (If Known)<br>Jonathan J. Lo - LO & LO LLP<br>506 North Garfield Avenue, Suite 280, Alhambra, CA 91801<br>626-289-8838 |
|---|---|

| PARTY (Check One Box Only)<br>☐ Debtor    ☐ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor    ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☒ Debtor    ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor    ☐ Other<br>☐ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

TO DETERMINE DEBT TO BE NON-DISCHARGEABLE PER 11 USC §§ 523(a)(2)(A), (a)(6); OBJECTION TO DISCHARGE PER 11 USC § 727; FRAUDULENT CONVEYANCE, PURSUANT TO, INTER ALIA, CAL. CIV. CODE §§ 3439.04(a)(1), (2), 3439.05, AND AS SET FORTH IN COMPLAINT ATTACHED AS EXHIBIT A TO COMPLAINT FOR THIS ADVERSARY PROCEEDING; REQUEST FOR INTEREST, ATTORNEY'S FEES & OTHER COSTS.

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☒ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☒ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☒ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☒ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☒ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☒ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $    At least $21,165,155.97 |

Other Relief Sought

Interest, attorneys fees and other costs, and such other and further relief as the Court deems appropriate.

**B1040 (FORM 1040) (12/15)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES |||
|---|---|---|
| NAME OF DEBTOR    YAO LIN | BANKRUPTCY CASE NO.<br>1:23−bk−10733−MB ||
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>San Fernando | NAME OF JUDGE<br>Martin R. Barash |
| RELATED ADVERSARY PROCEEDING (IF ANY) |||
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>*/s/ Karen Rinehart* |||
| DATE<br><br>September 7, 2023 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>Karen Rinehart ||

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.